UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAIGE INTERNATIONAL, INC. | * | |
| *Plaintiff*, | * | |
| v. | * | Case No. 14-cv-01244 (JEB) |
| XL SPECIALTY INSURANCE CO., et al. | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION TO STRIKE DEFENDANTS' EXPERT REPORT OF
## DONALD HARRINGTON ON CLEANUP / TRASH REMOVAL CLAIM

Plaintiff Paige International, Inc. ("Paige"), through counsel, pursuant to Federal Rules of

Evidence 702 and 703, and the legal principles enunciated by the U.S. Supreme Court in *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny, moves the Court to

strike the expert report of Donald Harrington. The Report at issue was submitted by defendants

XL insurance companies to support offsets asserted by XL against the amounts claimed to be due

to Paige in this case under the XL payment bond. The specific offset addressed in this motion is

one of five asserted by Harrington, and involves a portion of the monies that XL paid in

settlement of the prime contractor's performance bond claim for cleanup (trash removal) costs.

A copy of the Harrington Report is set forth at BD-1.[1] For ease of reference, that part of

the Report dealing with cleanup costs, which is specifically addressed in this motion, is attached

hereto as Exhibit A.  A Declaration contesting any liability on the part of Paige for cleanup costs

is attached as Exhibit B. In support of this Motion Paige states and represents as follows:

---

[1] Since multiple motions in this case are anticipated, plaintiff has assembled in a single
submission the expert report at issue, the relevant contracts and bonds, and other key
documents, entitled "Basic Documents Applicable to all Motions," hereafter BD- __.
The documents specifically related to the cleanup costs issue are attached hereto.

**Background – the Relevant Contractual Relationships**

This matter arises out of the construction of the Marriott Marquis Hotel, which is located next to the District of Columbia Convention Center. By contract dated October 26, 2010 in the amount of $372,243,261, the Owner, HQ Hotel, LLC, contracted with Hensel Phelps Construction Company for the design and construction of the hotel. BD-2. Hensel Phelps in turn subcontracted with Truland Systems Corporation, by agreement dated February 11, 2011 in the amount of $39,452,710, for the design and construction of the electrical portion of the Project. BD-3. In addition to the 120-volt electrical system, there were four low-voltage systems which Truland was responsible for designing and installing: communications/security, fire alarm, internet, and wireless (cellular telephone). As required by Hensel Phelps, Truland obtained from the XL insurance companies both payment and performance bonds. (BD-4 and BD-5).

After the electrical design had been completed, Truland entered into a sub-subcontract with Paige International, Inc., by agreement dated May 23, 2013 in the amount of $1,854,830, for the supply and installation of the cable for the security and telecommunications systems.[2] BD-6.

**Introduction and Setting**

The role of the surety's expert in this matter involves a convoluted and highly unusual fact pattern involving the interplay between the rights and obligations of a surety under a payment bond and a performance bond. Considerable background is necessary to understand the nature of the expert report in question, and the unique issue the expert addressed.

This payment bond suit involves a claim by an unpaid communications cable sub-subcontractor (Paige) against the surety of the electrical subcontractor (XL), which arises out

---

[2] A later change order added supply and installation of the audio-visual system to Paige's sub-subcontract.

2

of the construction of the hotel. During the course of the Project the electrical subcontractor (Truland) became insolvent, was unable to purchase critically-needed equipment because its supplier credit had been cut off, and it stopped making timely payments to its lower-tier subcontractors. As a result of Truland's failure to meet its contractual obligations, the prime contractor (Hensel Phelps) terminated Truland for default, and Truland subsequently filed for liquidation in bankruptcy.

The electrical subcontractor's surety, XL, issued two interrelated bonds: a *payment* bond for the benefit of the electrical subcontractor's sub-subcontractors and suppliers, to guarantee that they would be paid for the labor and materials they supplied to the Project, and a *performance* bond, which guaranteed to the prime contractor that the electrical subcontractor would perform all of its contractual obligations to the prime.

Two bond claims relevant to this case were filed as the result of the default of the electrical subcontractor. First, the plaintiff in this case, one of the cable installer sub-subcontractors, (Paige), having not been paid by the insolvent electrical subcontractor (Truland), filed this lawsuit against XL to enforce the electrical subcontractor's *payment* bond. Second, the prime contractor, Hensel Phelps, filed a claim in arbitration against XL under the *performance* bond, seeking its costs to complete after Truland had been terminated for default and the surety refused to honor its bond.

Oddly, the Donald Harrington expert report which is the subject of this motion focuses exclusively on the performance bond, not the payment bond, or more accurately, a portion of the amount paid out by XL to settle Hensel Phelps' performance bond claim, for which XL asserts an offset against Paige's payment bond claim.

What happened was as follows: After the electrical subcontractor, Truland, was terminated for default, the prime contractor, Hensel Phelps, demanded that the surety, XL, honor

3

its obligation under the performance bond and complete the electrical portion of the Project at XL's expense. As a result of XL's refusal to honor its bond, Hensel Phelps was forced to hire, at its own expense, a substitute electrical subcontractor (Rosendin Electric), to complete the electrical portion of the Project. Hensel Phelps then filed a claim against XL under the performance bond ("the HP Claim"), seeking reimbursement of the costs it incurred in completing Truland's work, plus compensation for certain backcharges which had been asserted during the Project by Hensel Phelps against Truland. The initial HP Claim, filed on December 22, 2014, was in the amount of $8,837,189, and was subsequently amended to $9,771,109. *See* BD-7 for a summary of the HP Claim, and BD-8 for the subsequent amended amounts.

In its response to the HP Claim, XL raised certain defenses, and asserted an offset for the balance due to Truland from Hensel Phelps. (BD-9). Hensel Phelps then challenged XL's defenses (HP-10), in response to which XL formally denied Hensel Phelps' claim (BD-11)

After upon receiving XL's formal denial, Hensel Phelps filed a demand for arbitration (BD-12); XL filed a counterclaim (BD-13); and Hensel Phelps filed an answer to the counterclaim (BD-14). Even before an arbitrator could be appointed a settlement of the HP Claim was reached, under which XL paid a portion of the HP Claim, and allowed Hensel Phelps to keep the monies it had withheld from Truland to offset a portion of the remaining balance. See Settlement Agreement, BD-15.

Under normal circumstances, a surety which pays out money to a bond claimant is entitled to reimbursement from the bond principal. In this matter, however, the bond principal, Truland, filed for liquidation in bankruptcy, and thus XL could not obtain indemnity from Truland. In addition to the Truland company, the individual owners, Robert and Mary Truland, were also contractual indemnitors. In a separate case in the U.S. District Court in Alexandria, Virginia, XL obtained judgment against Robert and Mary Truland for contractual indemnity

under numerous XL bonds in the amount of $16,790,728. *XL Specialty Insurance Co. v. Robert W. Truland*, 2015 WL 2195181 (E.D. Va. 2015). Presumably if XL is required by this Court to make payment to Paige under the payment bond it will be able to obtain an increase in its judgment against the individual contractual indemnitors, Robert and Mary Truland.

Now, with all that background in mind, we *finally* get to the task unprecedented task assigned by XL to their expert in this matter, Donald Harrington.

In order to avoid paying Paige's payment bond claim, XL has come up with a theory for which there is no precedent in the entire history of construction suretyship: that XL is entitled to an offset against Paige's *payment* bond claim for that portion of the monies paid out to by XL in settlement of Hensel Phelps' *performance* bond claim – with no allegation of any fault by Paige -- to the extent such payment was simply "related to" that part of Truland's scope of work which Truland had subcontracted to Paige.[3]

### Further Background: History of the Project

The most fundamental problem with the Project arose as a result of Marriott's Alice-in-Wonderland fantasy that the target completion date on a major construction project, set three years earlier, means the actual date everything will be done. Marriott contracted to host a large convention on the first day after scheduled substantial completion (and before scheduled final completion). All parties involved acknowledge that Hensel Phelps' construction schedule[4] was

---

[3] It is unclear exactly what legal theory XL bases its right of offset. Whether there is a legal or equitable obligation on the part of a sub-subcontractor to a performance bond surety – particular a surety that has defaulted on both its payment bond and performance bond obligations – will be the subject for a separate motion.

[4] For example, the following statement made by a Hensel Phelps representative in a Marriott Manager Schedule Meeting on October 17, 2012 (DB-16):

> *Hensel Phelps agrees that most schedules were projected with aggressive dates to perform the work as best as possible in a "perfect case scenario" to overcome most of the issues the project faced.*

very tight, but doable provided that nothing went wrong. As luck would have it, something went seriously wrong: mid-Project a major storm damaged the work in place, resulting in Project delay which caused the acceleration of all trades, working extended hours seven days a week in the final months before hotel opening, in order to meet the inflexible completion date.

The Project[5] involved seven below-ground levels – five for meeting rooms and ballrooms, and two for parking, an expansive lobby, two towers for the 1,175 guest rooms, and a canopy joining the two towers. There were a total of 59 subcontractors, coordinated by Hensel Phelps. The various trades followed each other from the ground up. After the infrastructure trades had built the foundation and structural concrete frame, and installed exterior walls, windows, and the electrical and mechanical systems, the drywall and finish trades followed along. In order to gain ground on a very tight schedule, finish work was commenced in the lower levels before the roof was installed.

As is related in a claim document filed by Hensel Phelps with the Project's Builders' Risk insurance carrier, BD-17, on June 7, 2013, the Washington area was hit by Tropical Storm Andrea, with record-breaking rain from June 7 through June 10. The Project's temporary weather protection was breached, causing damage to the interior work ("the Water Intrusion Event"). In order to determine the extent of the damage to the communications cable portion of the Project that had been installed to date, it was necessary for Paige to interrupt its forward progress, and to go back to test each of the cables it had already installed, and to replace the cables that had been damaged.

Paige submitted its costs caused by the Water Intrusion Event to Truland, in the amount of $196,483.13. See attachment to BD-17. Truland incorporated Paige's costs into its own claim

---

[5] The details concerning how the Project was built are set forth in Hensel Phelps builders' risk insurance claim for the June water damage event, BD-17, at p. 4-5..

6

which Truland submitted to Hensel Phelps, which Hensel Phelps submitted, along with other subcontractor costs, to the Project's Builders' Risk insurance carrier. BD-17 at p. 14. In addition to the testing and repair costs incurred by Paige and other direct damages incurred by Truland, Truland sought $400,000 in schedule impact and subcontractor acceleration costs.[6] Hensel Phelps in turn submitted a claim to the Builders' Risk insurance carrier in the total "Rough Order of Magnitude" amount of $6,443,412, including schedule impact and acceleration of $3,380,000.

In order to avoid late completion of the Project, starting in January 2014, to meet the looming hotel opening on May 1, 2014, the prime contractor, Hensel Phelps, directed all of its subcontractors, including Truland, to work extended hours and over weekends, with Hensel Phelps to absorb the overtime costs. Truland in turn directed its own subcontractors, including Paige, to work extended hours and on weekends to accelerate their work.

The Project acceleration that resulted from the Water Intrusion Event in turn caused stacking of the trades, which impacted the efficiency of all subcontractors, including Truland. The majority of subcontractors were granted additional compensation for their extra costs, in the form of Hensel Phelps' change orders. HP granted Truland a Change Order in the amount of $1,125,000 to settle Truland's acceleration and design-related claims through December 31, 2013 (BD-18).

In addition to the Water Intrusion Event, there were six other matters that impacted the performance of the electrical portion of the Project, as follows:

First, Truland's design for the steel supports for the ballroom chandeliers was defective, requiring the entire steel frames to be torn out and replaced, thereby interfering with the ability of

---

[6] "Acceleration" is a term of art in the construction industry, which means requiring a contractor to perform the same amount of work in less time than allowed in the schedule. Acceleration commonly results in "stacking of trades" -- more than one trade sharing elevators or hoists to transport the materials they are installing to their work areas, and sharing a work space at the same time, rather than in the sequence provided for in the schedule.

other trades to perform their work in the ballrooms. See BD-10 at p. 4. Hensel Phelps undertook the corrective work and backcharged its costs to Truland. There were two sets of backcharges: $1,124,638 for the costs of the re-design, fabrication and installation of the new steel frames (BD-19) and $377,557 for the impact on other subcontractors (BD-20)

Second, there were two accidents shortly after the hotel opened which revealed that the devices which connected the glass chandelier lenses to the steel frame, which had been installed by Truland, were defective. BD-10. There were roughly 10,000 of such lenses – located high in the air above the ballrooms. After the first incident all of the devices holding the lenses were replaced, and after the second accident, each one was taken down again so the method of connection could be modified. Hensel Phelps delegated the task of replacing and then modifying the chandelier lens connections to the substitute electrical subcontractor, Rosendin, which did not segregate the costs for that work from its other work.  See BD-20, page 1. In addition, Hensel Phelps included in its performance bond claim against XL $47,932 for its staff costs for re-testing the new connections. BD-22.

Third, Truland's fire alarm subcontractor, Honeywell, walked off the job due to nonpayment, which resulting in the hotel not having a functioning fire alarm system on the date the hotel was scheduled to open. Hensel Phelps' performance bond claim against XL included multiple costs related to completion of the fire alarm system (BD-23; BD-10 at p. 7-8), including:

- $600,000 to settle a $1,000,000 claim by Honeywell against Truland in order to get Honeywell to return to the Project
- $243,100 for the supplemental fire alarm work provided by the substitute electrical subcontractor, Rosendin.
- $161,130 in settlement of an impact claim of Otis Elevator
- $191,840 in settlement of an impact claim of the mechanical subcontractor
- $173,038 for other costs

Further, the District of Columbia agreed to issue a temporary Certificate of Occupancy based on the condition that the hotel maintain a 24-hour fire watch until the fire alarm system

was operable. The fire watch commenced on May 1, 2014, and continued until the fire alarm system was finally completed on November 12, 2014.  See BD-10 at p. 6. The fire watch was assigned to the replacement electrical subcontractor, Rosendin, which kept track of the hours it spent on fire watch on its daily extra work tickets, but did not segregate its fire-watch related invoices from other work. Rosendin's fire watch was supplemented by another contractor, Cavalier, for which $205,654 was included in Hensel Phelps' performance bond claim against XL. See BD-24.

Fifth, after the hotel opened there were two fires for which defective ballasts for a certain type of lights (NF-3s) were identified as the cause. There were 1300 NF-3 lights. The replacement electrical subcontractor, Rosendin, assigned a crew to replace the defective ballasts, which worked on that assignment from September 4 to October 16, 2014 (See BD-25).

The sixth, and by far the most significant event, which Harrington totally ignored, occurred in February 2014, just as the critical push to complete the Project by April 30 commenced: Truland ran out of money. At the very same time Truland was demanding that its subcontractors work extended hours and over weekends, it also was unable to pay them. Truland was also unable to purchase materials that were critical to completion of the Project because nearly all of the company's suppliers had cut off their credit. See documents collected at BD-26.

In its capacity as Truland's surety, XL took control of Truland's finances, and directed Truland's use of its payments from Hensel Phelps. For the February 2014 payment, XL directed Truland to pay each of its subcontractors and suppliers only 70% of the amount due them. DB-27. Truland did as XL directed, while assuring its subcontractors that the deficiency would be made up the following month. The following month, however (March 2014), XL approved paying each subcontractor only 50% of what it was due. See BD-28.

As a result of Truland's nonpayment, Truland's lighting contractor, Valley Lighting, Inc.,
filed a Notice of Payment Bond claim dated March 18, 2014, in the amount of $2,456,341.85
(DB-29); Truland's major electrical supplier, Landmark Electrical Supply, filed a Notice of
Payment Bond Claim in the amount of $2,093,272.11 (BD-30); another electrical supplier,
Maurice Electric, advised Hensel Phelps by email dated March 26, 2014, that it had not been paid
(BD-31); and the plaintiff in this matter, Paige International, filed a Notice of Payment Bond
claim dated April 18, 2014, in the amount of $1,092,952.91 (BD-32).

Truland's failure to make payment to its subcontractors constituted a material default
under its subcontract with Hensel Phelps, which triggered XL's obligations to Truland under both
the payment bond and performance bond. As of March 2014, Hensel Phelps was holding roughly
$4.5 million from Truland, including retainage in the amount of $2,499,196. Under well-
established principles of suretyship, a surety which advances money to its insolvent principal is
subrogated, as a matter of law, to its principal's right to receive contract payments. If XL had
advanced that sum at that time, Truland's default termination could have been avoided, and
virtually all of XL's losses could have been avoided.

The most significant ramification of XL's failure to provide assistance to Truland,
resulting in Truland's default termination, was that it rendered Truland unable to pursue a roughly
$4,000,000 claim against Hensel Phelps for Truland's acceleration costs incurred in January-
April 2014, which Truland was in the process of preparing in May 2014. Even if Truland's claim
had not resulted in affirmative recovery, at the very least it could have been used to offset the
extremely weak – indeed non-supportable – backcharges which HP "assessed" against Truland
for cleanup costs and drywall repairs, which totaled $2,369,848 ($968,734, for cleanup costs,
discussed below, $1,401,114 for drywall repairs, addressed in a separate motion). As is explained
in greater detailed below, the typical HP subcontractor closeout involved a settlement wherein the

10

sub agreed to permit 10-15% of Truland's backcharges for cleanup costs and drywall repairs to be applied as an offset against the subs' acceleration claims against Hensel Phelps.

Further, with the exception of the backcharges assessed by Hensel Phelps against Truland during the course of the Project, all of the costs included in Hensel Phelps's performance bond claim against XL would have been avoided if XL had not let Truland go into default. For example, the fire alarm subcontractor, Honeywell, would not have walked off the job, and the $1,574,572 included in the HP Claim for costs related to the failure to have the file alarm ready on time would have been totally avoided. Further, a substantial portion of the time spent by the replacement electrical subcontractor, Rosendin, was for retracing Truland's steps to test what had been done – a task that required in many instances cutting out drywall to gain access.[7] Moreover, due to the timing of Truland's default, the re-work at issue had to be performed in an unpredictable and inefficient sequence, since while the replacement electrical subcontractor was in the process of completing Truland's work, the hotel was operating and guests in the rooms.

Notwithstanding that XL had pledged, in its performance bond, to assure Truland's completion of its contract, and had further pledged, in its payment bond, to assure payment to Truland's subcontractors and suppliers, at the critical time that Truland needed XL's support, XL refused to honor either bond. A substantial portion of the monies XL was required to pay to Hensel Phelps in settlement of Hensel Phelps' performance bond claim, a part of which XL is now asserting an offset as an equitable remedy against Paige's payment bond claim in this case, was a direct result XL's refusal to honor its surety bond obligations in a timely manner.

---

[7] See, e.g., BD-10 at p. 6, which notes that all of the electrical cables in the hotel had to be retested, requiring a full time dedicated crew from June 2014 to January 2015.

### History of Paige's Work

Paige International's primary function was to use conduits placed by Truland to run communications and security ("cat6") cables. As is explained in detail at pages 5-9 of the Report of Paige's construction claims expert, James Ault (BD-33), the majority of Paige's cables ran from a jack located where a room was going to be built to the nearest electrical closet, where it would be terminated to an Intermediate Distribution Frame ("IDF"). Paige's main problem on the job arose because of a delay on Truland's part in building the closets. Despite the fact that there were no closets and hence no IDFs, Truland demanded that Paige run the cables anyway, and to leave the ends hanging from the ceiling until the closets were built.

The result of Truland's failure to build the electrical closets in a timely manner was twofold. First, as Ault explains, Paige's efficiency was shot. Normal practice is to terminate and test each cable after it is pulled, to make sure it is working properly before moving on to the next one. With no IDFs, the cables could not be tested on a timely basis. Further, rather than completing a floor and then moving on to the next, it was necessary for Paige's workers to carry their tools and equipment back to an area when the closet was ready. More significantly, while the cables were hanging from the ceiling there were numerous instances where the cables were damaged and had to be replaced.

By document dated January 15, 2014, Paige submitted a claim against Truland in the amount of $370,575, and a second claim dated March 31, 2014, in the amount of $614,925, for the extra costs which resulted primarily from Truland's failure to have predecessor work ready in a timely manner.

Further, when Truland stopped making payments to Paige, by both letters and emails Paige advised Truland that its ability to perform was being hampered by nonpayment. See attachments 1 and 2 to Exhibit B hereto (Charles Paige Declaration).  For example, on March 6,

2014, Paige advised Truland:

> As of Monday, 10 March 2014, Paige International will no longer have the ability
> to staff the Marriott Marquis Project due to non-payment. Paige International has
> not been paid for the December draw and the January draw is approaching.

After receiving a partial payment, Paige continued on the job. The partial payments,

however, impacted Paige's ability to buy needed parts. By letter dated April 23, 2014, Paige

advised Truland:

> One of the major issues that has limited us on our progress is the fact that we have
> been and still are not able to make payments for parts received and parts need to
> be ordered for the project due to non-funding. Many of the parts we are unable to
> order require a long lead time, some at a 4-week time frame and we have not been
> able to proceed with those orders for approximately 8 weeks.

### Summary of the Harrington Report

After XL settled with Hensel Phelps on its performance bond claim, XL hired a

construction claims consultant, Donald Harrington, whose assigned task was to "segregate that

portion of costs [incurred by Hensel Phelps] related to the low voltage work performed by Paige

and its subcontractors including SPL and others." BD-1, at p. 14. The only evidence concerning

the basis for the XL-Hensel Phelps settlement was a 2,418-page claim document, with several

hundred pages of supplemental support, which Hensel Phelps had submitted to XL.

Since the claim was settled before XL presented its (technically, Truland's) defenses, the

only documentary evidence available to determine the basis for the settlement was the Hensel

Phelps claim document. The so-called "methodology" utilized by Mr. Harrington involved

reviewing the claim document in question, making the assumption that each of the separate items

in the claim was valid in the full amount asserted, and then adding up the costs listed in Hensel

Phelps' claim document that "related to" the "low voltage" portion of the electrical work.

Rather than expressing an opinion based on his experience whether the various claims

asserted by Hensel Phelps against Truland were or were not valid, Mr. Harrington simply

13

assumed that Truland was responsible for the entire amount claimed, and that Paige International, in turn, was responsible for any costs that in his judgment appeared to be "related to" low voltage work. Mr. Harrington did not address whether Truland may have had offsetting claims against Hensel Phelps, did not address whether Truland had any defenses to any part of Hensel Phelps' claim, nor did he address whether Paige would have had any defenses if Truland had asserted similar claims against Paige. Harrington also made no effort to segregate out costs of re-work of the other low-voltage subcontractors, XL apparently having failed to inform Harrington that there were other low voltage subcontractors in addition to Paige.

The Harrington Report asserts that Paige was liable to XL in the total amount of $4,446,463, for Paige's alleged share of five categories of costs incurred by Hensel Phelps and reimbursed in part by the XL/HP settlement: Truland's share of drywall and painting repairs; Hensel Phelps' backcharge to Truland's for direct repair costs; the completion costs of the substitute electrical subcontractor; Truland's share of Hensel Phelps' cleanup costs (trash removal); and Paige's alleged share of Truland's share of Hensel Phelps' management costs.

In view of the massive size of the documentary evidence involving each of those separate claims and the fact that each of the five claims is based on a different theory of Truland's liability (and hence Paige's alleged liability), the plaintiff's "Daubert" challenges to each of the claims are being addressed in separate motions. This motion concerns only cleanup (trash removal) costs, for which XL asserts entitlement to an offset against Paige's payment bond claim of $460,861.

### The Hensel Phelps' Cleanup / Trash Removal Backcharge

The portion of the Donald Harrington expert report which is specifically addressed in this motion concerns his "allocation" to the "low voltage" subcontractors of a share of Truland's share of costs for cleanup and trash removal which Hensel Phelps incurred during the course of final months of the Project. Mr. Harrington's entire analysis consists of just over one page, a copy

14

of which, for ease of reference, is attached hereto as Exhibit A.

By way of background, Article 12 of the standard from subcontract form used by Hensel Phelps (BD-2) requires its subcontractors to "keep the premises clean at all times" and to remove its rubbish, etc. "within twenty four (24) hours after receipt by the Contractor of written notice to do so." Further, that clause provides that, "if the Subcontractor refuses or fails, in the manner and time aforesaid, to promptly perform such cleaning and/or repairs as directed by the Contractor [Hensel Phelps], the Contractor shall have the right to proceed with such cleaning and/or repair" at the subcontractor's expense, in the amount of "the Contractor's actual cost plus markup" to cover "supervision, insurance, tax and overhead." On the basis of the foregoing, Hensel Phelps' right to backcharge a subcontractor for cleanup and trash removal performed by HP was limited to those circumstances where HP had provided advance written notice, with which the subcontractor failed to comply. Notwithstanding that there were no such notices to Truland in the Project record, as the Project drew to a close, Hensel Phelps issued "backcharges" to its all of its subcontractors, including Truland, for their "allocated" portion of HP's cleanup costs.

There were two separate clean-up crews maintained by HP: Trusted Solutions Group, Inc. ("TSG") and National Services Contractors, Inc. ("NSC"). HP used two different methodologies for calculating its subcontractor backcharges for cleanup costs. TSG's costs were assessed based on each subcontractor's *pro rata* portion of Project labor, while NSC's charges were based on each subcontractor's *pro rata* share of punch list items. Both methods are random and arbitrary.

<u>The Hensel Phelps Backcharge for TSG Cleanup Costs</u>

For the entire project, Hensel Phelps incurred total costs of TSG's cleanup crews of $2,606,928, to which HP added markup of $739,152 for HP's supervision of TSG, for a total claim of $3,337,080. Hensel Phelps assessed that amount to its various subcontractors in the form of backcharges, including 20% ($667,416) to Truland. The methodology used by Hensel Phelps

15

to calculate backcharges to its subcontractors, including Truland, for TSG's cleanup costs is attached as Exhibit C hereto.

In calculating TSG cleanup cost allocation to its subcontractors, Hensel Phelps determined that the total amount of all payroll for the Project was 2,069,834 hours. Then the number of hours that had been included in previous Hensel Phelps backcharges was deducted, leaving a balance of 1,910,459 hours.  For Truland, Hensel Phelps determined that Truland's total payroll was 277,868 hours, which included 255,897 hours for Truland itself, 12,000 hours for Paige, and 12,971 for other Truland subcontractors. Hensel Phelps then divided the Truland hours by total hours (14.54%), rounded up Truland's allocation to 15%, then added an additional 5% for "severity of clean-up efforts required," for a total backcharge from Hensel Phelps to Truland of 20% of TSG's costs (20% of $3,337,080 = $667,416).

If the same methodology applied by Hensel Phelps to determine Truland's share of all cleanup costs were used to determine Paige's share of Truland's share, disregarding the obvious differences in the amount of trash generated, Paige's percentage of Truland's share would be 4.3% (277,868 Truland hours ÷12,000 Paige hours).

### The Hensel Phelps Backcharge for NSC Cleanup Costs

NSC billed Hensel Phelps $817,995 for cleanup. Of that amount, $41,478 was alleged by Hensel Phelps to have been required by cleanup costs "associated with the cable fix rework after Truland defaulted on the project," 100% of which was allocated by HP to Truland. The balance of NSC's charges ($779,600) was allocated among HP's subcontractors on the basis of their *pro rata* share of punch list items.

The method of allocation and the supporting documents for Truland's backcharge against Hensel Phelps for NSC's invoices are attached as Exhibit D. There were 21,426 total entries in the HP above-ground punch list. Of that amount, 7,082 entries involved work to be performed by

16

Truland, of which 70 items were identified as being that of Paige. See Exhibit B hereto. On the basis that 33% of the punch list entries were for Truland work, Hensel Phelps backcharged Truland for 33% of NSC's additional cleanup costs (33.33 % x $779,600 = $259,841). [Total assessment - $41,478 + 259,841 = $301,319].

If the same methodology applied by Hensel Phelps to Truland's share of NSC cleanup costs were to be applied to Paige's share of Truland's share, again disregarding the obvious differences in the amount of trash generated, Paige's percentage would be .00988 (7,082 Truland punch list items ÷ 70 Paige punch list items).

### The Harrington Report "Cleanup Cost" Allocation to "Low Voltage" Work

In his expert report (DB-1) at pages 14-15, Donald Harrington relates that the Hensel Phelps claim document asserts that its total cost of cleanup was $3,337,080, of which 20% ($667,416) was allocated by Hensel Phelps to Truland. Of that amount, the Harrington Report purports to identify $460,861 of such costs as "applicable to the low voltage contract work" for which it asserts an XL offset against Paige's payment bond claim. That number includes 100% of that which had been asserted by Hensel Phelps as "directly related to low voltage work" of $41,479, plus an additional $419,382, calculated as 45.2% of the remaining costs. As noted above, if the same methodology used by Hensel Phelps had been used by Harrington, Paige's share of TSG costs would have been 4.3%, and less than 1% of NSC's. Nonetheless, Harrington contends in his Report that since *in his judgment* [8] $3,260,188 of the total completion costs incurred by HP of $7,208,275 "related to low voltage work," the same percentage – 45.2% – should be used to determine the "low voltage" share of Truland's share of HP's cleanup costs.

---

[8] Due to the already too lengthy nature of the instant motion, the fallacious contention that 45.2 % of the completion work involved low voltage will be addressed in a subsequent motion.

### Summary of the Applicable Law

Pursuant to Rule 702 of the Federal Rules of Evidence and the guidance of the United States Supreme Court in *Daubert v. Merell Dow Pharm., Inc.,* 509 U.S. 579, 589-90 (1993) and related cases, trial courts are required to act as "gatekeepers" who may admit expert testimony only if it is both relevant and reliable.

Under Rule 702, expert testimony is reliable if (1) it is "based upon sufficient facts or data;" (2) it is "the product of reliable principles and methods," and (3) the witness has applied the principles and methods reliably to the facts of the case. *Harris v. Koenig,* 815 F.Supp2d 6, 8 (D.D.C. 2011). The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumbo Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). In all cases, "[t]he trial judge ... must find that [the proffered testimony] is properly grounded, well-reasoned and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note (2000 amends).

Expert testimony that rests solely on "subjective belief or supported speculation" is not reliable. *Daubert, supra.* Analytical gaps can make an expert's opinions unreliable and inadmissible. A court may refuse to admit expert testimony if it concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Groobert v. President and Dirs. of Georgetown Coll.,* 219 F.Supp2d 1, 6 (D.D.C. 2002) (quoting *Gen. Elec. Elec. Co. v. Joiner,* 522 U.S. 136 (1997).

In order to allow a court to assess the reliability of the methodology of a proposed expert witness, it is necessary for the expert to demonstrate that he does in fact *have* a methodology. Simply reviewing a few documents and reaching a series of conclusions do not constitute a methodology. *Chesapeake Climate Action Network v. Export-Import Bank of the United States,* 78 F.Supp3d 208, 219 (D.D.C. 2015).

It is true that pursuant to Fed. R. Evid. 203 that the facts or data upon which an expert bases his or her opinion do not have to be admissible in evidence. There are, however, limits to the data that can properly be used by an expert. In order to be admitted, the facts or data relied upon by an expert must be of a type reasonably relied on by experts in the particular field in forming opinions or inference upon the subject. *See, e.g., Fiorentino v. Rio Mar Assocs.,* 381 F.Supp2d 43 (D. Puerto Rico 2005). With respect to the data which may be properly relied upon by an expert witness, it is fundamental that expert testimony be predicated on facts legally sufficient to provide a basis for the expert's opinion, thus, an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation. *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1474 (1st Cir. 1996). Expert testimony should be excluded where an expert fails to apply his experience and a reliable methodology. For example, where a witness simply proposes to transmit hearsay to the jury, rather than applying his experience and a reliable methodology, the testimony should be excluded. *U.S. v. Mejia,* 545 F.3d 179, 197 (2nd Cir. 2008).

In evaluating the admissibility of expert testimony, the proper focus of the court should be on the methodology or reasoning employed. *Rothe Development, Inc. v. Department of Defense,* 107 F.Supp3d 183, 197 (D.D.C. 2015), citing *Ambrosini v. LaBarraque,* 101 F.3d, 133 (D.C. Cir. 1996).

## ARGUMENT

### I.   INTRODUCTION

As a threshold matter, it should be noted that the actual loss suffered by XL on the Marriott Project is the amount of the settlement paid by XL to Hensel Phelps: $3,550,000. See Settlement Agreement, BD-15. In his report (BD-1), however, Donald Harrington erroneously asserts that XL's loss is the total amount of the Hensel Phelps' amended claim of $8,177,009. As

19

part of the settlement, however, a credit back of $4,286,308 was extended by Hensel Phelps to XL, to account for monies withheld from by Hensel Phelps from Truland upon Truland's default, and an additional roughly $350,000 of its claim was waived by Hensel Phelps. Indeed, Harrington asserts in his Report that Paige is responsible to XL for $4,446,463 – more than XL's actual loss.

Nowhere does Harrington attempt to apply his expertise to figuring out how to allocate the actual amount paid out by XL ($3,550,000) to the claim submitted by Hensel Phelps (which Harrington asserts was $8,177,009). Further, Harrington makes no effort to determine what portion of the amounts he claims as damages suffered by XL have already been reimbursed to XL by the contractual indemnitees, Robert and Mary Truland, against whom XL has obtained a judgment in the amount of $16,790,728.

Lastly, Harrington makes no effort to address Truland's available defenses and whether, even if Truland were likely be found liable to Hensel Phelps for a particular claim, whether there were any defenses available to Paige International against Truland. Harrington failed to ask the most fundamental questions that a competent expert would ask.  The entire Harrington Report should therefore be rejected as constituting nothing more than speculation.

## II.    THE HARRINGTON REPORT SHOULD BE REJECTED FOR ITS RELIANCE ON AN INSUFFICIENT EVIDENTIARY FOUNDATION

As a secondary threshold issue (which applies to the entire Report, not just the cleanup costs), Paige International respectfully asserts that there is too great an analytical gap between the construction backcharges relied upon by Donald Harrington, which constitute mere *allegations* rather than evidence, and a finding of liability on the part of Paige.

20

One might wonder, is it true that a general contractor can simply "allocate" costs to its subcontractors without taking any sort of legal action?[9] Is it a proper way for a general contractor to allocate, say, total project cleanup costs to all subcontractors, regardless of how diligent any particular subcontractor was for taking out its trash? If so, is it reasonable to base such an allocation on a formula that has no relationship to the amount of trash a subcontractor probably generated, such as, say, percentage of payroll costs? What about as a percentage of punch list entries? The answer, according to the Contractors Golden Rule, is "yes" in each case. The reason why a prime contractor can simply issue "allocations" to its subcontractors is that they have the power of the purse to do so. All that a prime needs to do in order to "win" a claim against a sub is to send the sub a letter attaching a deductive change order. No such niceties as filing a lawsuit or the presentation of evidence is required. Indeed, once a prime contractor's backcharge has been issued, it is the *subcontractor* which has to take legal action against the very party it depends on for future payments in order to challenge the backcharge.

Hensel Phelps appears to have been successful in using backcharges against its subs as a negotiating tool in the settlement of subcontractor close-outs. Each finish-trade subcontractor had a claim against Hensel Phelps for acceleration. For each such subcontractor, Hensel Phelps would issue, at the end of the job, an omnibus change order, which would place a value on the subcontractor's claims against Hensel Phelps, apply a negotiated portion of Hensel Phelps' backcharges as offsets against the subcontractor's claims, and then award the subcontractor a change order for the net difference. Neither of them were required, of course, to offer evidentiary proof of their respective claims.

---

[9] Subcontractors have the same power with respect to sub-subcontractors. Indeed, Truland's standard form subcontract (BD-3) at paragraph 16, states that all backcharges "shall be deemed accepted unless rejected in writing in fifteen (15) days."

In May 2014, Truland was planning on submitting a delay and inefficiency claim against Hensel Phelps in the amount of $4,100,000, of which it anticipated giving back $800,000 in settlement of Hensel Phelps's backcharges against Truland. See BD-35. Truland lost its ability to file its claim as a result of its default termination.

Typical examples of how Hensel Phelps used its cleanup backcharges as a negotiating tool are set forth at BD-34.  In the close-out of Beaubois, the millwork subcontractor, Hensel Phelps accepted a settlement of $20,000 for its cleanup backcharge of $139,200. P & D Contractors negotiated a close-out settlement in which Hensel Phelps accepted $75,000 for its cleanup backcharge of $295,576. By far the worst negotiator was Otis Elevator, which accepted $65,000 of Hensel Phelps' $99,622 cleanup backcharge. With one exception, however, the sub obtained in return a portion of its claims against Hensel Phelps, resulting in a net payment to the sub.

The point of the foregoing is that in the construction industry, a backcharge constitutes nothing more than an *allegation.*

Surely if it had been necessary for Hensel Phelps to appear in court in order to enforce a backcharge for cleanup against one of its subcontractors, a mere allegation of liability would be insufficient. In order to establish at least an arguable claim for a backcharge for cleanup, *evidence* would first be necessary that the recipient of the backcharge had received the contractually-mandated notice from Hensel Phelps asserting that a subcontractor's cleanup efforts were inadequate. Then additional *evidence* would have to be proffered that after receipt of such notice, that the subcontractor in question had failed to comply, as well as the number of manhours it took to perform such cleanup. But here, there is no evidence at all whose trash was carried out by Hensel Phelps' cleaning crews, nor were there notices to Truland as required by its contract with Hensel Phelps.

A careful analysis of Donald Harrington's Report demonstrates that it constitutes nothing more than his repeating Hensel Phelps' allegations against Truland (and hence XL as Truland's surety). Harrington's Report in support of XL's $4,446,463 claim against Paige International starts on page 14, and asserts, in the penultimate and final (carry-over) paragraphs (pages 14-15):

> *Hensel Phelps submitted a claim to Truland's surety detailing the costs incurred to both complete Truland's contractual obligations and correct previously installed work including low voltage work performed by Paige and its subcontractors including SPL and others.*
> *The additional costs claimed by Hensel Phelps were reviewed to segregate that portion of the costs related to the low voltage work performed by Paige and its subcontractors.*

Then throughout Harrington's Report, he repeatedly describes the contents of Hensel Phelps' claim document, and then adds up the damages asserted by Hensel Phelps:

Claim # 1 (page 15): The additional costs incurred by Hensel Phelps "based on Sections 1.1 to 1.6" of Hensel Phelps' claim

Claim # 2 (page 17): Direct costs of rework "based on sections 2.4, 4.2, 4.4, 11.2 and 11.7 of the Hensel Phelps claim"

Claim # 3 (page 18): Rosendin Low Voltage Work: "The additional costs claimed by Hensel Phelps…"

Claim # 4 (page 19) Cleanup Costs: "The additional costs claimed by Hensel Phelps …".

Claim # 5 (page 20) "Hensel Phelps includes [in its claim]…".

Harrington's entire analysis is improperly based on his acceptance of Hensel Phelps' allegations as true and factual, with no knowledge concerning what defenses Truland would offer, nor without taking into account claims that Truland would have filed against Hensel Phelps if it had not filed for bankruptcy liquidation. It is apparent that the entire Harrington report is based on an insufficient evidentiary foundation, and is hence unreliable (and thus inadmissible).

### III.   THE ENTIRE HARRINGTON REPORT SHOULD BE REJECTED FOR LACK OF A RELIABLE METHODOLOGY

At no point in his entire Report does Donald Harrington express any *judgment* based on his experience and in reliance on a methodology. Indeed, the entire Report comes down to Harrington's communicating "this is what Hensel Phelps alleged as the basis for its claim of damages." For example, Harrington's Exhibits 2 and 3 merely restate the invoices of the replacement electrical subcontractor, Rosendin Electric, with no inquiry whatsoever concerning the reasons why the costs of the re-work at issue should be allocated to "low voltage." Exhibit 4, "Low Voltage Damage and Corrective Summary," is entirely a restatement, in chart form, of the Hensel Phelps claim document.

Simply assuming that an allegation is true without any inquiry concerning *why* the costs were incurred constitutes inadmissible speculation and conjecture, not a viable methodology. For that reason as well, the Harrington Report should be excluded as unreliable.

### IV.   THE ENTIRE REPORT SHOULD BE REJECTED FOR A FUNDAMENTAL FLAW IN HARRINGTON'S ASSUMPTIONS

In the introductory page of the Harrington's Report with respect to XL's claim of offset against Paige International's payment bond claim, page 14, last sentence of third paragraph, Donald Harrington states "Paige is responsible for the additional cost incurred to correct its work which is essentially the low voltage work not including the fire alarm system." Then throughout the balance of the Report, Harrington refers to "the low voltage work" as if it were synonymous with the scope of work of Paige International. See, e.g., page 15 ("costs relative to the low voltage work"); page 16 (costs "allocated to the low voltage work"); page 17 ("corrective costs related to the low voltage work"); page 18 (damages "calculated as the amount related to the low

24

voltage work'); page 19 (costs "applicable to the low voltage contract work."); and page 20 (costs "applicable to low voltage work.")

It is apparent that XL failed to inform Donald Harrington that the communications cable installed by Paige International was only one of at least four low-voltage systems, the other three being the fire alarm, internet and wireless communications systems. See Paige affidavit, Ex. B

Attached as Exhibit BD-36 are documents related to the installation of the wireless communications support system ("Distributed Antenna System – DAS"), which was subcontracted by Truland to a joint venture of Morcom International, Inc. and HS Solutions, LLC. Morcom/HS installed roughly the same amount of low-voltage cable in the Marriott as did Paige, in mostly the same pathways. Similarly, the Clearsky System also involved installation of similar cable. See BD-37.

Given that Hensel Phelps's claim was directed at Truland and only Truland, Hensel Phelps had no reason to attempt to distinguish in its claim between completion work involving Truland itself, and that of Truland's subcontractors. That being the case, there is no factual basis upon which to allocate Truland's share of responsibility for cleanup down the chain of privity to any particular Truland subcontractor, and such an attempt could only be based on sheer speculation. On that additional basis Harrington's entire Report should be excluded as unreliable.

## V.   HARRINGTON'S OPINION CONCERNING PAIGE LIABILITY FOR CLEANUP IS FLAWED IN FOUR FURTHER RESPECTS

In Donald Harrington's Report concerning the scope of liability on the part of Paige International for a share of Truland's share of Hensel Phelps' cleanup costs, there are four major additional flaws that both individually and collectively cause the Report to be unreliable.

The first flaw has already been noted: the failure of Harrington to follow the same methodology, in his determination of Paige International's alleged share of Truland's cleanup that

Hensel Phelps used to determine Truland's share. With respect to the amounts paid by Hensel Phelps to TSG, Hensel Phelps calculated each subcontractor's *pro rata* share based on that subcontractor's payroll as a percentage of total project payroll. Had that same methodology been applied to Paige's share of Truland's share, Paige would have been assessed only 4.3% of the amount assessed by Hensel Phelps against Truland (277,868 hours ÷12,000 hours), rather than the 45.2% asserted by Harrington.  Similarly, with respect to the amounts paid by Hensel Phelps to NSC for cleanup, Hensel Phelps based its allocation among subcontractors on the percentage of each subcontractor's entries on Hensel Phelps' punch list to the total number of entries. Using that methodology, Paige's share of Truland's share would have been less than 1% (7,082 Truland entries ÷ 70 Paige entries), rather than the 45.2% asserted by Harrington.

Harrington's assertion that Paige is responsible for 45.2% of Truland's share of Hensel Phelps' cleanup costs for both TSG and NSC is based on his contention that since *in his judgment* 45.2% of Hensel Phelps' electrical completion costs involved low voltage work that the same percentage should apply to cleanup costs. Even assuming that a different methodology than that used by Hensel Phelps would be somehow warranted, the basis for the allocation asserted by Donald Harrington makes no logical sense. TSG's invoices were for cleanup costs incurred from February 10 to May 11, 2014 – *before* Truland's termination for default and *before* Hensel Phelps hired a substitute electrical subcontractor. The majority of NSC's invoices were also for cleanup before Truland was terminated. There is simply no correlation between the amount cleanup required or trash generated during the Project by all trades, and the costs of hiring a replacement electrical subcontractor after Truland was terminated for default. Harrington's "assessment" to Paige of 45.2% of HP's assessment to Truland is entirely arbitrary, and must be rejected as unreliable.

The second major flaw in Harrington's contention that Paige is liable for 45.2% of Truland's share of Hensel Phelps' cleanup costs is his failure to recognize the critical difference between an infrastructure trade and a finish trade, both in terms of timing and volume of trash.

With respect to the *timing* issue, as an infrastructure trade, Paige's installation of cables preceded the framing and drywall of the hotel rooms. Indeed, as is explained in the attached Declaration of Charles Paige (Exhibit B), nearly all of the cable installed by Paige had been pulled before the dates of the majority of the cleanup invoices for which Hensel Phelps sought reimbursement from its subcontractors. Thus it makes no sense to allocate to Paige 45.2% of cleanup / trash removal that occurred after it had completed most of its work.

Further, there was a vast difference in the *volume* of trash generated by Paige compared with that of Truland. Paige's trash consisted of a relatively small number of boxes of cable and boxes for the distribution frames, and boxes for audio-visual equipment installed by its AV subcontractor. As explained by Charles Paige, on any given day, the typical amount of trash that was generated by Paige was perhaps a few boxes.

In contrast, in addition to its duties as an *infrastructure* trade, installing the electrical backbone for the hotel, Truland was also a *finish* trade, responsible for supplying and installing the electrical fixtures in the hotel rooms after the walls of the rooms had been built. As further explained by Charles Paige (Exhibit B), a review of the Truland punchlist reveals that for each of the 1,175 rooms, Truland was responsible for installing a telephone, a television, a data port, a smoke detector, multiple wall-mounted light switches, a light fixture over the entranceway, an overhead room light, lamps on the sides of the beds, a light over the coffee niche, an overhead light in the bathroom, a light over the shower, and a light in the bathroom vanity mirror. Presumably each of the foregoing fixtures came in a separate box. At a conservative estimate of 12 boxes per room and 1,175 rooms, Truland would have generated 14,100 boxes of trash,

compared with at most perhaps 200 boxes by Paige and its subcontractors. To even suggest that Paige was responsible for 45.2% of Truland's trash removal is well beyond merely unreliable, and is in fact utterly absurd.

The third flaw in Harrington's Report concerning cleanup costs is his failure to take note of the fact that Truland had an absolute defense to Hensel Phelps' allocation of trash removal costs. Article 12 of the Subcontract Agreement between Hensel Phelps and Truland required Hensel Phelps, as a condition of a backcharge for trash removal costs, to issue a notice to Truland. No such notice was ever given, so Hensel Phelps' claim against Truland (a portion of which it is now asserting against Paige) would have been barred as a matter of law.

Fourth, if in fact Paige International had breached its contractual duties to Truland to remove Paige's trash, there would be at least *some* evidence in the Project record supporting such a contention. In the Attachment A of his Report, Donald Harrington sets forth a list of six single-spaced pages – virtually the entire Project record -- identifying the documents he reviewed as part of his analysis. He is unable, however, to cite to a single reference to a request by Truland directing Paige to remove trash from Paige's work area. There is no evidence in the entire Project record that anyone hired by Hensel Phelps removed so much as a single box or scrap of wire generated by Paige. All that Harrington offers is unsupported allegations, which are speculative and hence unreliable.

## VI.    CONCLUSION

Rule 702 and the Supreme Court's guidance in *Daubert* require District Courts to reject expert testimony that is unreliable. The Report of Donald Harrington with respect to his attempt to "assess" to Paige International 45.2% of the Truland's allocated share of cleanup costs incurred by Hensel Phelps and reimbursed by means of a settlement of Hensel Phelps' performance bond

claim lacks a proper evidentiary foundation, lacks a reliable methodology, and is based entirely on speculation and conjecture.

The entire Report should be rejected for the reasons stated in sections I-IV above, and to the extent not already excluded, that portion of the Report which concerns cleanup costs should be excluded.

Respectfully submitted,

PAIGE INTERNATIONAL, INC.

Philip C. Jones, DC Bar # 196097
JONES & COHEN, LLC
1125 West Street, Suite 200
Annapolis, Maryland 21401
(301) 921-3360
pjones@jonescohenlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this ___1___ day of ___March___, 2016, in addition to service through the Court's ECF system, a copy of the foregoing document and supporting exhibits will be served by mail on counsel for defendants, addressed as follows:

Patrick J. Madigan, Esq.
Pike & Gilliss, LLC
9475 Deereco Road, Suite 300
Timonium, Maryland 21093

Philip C. Jones

# Exhibit A

**(Excerpt from Harrington Report Concerning Alleged Paige Liability For 45.2% of Hensel Phelps' Cleanup Costs)**

summary of the calculation of the $2,539,148 of cost incurred by Rosendin to correct low voltage work performed by Paige or its subcontractors.

4) **Cleanup Costs.** The additional costs claimed by Hensel Phelps included job site cleanup services of $968,734. According to Hensel Phelps cleanup was the responsibility of the individual contractors, however, cleanup services were contracted separately throughout the project. Per its "Explanation of Change" included in Section 6.1 of its July 10, 2015 updated claim for additional costs, Hensel Phelps noted that subcontractors including Truland "did not provide manpower for clean up or allow time for their craft to clean up at the end of each day. Most of the work areas were left in a constant state of disorganization and would need to be organized and swept up to provide a safe work environment for all employees."

Cleanup costs are applicable to the low voltage contract work. Hensel Phelps "Explanation of Change" for Section 6.2 of its updated claim noted "there were direct cleanup costs associated with the cable fix rework" in guest rooms and that a cleaning service contractor "provided final cleaning services multiple times in the same space due to subcontractors going back into finished spaces to perform outstanding punchlist work."

Of the $968,734 of cleanup costs included in Hensel Phelps costs, $41,479 was identified as directly related to low voltage work. For the remaining $927,255 of cleanup costs, the ratio of the total of the low voltage work ($3,260,188) was compared to the total costs incurred ($7,208,275) by Hensel Phelps exclusive of cleanup and Hensel Phelps management costs to arrive at a ratio of 45.2 percent. This 45.2 percent ratio was then applied to the $927,255 of remaining cleanup costs which yields $419,382 of cleanup costs related to low voltage work. The resulting

total of $460,861 ($41,479 + $419,382) for cleanup costs is applicable to the low voltage work.

5) **Hensel Phelps Management Costs.** Hensel Phelps includes a total of $1,594,101 for additional management costs which was incurred on behalf of Truland. This amount includes superintendents, managers, supervisors, engineers, schedulers, and secretaries. To determine the amount applicable to low voltage work, the total of the low voltage work including cleanup ($3,721,050) was compared to the total costs claimed by Hensel Phelps ($8,177,009) for the same categories to arrive at a ratio of 45.5 percent. This 45.5 percent ratio was then applied to the $1,594,101 of management costs, resulting in an amount of $725,415 allocated to the low voltage work.

As summarized above, a total of $4,446,463 of the additional costs claimed and summarized by Hensel Phelps is applicable to low voltage work that was the contractual responsibility of Paige and/or its subcontractors including SPL. The detail and analysis supporting this $4,446,463 amount is shown in Exhibit 4.

By

**Donald Harrington**

20

# Exhibit B

**(Declaration of Charles Paige, President, Paige International, Inc. With Attachments 1-6)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAIGE INTERNATIONAL, INC.          *

     *Plaintiff*,                              *

v.                                                     *       Case No. 14-cv-01244 (JEB)

XL SPECIALTY INSURANCE CO., et al.  *

     *Defendants*.                           *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DECLARATION OF CHARLES PAIGE CONCERNING
### DEFENDANTS' CLAIM OF OFFSET FOR CLEANUP / TRASH REMOVAL

Charles Paige, in his capacity as President of the plaintiff in this action, Paige

International, Inc., after being duly sworn on oath, states as follows:

    1.     Paige International, Inc. ("Paige") was a second-tier subcontractor to Truland

Systems Corporation ("Truland"), which was a first tier subcontractor to the prime contractor,

Hensel Phelps Construction Company ("Hensel Phelps") for the construction of the Marriott

Marquis Convention Center Hotel ("the Project"). Truland was bonded by the XL insurance

companies ("XL"), which issued both a payment bond and a performance bond for which

Truland was the Principal.

    2.     During the course of the Project Truland became insolvent. During my effort to get

my company paid, several Truland representatives admitted to me that the company did not have

enough money to pay its bills. Further, Truland was unable to purchase critical equipment

because its credit had been cut off, and was unable to make full and timely payments to its

subcontractors, including Paige.

    3.     Paige's ability to perform its subcontract obligations to Truland was seriously

impeded by Truland's failure to make payments to Paige. Appended to this affidavit as

Attachment 1 are copies of letters and as Attachment 2 are emails, send by both myself and my project manager to Truland, placing Truland on notice that Paige was being impacted by nonpayment of its invoices.

4.   In its payment bond, XL pledged to make payments to those persons who supplied labor and material to the Project under contract with Truland and were not paid. As a result of nonpayment by Truland, Paige filed this civil action against XL to enforce XL's payment bond.

5.   In its defense, XL has asserted a right of setoff against the monies due to Paige for a portion of the monies paid by XL to Hensel Phelps in settlement of claims asserted by Hensel Phelps's against XL under its performance bond.

6.   In support of its right of setoff, XL engaged the professional services of a construction claims consultant, Donald Harrington, who has submitted a report ("the Harrington Report") expressing an opinion that XL is entitled to a setoff against Paige's payment bond claim in the amount of $4,446,463, based on his analysis of the performance bond claim submitted by Hensel Phelps to XL.

7.   The Harrington Report contains five separate claims against Paige. This affidavit addresses that portion of the Harrington Report which contends that Paige is liable to XL in the amount of $460,861, for Paige's share of $968,734 purportedly paid by XL to Hensel Phelps in satisfaction of that portion of the Hensel Phelps' performance bond claim seeking reimbursement of Truland's share (20% of $3,337,080) of Hensel Phelps' costs of cleanup on the Project.

8.   There are multiple flaws in Donald Harrington's analysis. In fact, the amount of expense incurred by Hensel Phelps to clean up after Paige was zero.

9.   First, Paige had a strict policy that required its workers to properly dispose of its trash on a daily basis. Our cable installers generated two main types of trash: boxes for the cables, etc., and wire clippings. Each box contained 1,000 feet of cable. We installed roughly 132,000 feet of cat6 cable, and 22,000 feet of fiber, which calculates out to about 152 boxes. The

empty boxes were carried to dumpsters on a daily basis. Our work also generated wire clippings, which were collected, stored, and later sold to a scrap dealer to generate funds for special events for the workers. In the hundreds of email exchanges which occurred between Truland and Paige during the course of the Project there was not so much as a single complaint made by Truland that Paige was failing to keep its work area clean.

10.     Second, Donald Harrington's Report fails to understand the difference between the infrastructure trades and finish trades with respect to the *timing* of their work, and wholly disregards the dates of the cleaners' invoices. The heavy cleanup costs for the Project coincided with the big push from January through April, 2014, when the finish trades were under tremendous pressure to complete their work in time for the hotel opening. The dates of nearly all of TSG's charges were during this period, as follows:

| | |
|---|---|
| 01/11/2014 | $62,083 |
| 01/18/2014 | 77,369 |
| 01/25/2014 | 67,059 |
| 02/01/2014 | 63,127 |
| 02/08/2014 | 76,686 |
| 02/15/2014 | 72,471 |
| 02/23/2014 | 94,490 |
| 03/02/2014 | 90,160 |
| 03/09/2014 | 71,741 |
| 03/16/2014 | 100,900 |
| 03/23/2014 | 104,168 |
| 03/30/2014 | 128,274 |
| 04/06/2014 | 115,593 |
| 04/13/2014 | 80,000 |
| 04/20/2014 | 85,812 |
| 04/27/2014 | 111,464 |
| 05/04/2014 | 59,328 |
| 05/11/2014 | 35,832 |

11.     Similarly, NSC's cleanup invoices were primarily for the final pre-opening cleaning of the entire hotel in the weeks before opening day (March and April 2014). On the dates in question Paige's cables had already been pulled. With the exception of our audio-visual subcontractor's programming of the system, which involved no trash or cleanup, Paige was gone from the Project on most of the relevant dates.

12.     By January 2014, with the exception of replacement cable where the originally-installed cable had been damaged by other subcontractors, all of Paige's cable had been pulled. From January through March 2014, our crews were primarily engaged in terminating cables to distribution frames in electrical closets. Not only does that work generate no trash, the sensitivity of the cables is such that the electrical closets in which terminations are made requires the closets to be completely free of any dust or debris.

13.     Third, Donald Harrington also fails to understand the difference in the *volume* of trash generated by finish trades compared with infrastructure trades. Truland was both. After installing the electrical backbone for the hotel (infrastructure work), Truland was responsible for installing the electrical fixtures in the hotel rooms (finish trade work). A review of Truland's punch list reveals that Truland was responsible for installing the following in each of the hotel's 1,175 rooms: a telephone, a television, a data port, a smoke detector, multiple wall-mounted light switches, a light fixture over the entranceway, an overhead room light, lamps on the sides of the beds, a light over the coffee niche, an overhead light in the bathroom, a light over the shower, and a light in the bathroom vanity mirror. Presumably each of the foregoing fixtures came in a separate box. At a conservative estimate of 12 boxes per room and 1,175 rooms, Truland would have generated 14,100 boxes of trash just for the room fixtures, compared with no trash at all generated by Paige.

14.     Fourth, Donald Harrington's entire report is based on a misperception that Paige was the only low voltage subcontractor on the Project. The Harrington Report makes repeated references to the "low voltage" portion of the Project as if Paige's scope of work and "low voltage" were synonymous. In fact, the cables for the communications / security systems installed by Paige were only one of four low voltage systems which Truland was responsible for installing.

15.     Appended to this affidavit as Attachment 3 is the quotation for the wireless infrastructure for the hotel, which supported cellular telephone communications and the wireless control of the in-room thermostats, knows as the "Distributed Antenna System" ("DAS"). The cables installed by Morcom and Paige overlapped, as is revealed in an email concerning the work of Paige and Morcom in Attachment 4.

16.     Appended to this affidavit as Attachment 5 is a summary of the design for the cables for the Clearsky Network Platform, which was added to Truland's scope of work by Hensel Phelps Change Order No. 7 (Attachment 6). The "Cat6" supporting Clearsky was the same type of cable installed by Paige (both low voltage).

17.     Fifth, given the fact that Hensel Phelps based its allocation of Truland's share of NSC's cleanup costs on the basis of the percentage of Truland entries to total entries on Hensel Phelps' punch list, I reviewed that punch list to determine how many entries there were for Paige. Of the 7,082 entries on Truland's list, 70 were for Paige, which equals less than 1%, not the utterly ridiculous 45.2% assessed by Harrington against Paige.

18.     Sixth, if Donald Harrington is in fact an expert on practices in the construction industry, he should know better than to base his opinion on backcharges, as if a backcharge constituted proof of fault on the part of the lower-tier contractor against which it is asserted. A backcharge is nothing more than an allegation. Just as, say, a subcontractor's claim for delay against a general contractor doesn't constitute by itself proof of liability, a general contractor's

backcharge is not by itself proof. In either case, <u>evidence</u> is required in order to sustain a claim. In this matter, Harrington treats Hensel Phelps' claim against Truland's surety as that is all Hensel Phelps needed to show in order to prevail. Harrington overlooks that if Truland had not gone into liquidation in bankruptcy, Truland would have been able to offset Hensel Phelps' claim with its own claim against Hensel Phelps, as well as asserting its defenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 29, 2016

Charles Paige, President
Paige International, Inc.

# Attachment 1

## (Paige Letters- Notices of Nonpayment by Truland)



# PI π   PAIGE INTERNATIONAL, INC.
*AN INFORMATION  TECHNOLOGIES COMPANY*

March 6, 2014

Truland Systems Corporation
1900 Oracle Way
Suite 700
Reston, VA  20190

To whom it may concern:

As of Monday, 10 March 2014, Paige International will no longer have the ability to staff the Marriott Marquis Project due to Truland System Corporation's non-payment.  Paige International has not been paid for the December draw and the January draw is approaching.  As a result, PI finds that we are unable to make payroll and continue to pay our suppliers.  Please, understand, Paige International and A&E has no intention of abandoning or defaulting this project; this is simply a temporary measure required while Truland Systems finds a way to meet its financial obligations, enabling Paige International and A&E to meet our financial obligations with our employees and vendors.  We are willing to work with Truland in any reasonable way possible to insure a mutually beneficial outcome for both our companies and our customer.  Yesterday, I had a conversation with Steve LeToile.  We had a very fruitful conversation whereby both our companies can compromise and find a way that both can temporarily get by; immediately pay the December bill, which will allow me to make current payroll and partial vendor payments while allowing Truland time to get the January payment together.  Perhaps others will find this approach appealing.  Please, feel free to contact me at any time to discuss how we may move forward.  Below is and accounting for the December and January totals.

December:   $208,637.02
January:    $656,832.87
Total:      $865,469.89

Charles Paige

President
cpaige@paigeinternational.com



# *PI* π  PAIGE INTERNATIONAL, INC.

*AN INFORMATION TECHNOLOGIES COMPANY*

March 21, 2014

Truland Systems Corporation
1900 Oracle Way
Suite 700
Reston, VA  20190

To whom it may concern:

As of Monday, 24 March 2014, Paige International will no longer have the ability to staff the Marriott Marquis Project due to Truland System Corporation's non-payment.  Paige International has not been paid for one third of the  December draw and the January draw has not been paid.  I have tried on a number of occasions to reach Al Bracasus, CFO;  he will not take my calls nor will he return any of my calls in order to discuss the payments.  Al did instruct Nancy King, Treasurer, to call me.  When asked when payment will be made, she replied that she did not know because she does not have that information but may have an answer for me sometime next week.  She stated that she does not know if I will be paid, when I will be paid or how much I will be paid; it is up to a group of individuals to make that determination and will not give me their names so I can ask them directly.  This is certainly not the kind of information I can relay to my suppliers or for planning.  As a result, PI finds that we are able to make payroll and continue to pay our suppliers.  Please, understand, Paige International and A&E has no intention of abandoning or defaulting this project; this is simply a temporary measure required while Truland Systems finds a way to meet its financial obligations, enabling Paige International and A&E to meet our financial obligations with our employees and vendors.  We are willing to work with Truland in any reasonable way possible to insure a mutually beneficial outcome for both our companies and our customer.  PI worked with Truland to arrive at an acceptable plan for December but did not expect to receive this type of behavior right afterwards for the January invoice.  this certainly does not build a lot of confidence.  Paige International is aware that Truland has been paid for the January draw and there should be no question about if, when or how payment will be made. Truland has the funds allocated for PI and that money should be paid to PI forthwith.

Please, feel free to contact me at any time to discuss how we may move forward.  Below is and accounting for the December and January totals.

| | |
|---|---|
| December: | $  69,545.67 |
| January: | $656,832.87 |
| Total Due: | $726,378.45 |

Charles Paige

sident
.aige@paigeinternational.com

*3166 TENNYSON ST, N. W - WASHINGTON, D.C. 20015 - (202) 244-6406 - WWW.PAIGEINTERNATIONAL.COM*



**PAIGE INTERNATIONAL, INC.**
*AN INFORMATION TECHNOLOGIES COMPANY*

April 23, 2014

To All,

We have reached the point where it will be next to impossible to complete the AV system at the Marriott in time for the 4/28 deadline (We have just recently been told by Mike Park that the deadline is 4/28 not 5/1). At this time we still do not have all the fiber terminated and tested in several of the A/V rooms due to the late time frame of turnover of all the IDF closets and limited access for us to be able to complete our tasks.

Complete functionality is not possible in the Ballrooms on M-2 level and several of the meeting rooms due to this. Fiber is not yet completed termination and testing in Level 1-126 and no functionality is possible out of L2-193 without fiber, L1-126 was just recently granted access to us with their needing other trades working in there as well which has been limiting our ability to complete our tasks; Truland having to install power for the AV racks, Direct TV to install their services and JJK to complete their systems. L2-193, once we could work in this IDF, we still could not terminate and test fiber due to the extreme amount of dust from the grinding of the floor grout outside the IDF. These are just a few examples of things that will not work without this backbone and its incomplete status.

There are several other areas that are listed on the "rack room issues" document that include damaged cables among other issues we have been trying to address with limited access to the spaces affected, and again not having been able to complete IDF areas in a time frame prior to system commissioning and now having areas closed off to us has put us behind schedule.

One of the major issues that has limited us on our progress is the fact that we have been and still are not able to make payments for parts received and parts needed to be ordered for the project due to non-funding. Many of the parts we are unable to order require a long lead time, some at a 4 week time frame and we have not been able to proceed with these orders for approximately 8 weeks.

There is a great amount of time needed to program, test and commission all of these systems and we are out of time. It has been stated on several occasions that we will need 2 weeks to complete our work AFTER this backbone work is completed.
I know you have other urgent work to complete, but there needs to be more focus on the AV systems.
I'm not sure where we go from here, Paige and AVI/SPL has been doing everything in their power to help get all of these systems up and running by the finish date, but our hands are tied. We will continue to try and get as much of the equipment up and running as we can, but we have limited time. Keep in mind that we are trying to express the urgency of the work that needs to be completed. We are team players and want to have a successful project completion.

Thank you,

James W. Ault
Paige International, Inc.
443-742-1086

*3166 TENNYSON ST. N. W - WASHINGTON, D.C. 200015 - (202) 244-6406 - WWW.PAIGEINTERNATIONAL.COM*

**XL 12339**

# Attachment 2

## (Emails Concerning Nonpayment to Paige International)

**Phil Jones**

| | |
|---|---|
| From: | Charles Paige <cpaige@paigeinternational.com> |
| Sent: | Wednesday, March 05, 2014 7:32 AM |
| To: | Park, Michael |
| Subject: | RE: I am not taking calls |

Thanks  please forward his tel number
cp

**From:** Park, Michael [mailto:mpark@truland.com]
**Sent:** Wednesday, March 05, 2014 7:27 AM
**To:** Charles Paige
**Subject:** RE: I am not taking calls

You are not the only one not being paid.

Call Steve Le'Toile and discuss with him.

Sent from my Verizon Wireless 4G LTE Smartphone

-------- Original message --------
From: Charles Paige
Date:03/05/2014 7:25 AM (GMT-05:00)
To: "Park, Michael"
Subject: RE: I am not taking calls

Mike,
I am looking for some advice or direction, on or off the record.  Nancy told me that Truland had no money and is waiting
for some to come in.  She didn't know when  or how much or from where.  I have a number of questions.  Is HP paying
Truland?  Is Quadrangle paying HP?  Am I the only one in this boat and how are they dealing with this?  Maybe I should
go to HP and/or quadrangle and ask them where the money is?  It is hard to look these guys in the eyes and know that
you are not going to be paying them and that is a very real possibility very soon and I can't do that.  Like I said, I am
looking for some guidance, and I do value your opinions.

CHARLES PAIGE
PAIGE INTERNATIONAL
3166 TENNYSON ST, NW
WASHINGTON,DC  20015
O:  202.244.6406
C:  202.421.5200

**From:** Park, Michael [mailto:mpark@truland.com]
**Sent:** Tuesday, March 04, 2014 3:44 PM
**To:** Charles Paige
**Subject:** I am not taking calls


Phil Jones

| | |
|---|---|
| From: | Charles Paige <cpaige@paigeinternational.com> |
| Sent: | Sunday, March 30, 2014 9:31 AM |
| To: | 'Park, Michael' |
| Cc: | 'Foster, Ian'; 'Nunez, Agustin'; 'Bean, John H'; 'External-Dan van Goidtsnoven'; 'Thornsbury, Jeff' |
| Subject: | RE: Hubbell equipment for Marriott |

Mike, what part of "out of money don't you understand?"  The only reason I am not on credit hold is because I pay my bills and a big chuck is due the end of this month and I have no idea how the next is going to be paid, since the cash flow has ended.  The house of cards is falling down.  If you are so concerned about getting the materials delivered, ride your company all day, every day, to get money to me.  Why should I put myself in further jeopardy while you and Truland are simply taking care of yourselves and the hell with others.  As the old saying goes, "if you are in a hole, stop digging."  Like a fool, I just put (5) 40" and (1) 48" monitors on my credit card to keep the delivery going because they have a long lead time.  You think I will have money to cover this when the bill comes due?  Hell, why should you guys care, just as long as you get what you want.  Don't even think of threatening me again with LD's or anything else.  Don't you think I consulted an attorney on all of this and what my options are?  I am still staffing this project, with overtime, as a show of good faith, not knowing how I am going to continue paying these people, and that bothers me because I am messing with someone else's family and well being, and doing all I can to meet deadlines with no apparent help on your part, monetarily wise.  Get some cash flow and we all can keep moving.  Truland has put me in a deep enough hole already and I can no longer keep digging with you.  I am here to see this project completed and will do all I can do to make it happen; you, also, have a responsibility to help in this regard.  Refusing to talk to me about this or anything else related to this problem doesn't help either.  You were sent some PO's for approval; you need to meet on Wednesday with Dan and myself to get these approved or there is no money for any additional months past February or to finish this job, period.  Do not cut off lines of communication.

CHARLES PAIGE
PAIGE INTERNATIONAL
3166 TENNYSON ST, NW
WASHINGTON,DC  20015
O:  202.244.6406
C:  202.421.5200

From: Park, Michael [mailto:mpark@truland.com]
Sent: Friday, March 28, 2014 2:20 PM
To: Charles Paige
Cc: Foster, Ian; Nunez, Agustin; Bean, John H
Subject: FW: Hubbell equipment for Marriott

You need to ship that material. The LD's are staggering if you don't. Thing is you should have already had the material here.

Please deliver it so we can get this job done.

Michael L. Park
*Truland Systems Corporation*

1

**rom:**          Craun, Tamra <tcraun@truland.com>
**ent:**          Monday, April 07, 2014 8:40 AM
**To:**           Park, Michael; Charles Paige (cpaige@paigeinternational.com)
**Cc:**           Harnal, Majoni
**Subject:**      FW: Feb. invoice
**Attachments:**  SOV - 011 FEB 2014.xlsx; PO TS 026121 Change Order- Paige Int'l.pdf

**Importance:**   High

**Follow Up Flag:**   Follow up
**Flag Status:**      Flagged

**Categories:**   Red Category


Good Morning Gentlemen,

AP can't process Paige International App 11 due to funding.  The total PO value is 4,106,691.69.  The remaining PO balance is
380,724.12 in which 38,072.43 is for retention.  The invoice is billing  396,120.03 over the PO.  Attached is change order 5 dated  3/27/14 in which the new subcontract amount of 4,106,691.68 and matches our PO total.

Please review and advise.

Thank you and have a nice day.

Tamra Craun
AP Supervisor
The Truland Group, Inc.
1900 Oracle Way, Suite 700
Reston, Va. 20190
D-703-636-0483  Fax 703-796-1718
tcraun@Truland.com

**From:** Charles Paige [mailto:cpaige@paigeinternational.com]
**Sent:** Friday, March 28, 2014 12:36 PM
**To:** Craun, Tamra
**Cc:** Park, Michael
**Subject:** Feb. invoice

Please, find attached the Feb invoice.  if you have any questions, please contact me.

CHARLES PAIGE
PAIGE INTERNATIONAL
3166 TENNYSON ST, NW
WASHINGTON,DC  20015
O:  202.244.6406
C:  202.421.5200



Ian Foster

Project Executive
Phone # (240) 638-1211
Cell # (703) 928-6294
http://www.truland.com/

BEYOND CONNECTED.



---

**From:** Charles Paige [mailto:cpaige@paigeinternational.com]
**Sent:** Wednesday, June 11, 2014 10:05 AM
**To:** Park, Michael
**Cc:** 'Mark Brungart'; Foster, Ian; Park, Michael; rknopf@quad1.com; JMcDonald@henselphelps.com; JHudson@henselphelps.com; CMihalick@henselphelps.com; DEvans@henselphelps.com; MZoubek@henselphelps.com; MOliveri@henselphelps.com; 'Will Parry'; pswitzer@gocsc.com; 'James W. Ault'; Thornsbury, Jeff; External-Dan van Goidtsnoven; L'Etoile, Steve; 'Jackie Turner'; 'Huber, Jodi (CSC)'; 'Nancy Watts'
**Subject:** OUTSTANDING PAYMENTS AND ACTIONS

Michael,

I have asked for information concerning your accounting of back charges and a meeting to deal with the outstanding monthly invoices, along with the change orders and have gotten no responses from you, just stonewalling. This appears to also be the case with how you are addressing request from the DC DSLBE office. It is clear your actions and purposes are to put me out of business and you are doing everything in your power to not pay PI for anything. This not only affects PI, and me personally, but also a number of suppliers and sub contractors with men who need to put bread on their table. Rest assured, I will not go out quietly. Because of your actions, or should I say inactions, I am forced to take actions I was trying my best over the last few months to avoid. As a result, I am forced to move forward with my attorney and to pursue any and all legal actions at my disposal against Truland, Hansel Phelps, Marriott, and the bonds, along with some individuals personally for both civil and criminal charges, along with liens. I will be contacting the DC Attorney General with regards to the fact that HP has paid Truland for PI labor and material and Truland paid that money elsewhere. At a minimum, HP was made aware of this fact and they continued to pay you may, also, leave them exposed. Because of your behavior, all these individuals and entities must now become involved in something I am sure they had no desire to get into. I am going to meet with my City Counsel Woman to let her know how this project has progressed and how the city contractors and employees have been Impacted as a result. Not good PR. You surely opened up a can of worms.

CHARLES PAIGE
PAIGE INTERNATIONAL
3166 TENNYSON ST, NW
WASHINGTON,DC  20015
O:  202.244.6406
C:  202.421.5200

# Attachment 3

## (Quotation of Morcom, Another Low-Voltage Cable Installer – DAS Wireless Communications System)[1]

---

[1] See BD-35 for further documents describing the DAS system.

# *MORCOM QUOTATION* ®



INTERNATIONAL INC.

| Sent to: | Truland Systems Corporation |
|---|---|
| Attention: | Michael Park |
| Our Ref. Number | MI-169PI-12-B |
| Your Ref. Number: | Marriott Marquis DAS Cable Complete |

P.O. Box 220824
Chantilly, VA 20153-0824
Phone: (703) 263-9305
Fax: (703) 263-9308

| Date: | # of Pages: |
|---|---|
| 22-Jun-12 | 1 |

In response to your above inquiry we are pleased to quote you the following items:

| ITEM# | QTY. | DESCRIPTION | UNIT PRICE U.S. $ | TOTAL PRICE U.S. $ |
|---|---|---|---|---|
| 1 | 1 | Coax cable as quoted in Quotation MI-157PI-12 | 671,794.71 | 671,794.71 |
| 2 | 1 | DAS Racks and Cable Mgt Equipment in IDF's | 87,651.88 | 87,651.88 |
| 3 | 1 | Cable Trays in IDF's and Head End | 84,042.18 | 84,042.18 |
| 4 | 1 | Fiber Infrastructure and all equipment | 636,105.40 | 636,105.40 |
| | | Administrative Costs 4% | | 59,183.77 |
| | | **Note: Award would be made to a CBE Joint Venture** | | |

| | | |
|---|---|---|
| Inland & Packing Charges | | |
| Sub Total F.O.B. Price............. | | **$1,538,777.94** |
| Estimated Airfreight Cost to...... | | |
| Total Cost C&F | | **$1,538,777.94** |

This quote is subject to the following terms and conditions:
1. Delivery Time:      TBD - Target of September 2012 - 15 months
2. Payment Terms:

☐ Advanced Payment by check or wire transfer to us.
☐ Irrevocable Letter of Credit confirmed in a U.S. Bank and payable at sight in favor of:
     Morcom International, Inc.
     P.O. Box 220824
     Chantilly, VA 20153-0824
     U.S.A.

☑ Other:
TBD

3. Validity of Proposal:   90 days. If contract not awarded within validity period check back with Morcom for
4. Comments:                    any escalation on prices that may have occurred

In addition to this, our quote is subject to approval of any applicable export license. Prices and/or conditions are subject to change without notice. Should you have any questions about this quotation or should you need a retransmission of this quote please fax us at (703) 263-9308 or send us an e-mail at sales@morcom.com

| Approved by: | *Manuel Ojeda* |
|---|---|

# Attachment 4
**( Email Exchange Showing Paige and Morcom Using Same Cable Pathways)**

**Philip Jones**

| | |
|---|---|
| **From:** | Ruben E. Devia <rdevia@morcom.net> |
| **Sent:** | Thursday, September 05, 2013 10:46 AM |
| **To:** | Park, Michael |
| **Cc:** | mojeda@morcom.com; 'Oscar Olea' |
| **Subject:** | RE: morcom |

Dear Mike,

Regarding the comment of Jim, he is not correct to accuse us. In all these months, our supervisor  Oscar Olea has been working in coordination with their supervisor and any discrepancy has been resolved on site. Because we (they and us)  have pretty much the same pathway for our cables and, after all, we are in the same "boat". Sometimes they have used our sleeves, sometimes we have used their sleeves, and occasionally we have had to share some sleeves. The issue was that their supervisor was absent some days for family reasons and the person who was temporarily replacing him didn't know this type of coordination between both companies. Now their supervisor is back on site and Oscar already talked to him about this issue. I think there won't be any issue again.

Respectfully,

Ruben E. Devia
Manager of Tech.Department


www.morcom.com
Morcom International, Inc.
3656 Centerview Dr. Unit #1
Chantilly, VA 20151
Phone: (703) 263-9305
Fax: (703) 263-9308
Web Page: www.morcom.com

---

**From:** Park, Michael [mailto:mpark@truland.com]
**Sent:** Tuesday, September 03, 2013 9:35 AM
**To:** rdevia@morcom.net; Manuel A. Ojeda; hsin@hssolutions-llc.com
**Cc:** jault@paigeinternational.com
**Subject:** FW: morcom

See email below and address in field with Paige/A&E personnel.

Michael L. Park
*Truland Systems Corporation*
Project Manager
Marriott Marquis DC Project
Cell   571-282-7886
Office: 703-464-3016

---

**From:** JIM AULT [mailto:jault@paigeinternational.com]
**Sent:** Tuesday, September 03, 2013 9:33 AM

1

**To:** Park, Michael
**Subject:** morcom

mike,
please tell morcom to stay out of our J hooks and sleeves they are possibly damaging our cat6 and fiber cables
on M3 !

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.3392 / Virus Database: 3222/6623 - Release Date: 08/30/13

# Attachment 5

## (Cable Drop Chart Showing Clearsky Network Based on Low-Voltage Cat6 Cables – Another Low-Voltage Subcontractor)[1]

---

[1]  See BD-36 for further documents describing the Clearsky Network.

| | Note 1: See the below comparison for number of Cable Drops per Guestroom between GMP & Clear Sky Design |
|---|---|
| | GMP Design: 5 CAT6 Drops + 1 Coax Drop | Clear Sky Design: 3 CAT6 Drops + 1 Internal CAT6 Loop + 1 Internal Conduit + 0 Coax |
| | | |
| | 1 ea CAT6 to Desk for Internet | 1 ea CAT6 to Desk for IPTV, VoIP & Internet w/ Use of Network Switch |
| | 1 ea CAT6 to Desk for Phone | 1 ea CAT6 Loop (inside of "smurf tube") from Network Switch location to TV in select Suites only as |
| | 1 ea CAT6 to Nightstand for Phone | indicated on drawings. Typical guestrooms will be handled via external patch cord from switch to |
| | 1 ea CAT6 to Thermostat | TV by Vendor. |
| | 1 ea CAT6 to TV | 1 ea empty "smurf tube" from desk to Closet Ceiling |
| | 1 ea Coax to TV | 1 ea CAT6 to Nightstand for VoIP |
| | | 1 ea CAT6 spare to TV outlet location |
| | | Note that all network switches for IP Infrastructure are by Vendor (IDF Rooms & in Guestrooms) |
| | | Note that network switch box / receptacle in guestroom will stick approx 1" off wall surface. |

# Attachment 6

**(Hensel Phelps Change Order to Truland Adding Cable for Low-Voltage Clearsky System)**

HPCC Form 656    Revised 07 2010

# Change Order

## Hensel Phelps
## Construction Co.

Performance!

Refer to this No. in all communications

| Acct. Contract No. | Job No. | Prime C.O. No. | HPCC C.O. No. | |
|---|---|---|---|---|
| | 2010064 | N/A | 2010064-1600100 | 007 |

To:  Truland Systems Corporation

    1900 Oracle Way
    Suite 700
    Reston, VA  20190

Attn: Michael Park

To:  Subcontract          Agreement Date:  February 11, 2011

Project:  Marriott Marquis Washington, DC

The agreement referred to above is hereby modified as set forth below.  Excepting only those terms specifically waived or amended herein, all of the terms, conditions, provisions and covenants of said agreement shall remain in full force and effect. If any portion of this change order is not acceptable, you must furnish us with written notification of such non-acceptance at the address designated below within seven (7) days of the date of issue hereof. In the absence of such notice of non-acceptance, your unqualified acceptance of this change order will be deemed conclusive seven (7) days after date of issue hereof.

Budget Adjustment #224

**YOUR SCOPE OF WORK HAS BEEN MODIFIED TO INCLUDE THE FOLLOWING:**

1.   Truland - The subcontractor agrees to all costs associated with Prime Change Order #15 for the Distributed Antenna System.  The cost of this change order is inclusive of all labor, materials, equipment, design services, delivery, taxes, mark-ups and fees required for the performance of this work.  (CE #0130)      ADD..........   $116,932

2.   Truland - The subcontractor agrees to all costs associated with Prime Change Order #11 for the connection of the (3) access control gates in stairwells W1, W2 and Stair 9 to the fire alarm system. The cost of this change order is inclusive of all design fees, labor, equipment, materials and mark-ups.  (CE #0282)      ADD..........   $12,473

3.   Truland - The subcontractor agrees to all costs associated with Prime Change Order #13 for the fiber connection from the ballrooms to 9th Street for satellite truck interface.  The cost of this change order is inclusive of all design fees, labor, equipment, materials and mark-ups.  (CE #0511)      ADD..........   $38,527

4.   Truland - The subcontractor agrees to all costs associated with Prime Change Order #14 to furnish and install the cabling and backbone infrastructure for the Marriott implementation of the Clearsky Network Platform.  The cost of this change order is inclusive of all design fees, labor, equipment, materials and mark-ups.  (CE #0544)      ADD..........   $388,073

5.   Truland - The subcontractor agrees to all costs associated with Prime Change Order #16 for the added power and data infrastructure to the pedestrian checkpoints and future operable barriers. The cost of this change order is inclusive of all design fees, labor, equipment, materials and mark-ups. (CE #0546)      ADD..........   $25,000

The date of Substantial Completion for this Project has not changed.   Truland Systems Corporation for itself and its subcontractors, suppliers, and consultants of any tier hereby agrees that the compensation provided herein is full compensation for all costs, direct and indirect, including, but not limited to, delay, disruption, inefficiencies, acceleration, extended overhead costs and other potential impacts relating to or arising from the extra work, changes and/or events described in this Change Order.

| | |
|---|---|
| In consideration whereof the contract has been INCREASED in the amount of | $581,005 |
| Contract amount prior to this change | $39,453,128 |
| Adjusted contract amount | $40,034,133 |

Accepted:

Truland Systems Corporation     2-19-2013

(Subcontractor or Vendor)         (Date)

By:

(Authorized Signature)

Title:

Return three signed copies promptly to:

**Hensel Phelps Construction Co.**
929 L Street NW
Washington, DC  20001

By:

     Brandon Johnston - Project Manager

Date of issue:  February 18, 2013

**XL 08701**

Marriott Marquis, Washington DC
Truland Systems

### 6.1 - TSG Labor for Cleanup

| Company | Description | Cost | Notes |
|---|---|---|---|
| TSG/HP | Cost for laborers performing weekly cleanup | $    667,416 | Includes HP Supervision |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | $    667,416 | |

### Explanation of Changes:

TSG provided jobsite cleanup services that were contracted to be performed by the individual contractors. Truland did not provide manpower for clean up or allow time for their craft to clean up at the end of each day.  Most of the work areas were left in a constant state of disorganization and would need to be organized and swept up to provide a safe work environment for all employees.  Cost has been developed through a calculation of the amount of TSG people utilized for Truland clean-up.  The HP supervisor labor was then developed from that percentage of the total TSG costs.

XL02364

**Exhibit 5**
**Response to XL Bond Claim Questions**
**Date: 2/12/15**

The following table summarizes the total TSG cost impacts attributed to Truland from 2/10/13 - 5/11/14

| Description | Date Range of Certified Payroll | Hours |
|---|---|---|
| Total Certified Payroll | 2/10/13-5/11/14 | 2,069,834 |
| Deduct TSG Hours (Cleaner) | 2/10/13-5/11/14 | (92,986) |
| Deduct NSC Hours (Cleaner) | 2/10/13-5/11/14 | (40,456) |
| Deduct Cleveland Backcharge Hours | 2/10/13-5/11/14 | (8,528) |
| Deduct P&D Backcharge Hours | 2/10/13-5/11/14 | (3,770) |
| Deduct Commercial Backcharge Hours | 2/10/13-5/11/14 | (10,277) |
| Deduct NLP Backcharge Hours | 2/10/13-5/11/14 | (1,560) |
| Deduct PWT Backcharge Hours | 2/10/13-5/11/14 | (1,038) |
| Deduct Teel Backcharge Hours | 2/10/13-5/11/14 | (760) |
| | Subtotal Revised Certified Payroll (Total C.P.) | **1,910,459** |

| | | |
|---|---|---|
| Truland Certified Payroll | 2/10/13-5/11/14 | 255,897 |
| HS Solutions Certified Payroll | 2/10/13-5/11/14 | 4,164 |
| Ft Myers Certified Payroll | 2/10/13-5/11/14 | 1,560 |
| A&E Certified Payroll | 2/10/13-5/11/14 | 4,247 |
| Paige Certified Payroll (estimated) | 2/10/13-5/11/14 | 12,000 |
| | Subtotal Truland Certified Payroll (Truland C.P.) | **277,868** |

| | | |
|---|---|---|
| Percentage Truland based on certified Payroll | Truland C.P. / Total C.P. | 15% |

| | | |
|---|---|---|
| Severity of Cleanup efforts required | 2/10/13-5/11/14 | 5% |

| | | |
|---|---|---|
| | GRAND TOTAL | **20%** |

The above hour allotments were gathered from the certified payroll from 2/10/13 - 5/11/14 to coincide with the date range TSG was onsite performing cleanup services. Hensel Phelps deducted the cleaners from the overall certified payroll hours since they did not cause any damage, only cleaned up. Additionally, Hensel Phelps deducted certified payroll hours from subcontractors that were re-entering spaces and performing additional work due to Truland's damage/late work including but not limited to Cleveland, P&D, Commercial, NLP, PWT, TEEL. Lastly, Hensel Phelps assessed an additional 5% due to the severity of cleanup required on Truland and their subcontractors behalf due to the scope of work and impacts to follow on trades.

# TSG Cost Distribution

| TSG Costs | $ | 2,606,928 |
|---|---|---|
| HP TSG Supervision Labor | $ | 456,345 |
| 60% Burdens | $ | 273,807 |
| **TOTAL** | **$** | **3,337,080** |

| | | | |
|---|---|---|---|
| 20% | JJK | $ | 667,416 |
| 20% | Truland | $ | 667,416 |
| 20% | Drywall/Paint Subcontractors | $ | 667,416 |
| 20% | Hensel Phelps | $ | 667,416 |
| 10% | Flooring and Stone | $ | 333,708 |
| 10% | Other Trades | $ | 333,708 |

XL02365

# Exhibit D

## (Assessment by XL to Hensel Phelps For NSC Labor Costs for Cleanup)

Marriott Marquis, Washington DC
Truland Systems

### 6.2 - NSC Labor for Cleanup

| Company | Description | Cost | Notes |
|---|---|---|---|
| NSC | Additional labor required during construction and turn-over - CO #002 | $ 106,249 | Truland Portion of Total Costs - 33% |
| NSC | Additional labor required during construction and turn-over - CO #003 | $ 137,965 | Truland Portion of Total Costs - 33% |
| NSC | Additional labor required during construction and turn-over - CO #004 | $ 15,625 | Truland Portion of Total Costs - 33% |
| NSC | Invoice #63888 - Guestroom Cleanup | $ 18,349 | |
| NSC | Invoice #63920 - Guestroom Cleanup | $ 17,422 | |
| NSC | Invoice #64017 - Guestroom Cleanup | $ 4,050 | |
| NSC | Invoice #64052 - Guestroom Cleanup | $ 1,618 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | $ 301,319 | |

#### Explanation of Changes:

NSC provided final cleaning services multiple times in the same space due to subcontractors going back into finished spaces to perform outstanding punchlist work.  Truland is responsible for 33% of the additional costs incurred based on the quantity of Truland's outstanding punchlist items in finished spaces.  This applied for NSC change orders #002, #003, and #004 as indicated above.  In addition, there were direct cleanup costs (see above invoices) associated with the cable fix rework after Truland defaulted on the project.

XL02450