UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAIGE INTERNATIONAL, INC.          *

    *Plaintiff,*                             *

v.                                 *        Case No. 14-cv-01244 (JEB)

XL SPECIALTY INSURANCE CO., et al. *

    *Defendants.*                          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MOTION TO STRIKE DEFENDANTS' EXPERT REPORT OF
## DONALD HARRINGTON ON DRYALL AND PAINTING CLAIM

Plaintiff Paige International, Inc. ("Paige"), through counsel, pursuant to Federal Rules of

Evidence 702 and 703, and the legal principles enunciated by the U.S. Supreme Court in *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny, moves the Court to

strike the expert report of Donald Harrington. The Report at issue was submitted by defendants

XL insurance companies to support offsets asserted by XL against the amounts claimed to be due

to Paige in this case under the XL payment bond. The specific offset addressed in this motion is

part of the prime contractor's performance bond claim for drywall repair and repainting costs.

A copy of the Harrington Report is set forth at BD-1.[1] The portion of the Report which is

specifically addressed in this motion is attached hereto as Exhibit A. A declaration of Charles

Paige which explains the method used by Hensel Phelps for allocating its drywall costs to its

subcontractors, and which contests any liability on the part of Paige, is attached as Exhibit B.

---

[1] The plaintiff has assembled in a single submission the expert report at issue, the relevant
contracts and bonds, and other key documents, entitled "Basic Documents Concerning All
Motions," hereafter BD- __, which are attached to the plaintiff's first *Daubert* motion. The
key documents specifically related to the drywall issues are attached hereto. The primary
portion of the performance bond claim relied upon by Donald Harrington for the drywall
claim is submitted as Plaintiff's Supplemental Exhibit 1.

### Introduction

This matter arises out of the construction of the Marriott Marquis Hotel, which is adjacent to the District of Columbia Convention Center. The prime contractor was Hensel Phelps Construction Company. The electrical subcontractor was Truland Systems Corporation. The plaintiff, Paige International, Inc., was one of four low-voltage second-tier subcontractors to Truland. The defendants, the XL insurance companies, issued payment and performance bonds on behalf of Truland.[2]

During the course of the Project Truland became insolvent and failed, among other things, to make payments to its subcontractors and suppliers, including Paige. Under its payment bond, XL had pledged to make payment to persons supplying labor and materials to the Project if not paid by Truland. Paige filed a timely claim under the XL payment bond, but XL refused to honor its bond. This case involves a suit by Paige, in its status as an unpaid sub-subcontractor, to enforce Truland's payment bond.

Truland's failure to make payment to its subcontractors and suppliers constituted a breach of its subcontract with Hensel Phelps. As a result, Hensel Phelps terminated Truland for default, thereby invoking XL's obligation under its performance bond to complete Truland's work. Upon XL's refusal to honor its bond, Hensel Phelps contracted with a substitute electrical subcontractor. After substantial completion of the substitute electrical subcontractor's work, Hensel Phelps filed a claim against XL for the extra costs it incurred, as well as costs for which Hensel Phelps had issued backcharges to Truland during the Project ("the HP Claim"). XL denied the HP Claim and asserted various defenses.

The XL performance bond incorporated the dispute resolution process in the Hensel Phelps-Truland subcontract, which provided for arbitration. After Hensel Phelps submitted a

---

[2] A detailed history of the Project is set forth in plaintiff's first Daubert motion.

demand for arbitration and XL filed a counterclaim, before an arbitrator was appointed a settlement was reached under which XL paid a portion of the HP Claim and permitted HP to keep monies it had withheld from Truland.

The HP Claim asserted a breach by XL of its contractual obligations under its performance bond. Hensel Phelps' damages were based on the costs incurred by HP in completing Truland's work. The HP Claim made no effort to identify specific costs that may have been the fault of any of Truland's subcontractors. After making payment to Hensel Phelps, XL engaged the services of a construction claims consultant, Donald Harrington, whose assigned task was to review the HP Claim and to "segregate that portion of costs related to low voltage work performed by Paige and its subcontractors" as the basis for an offset against Paige's payment bond claim. HP-1 at 14. The methodology followed by Harrington in undertaking that task was to review each individual part of the HP Claim, identify any work that was in Harrington's judgment "related to low voltage," and then to add up the costs incurred by Hensel Phelps for such work.  All such costs were then asserted in Harrington's Report to be the responsibility of the low voltage subcontractors, and thus constituted in his opinion offsets against the amount due from XL to Paige under the XL payment bond.

This *Daubert* motion is the second of four, each of which addresses the admissibility of the expert report of Donald Harrington concerning specific claims asserted by XL as offsets to Paige's payment bond claim. In its first motion, concerning XL's claim of offset for monies paid to the prime contractor in reimbursement of the prime's cleanup costs, sections I-IV set forth alternative grounds for excluding the entire Harrington Report, which plaintiff incorporates into this Motion by reference. In the event the entire Report is not excluded, this Motion is directed at the deficiencies in the Report concerning XL's $700,556 claim of offset for a portion of Hensel Phelps' costs for drywall repairs and repainting.

3

## Summary of the Hensel Phelps' Drywall Repair and Repainting Claims

The Harrington Report is based on Donald Harrington's analysis of the roughly 3,500- page claim document and supplement submitted by Hensel Phelps in support of its performance bond claim. There were six drywall and painting subcontractors for which Hensel Phelps incurred costs, for which it sought reimbursement from XL under the electrical subcontractor's performance bond (50% of which XL is claiming in this lawsuit as an offset against Paige's payment bond claim).

A statement of the basis for the claim for each of the six drywall and painting subcontractors, which breaks down the amount and method of calculation, is attached hereto as Exhibit C. The six drywall / repainting claims submitted by Hensel Phelps to XL were as follows:

### Cleveland Construction - $426,379

Hensel Phelps's claim for Cleveland's costs was based on "T &M" (time and material) extra work tickets performed during the Project (3-22-13 to 5-22-14), before Truland was terminated (June 2014).  A portion of those costs was based on deductive change orders issued to Truland during the Project for tickets that were specifically alleged by HP to have been caused by Truland, and a portion was based on Truland's alleged share of HP's global assessment to all subcontractors based on their *pro rata* share of punch list items (33% above-ground, 43% below ground).[3] Cleveland's tickets provided minimal if any information concerning the nature of the extra work, and more than half of Cleveland's tickets were illegible.

Examples of typical Cleveland tickets are attached as Exhibit D hereto. The full set of tickets are submitted as Exhibit 1 of Plaintiff's Supplemental Exhibits.

---

[3] Documentation describing the methodology followed by Hensel Phelps in calculating its allocations of each subcontractor's share of HP's costs for drywall repairs and repainting is attached to Charles Paige's Declaration, Exhibit B hereto, as attachments 1 and 2. For above-ground work there were a total of 21,467 applicable punch list entries, of which 7,082 were for Truland, resulting in a 33% allocation to Truland. (7,082 ÷ 21,467 = .3299). Of Truland's 7,082 entries, 70 were for Paige International.

4

<u>P & D Contractors – $188,525</u>

Hensel Phelps's assessment for P & D's costs was based on T & M tickets for extra drywall work performed during the Project (3/3/14 to 3/21/14), before Truland was terminated. P &D's assessment was based in part on HP's identification of specific T& M tickets that were alleged by HP to be the responsibility of Truland, for which HP issued deductive backcharges to Truland, and in part on the basis of Truland's alleged share of HP's global assessment to all subcontractors (33% above ground, 43% for below ground). P & D's extra work tickets were well documented, and included a detailed description of the work in question and the location of the Project were it had been performed. Each P & D ticket was supported by a photograph of the specific damage that it was charging extra to repair.

Examples of the typical P & D extra work tickets and photographs are attached hereto as Exhibit E.

<u>Commercial Interiors - $578,610</u>

Hensel Phelps's assessment for Commercial Interiors was based entirely on daily T & M tickets, for work performed both during the Project, starting on 3/5/15, and continuing into the post-completion phase until 10/30/14.  Someone (presumably from HP) made a notation on each ticket the percentage particular subcontractors, most frequently either Truland, the mechanical subcontractor ("JJK"), or both, were alleged by HP to have been responsible. Although the tickets contained detailed descriptions of the work performed by Commercial Interiors and the hours worked, the typical Commercial Interiors' ticket listed as many as five or six activities performed that day, with no attempt to identify how many hours each task took. Thus Truland's assessment of (alleged) responsibility was therefore necessarily based on an estimate, not precise data.

The Commercial Interiors' T & M log and examples of the typical Commercial Interiors T& M tickets are attached hereto as Exhibit F.

<u>NLP Enterprises - $78,386</u>

Hensel Phelps' assessment for NLP Enterprises was based in part on specific T& M tickets for work performed during the Project (2/6/14 to 4.28/14) which HP alleged were entirely or partly the responsibility of Truland, and in part based on Truland's alleged share of HP's global assessment to all subcontractors. The NLP tickets were not as detailed as HP's other drywall and painting subcontractors, but did provide basic information as the basis for the extra work charge.

Examples of NLP Enterprise's T & M Tickets are attached as Exhibit G.

<u>Progressive Wallcovering Technicians- $51,890</u>

Hensel Phelps' assessment for PWT's costs involved wallcovering repair performed during the Project (2/7/14 to 6/19/14), and was based entirely on HP's global assessment to all subcontractors (33% share for Truland, calculated on  Truland's *pro rata* share of total above-ground punch list entries).

Examples of the typical PWT  T & M tickets are attached hereto as Exhibit H.

<u>Teel Construction - $38,518</u>

Teel Construction arranged for its painting subcontractor, Hunt & Walsh, to supplement the forces of Hensel Phelps's other painters, starting on April 22, 2014, in the rush to finish construction of the hotel in time for May 1 opening. Hunt & Walsh then stayed on the job after opening, until August 18, 2014. HP allocated 33% of Teel's extra work invoices to Truland, based on Truland's share (33%) of the total Project punch list entries.

A chart showing the allocation by Hensel Phelps of Teel Construction's invoices to HP's various subcontractors is attached as Exhibit I.

### Donald Harrington's Assessment of XL's Offset to Paige International

With respect to Hensel Phelps' drywall and painting costs, Donald Harrington's assigned task was to analyze HP's performance bond claim, and to segregate out from the costs incurred by HP for the work of the foregoing six subcontractors that portion of each of such costs which "related to low voltage." See Exhibit A hereto. Disregarding for the moment the nonexistent evidentiary value of the results of that exercise, the methodology Harrington used carrying out his assignment was arbitrary and capricious, and hence unreliable.

First, rather than analyzing the T & M tickets of each of the six Truland subcontractors to ferret out any that "related to low voltage," Harrington chose only one of the six – Cleveland Construction – and on the basis of his determination that 50% of one category of *Cleveland's* tickets related to low voltage – applied that 50% factor *to the other five,* without any additional analysis whatsoever. There is nothing in his Report that indicates that Harrington even looked at the tickets for the other five Hensel Phelps subcontractors.

Second, in contrast to the other five subcontractors, whose T & M tickets consistently contain detailed descriptions of the work for which they assert a right to extra compensation, roughly half of the Cleveland tickets are illegible, and those that are legible only contained cryptic descriptions of the work in question. For many of them, the only thing clearly legible is the notation, presumably made at an unknown time by Hensel Phelps or someone acting on its behalf, assigning part or all responsibility for the work to Truland. Further, the judgment that the costs of a particular Cleveland ticket was not made by Harrington, but rather at some unknown time by some unidentified person.

Third, and equally bizarre, despite the fact that Hensel Phelps had included in its claim a chart (Exhibit J hereto), showing the dollar value of each of the Cleveland's T & M tickets which Hensel Phelps had identified as being the sole responsibility of Truland (hereafter "the Truland

7

Sole Responsibility Tickets"), rather than using the *data* contained those Cleveland tickets, Harrington bases his conclusions, without identifying which tickets he counted, on the *number* of the Truland Sole Responsibility Tickets which purportedly "relate to low voltage." Notwithstanding that HP assigned "split" responsibility for many of the Truland Sole Responsibility Tickets (for example 25% to Truland and 75% to the mechanical sub, JJK), Harrington gave the same weight to split tickets as he did for tickets for which Hensel Phelps has assigned 100% responsibility to Truland, thereby skewing his percentage calculation against the low-voltage subcontractors. Harrington's calculation of alleged Paige responsibility for a portion of Hensel Phelps's s drywall costs based on number of tickets, when the actual data in the tickets was available, was arbitrary and capricious.

Fourth, Harrington "counts" as low voltage an arbitrary percentage of the Truland Sole Responsibility Tickets that have no description of the work performed, thereby increasing the percentage he allocated to "low voltage" from 33% to 50% -- a percentage he then applies to both the other three categories of Cleveland tickets and all five of the other HP drywall and painting subcontractors.

The following paragraph, although it starts out with "for example" to suggest that his analysis went beyond that stated, in fact constitutes Harrington's *entire analysis* on which he bases a right on the part XL to an offset of $700,556 against Paige's payment bond claim:

> For example, a total of 198 work orders for Cleveland Construction were reviewed to determine the amount of drywall work and repairs resulting from damages caused by low voltage subcontractors including Paige and SPL. Of the 188 legible work orders, 99 specifically identified Truland as wholly or partially responsible. Of the 99 work orders, 33 or 33 percent specifically referenced low voltage subcontractors as responsible for the drywall repairs. For the 66 work orders that did not further identify the type or category of work performed on behalf of Truland, it is reasonable to apply the 33 per cent factor which yields 22 work orders related to low voltage. Thus a total of 55 of the 99 work orders or 55 per cent relate to low voltage work which validates the use of a 50 per cent factor for the drywall and paint costs included in the Hensel Phelps claim.

8

First off, Harrington's representation that 33 Cleveland tickets "specifically referenced low voltage subcontractors as responsible for the drywall repairs" is flatly untrue. In Hensel Phelps' determination of Truland's "allocation" for drywall and painting repairs, HP prepared a chart showing all 101 of the Cleveland tickets which HP specifically contended were the responsibility of Truland. See Attachment J hereto. In the explanation provided by HP on that chart as the basis of each line item, there are only *two* references to "low voltage:" ticket #35271, for 4 Feb. (2014), and ticket #35259, for 5 Feb. Further, 27 of the spaces on the chart for such explanation are blank, and for the ones which have descriptions, Hensel Phelps could only have guessed what type of work was involved for entries such as "Damage" or "Damage /Late Work." Further, the chart in question lists the specific dollar amount of each ticket, so there is no need to calculate the costs in question based on a percentage of the *number of tickets,* rather the *data contained in the tickets.* It is not surprising that at no point in his Report does Harrington make reference to this document, which severely undercuts his analysis.

Cleveland's T & M tickets are set forth at Plaintiff's Supplemental Exhibits, at PSX-1. The tickets are broken down by Hensel Phelps into four categories, as follows:

| Number | Category | Basis of Allocation[4] |
|---|---|---|
| 101 | Identified by Hensel Phelps as Truland responsibility | Notations on tickets |
| 26 | "Undetermined Podium | 43% share |
| 16 | Undetermined Guest Towers | 33% |
| 60 | "Caused by other trades" | 33% |

---

[4] The 33% and 43% allocations are based on Truland's theory that each subcontractor is responsible for drywall repairs in the same percentage as its percentage of punch list entries to the total punch list. Truland had 43% of the below-ground and 33% of above-ground punch list, and was thus "allocated" those percentages of Hensel Phelps' drywall costs.

Of the claimed 198 Cleveland T& M tickets (there are actually 203), 102 of them are included in Hensel Phelps' global allocation to all subcontractors, and thus it is entirely irrelevant whether any of them specifically allocate responsibility to Truland, It was therefore improper of Harrington to use the "global allocation" tickets in his calculated percentage (i.e., no matter how many or how few may designated Truland as the responsible subcontractor, under Hensel Phelps theory, Truland was assigned 43% for below ground and 33% for above ground). Thus the only tickets, under Harrington's methodology, which were properly counted are the 101 tickets that Hensel Phelps culled out as being specifically identified as the "sole responsibility" of Truland.

It is apparent from the foregoing that:

(1) that the methodology used by Hensel Phelps in "allocating" responsibility for drywall repairs among its subcontractors based on the random number of each subcontractor's punch list entries was entirely arbitrary and capricious and lacked substantive evidentiary foundation upon which to base a reliable expert opinion;

(2) that the actual data contained in the 101 Cleveland T & M tickets which an unknown person at an unknown time identified as "Truland's sole responsibility," roughly half of which were illegible and which contained only cryptic descriptions of Cleveland's work, was inadequate upon which to base such a judgment, and hence lacked substantive evidentiary foundation upon which to base a reliable expert opinion;

(3) that Harrington's selective use of the data upon which Hensel Phelps' had based its allocation (ignoring the *actual data contained in the tickets* and basing his opinion on the random *number* of Cleveland's tickets he "deemed" related to low voltage, regardless of the number of hours reflected in the tickets and the "split" nature of many such tickets) was entirely arbitrary;

10

(4) Harrington's calculation of his "50%" allocation to low voltage, based on 66 Cleveland tickets which did not identify the nature of the work performed by Cleveland constituted unreliable speculation;

(5) the application of Harrington's "50%" allocation to low voltage, which was based solely on his analysis of the 101 purported "Truland sole responsibility" tickets, to the other three categories of Cleveland tickets, without any analysis of those tickets, was arbitrary and capricious; and

(6) the application of Harrington's "50%" allocation to low voltage - based solely on a portion of *Cleveland's* tickets – to the costs incurred by Hensel Phelps for the work of the other five HP drywall and painting subcontractors (P & D, Commercial Interiors, NLP, PWT and Teel), with no analysis at all of those subcontractors invoices or T & M tickets, was arbitrary and capricious.

### Summary of the Applicable Law

Pursuant to Rule 702 of the Federal Rules of Evidence and the guidance of the United States Supreme Court in *Daubert v. Merell Dow Pharm., Inc.,* 509 U.S. 579, 589-90 (1993) and related cases, trial courts are required to act as "gatekeepers" who may admit expert testimony only if it is both relevant and reliable.

Under Rule 702, expert testimony is reliable if (1) it is "based upon sufficient facts or data;" (2) it is "the product of reliable principles and methods," and (3) the witness has applied the principles and methods reliably to the facts of the case. *Harris v. Koenig,* 815 F.Supp2d 6, 8 (D.D.C. 2011). The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. *Kumbo Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). In all cases, "[t]he trial judge … must find that [the

11

proffered testimony] is properly grounded, well-reasoned and not speculative before it can be admitted. Fed. R. Evid. 702 advisory committee's note (2000 amends).

Expert testimony that rests solely on "subjective belief or supported speculation" is not reliable. *Daubert, supra.* Analytical gaps can make an expert's opinions unreliable and inadmissible. A court may refuse to admit expert testimony if it concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Groobert v. President and Dirs. of Georgetown Coll.,* 219 F.Supp2d 1, 6 (D.D.C. 2002) (quoting *Gen. Elec. Elec. Co. v. Joiner,* 522 U.S. 136 (1997).

In order to allow a court to assess the reliability of the methodology of a proposed expert witness, it is necessary for the expert to demonstrate that he does in fact have a methodology. Simply reviewing a few documents and reaching a series of conclusions do not constitute a methodology. *Chesapeake Climate Action Network v. Export-Import Bank of the United States,* 78 F.Supp3d 208, 219 (D.D.C. 2015).

It is true that pursuant to Fed. R. Evid. 203 that the facts or data upon which an expert bases his or her opinion do not have to be admissible in evidence. There are, however, limits to the data that can properly be used by an expert. In order to be admitted, the facts or data relied upon by an expert must be of a type reasonably relied on by experts in the particular field in forming opinions or inference upon the subject. *See, e.g., Fiorentino v. Rio Mar Assocs.,* 381 F.Supp2d 43 (D. Puerto Rico 2005). With respect to the data which may be properly relied upon by an expert witness, it is fundamental that expert testimony be predicated on facts legally sufficient to provide a basis for the expert's opinion, thus, an expert should not be permitted to give an opinion that is based on conjecture or speculation, from an insufficient evidentiary foundation. *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1474 (1st Cir. 1996).

Expert testimony should be excluded where an expert fails to apply his experience and a reliable methodology. For example, where a witness simply proposes to transmit hearsay to the jury, rather than applying his experience and a reliable methodology, the testimony should be excluded. *U.S. v. Mejia*, 545 F.3d 179, 197 (2nd Cir. 2008).

In evaluating the admissibility of expert testimony, the focus of the court should be on the methodology or reasoning employed. *Rothe Development, Inc. v. Department of Defense*, 107 F.Supp3d 183, 197 (D.D.C. 2015), citing *Ambrosini v. LaBarraque*, 101 F.3d, 133 (D.C. Cir. 1996).

## ARGUMENT

### I.   INTRODUCTION

As a threshold matter, it should be noted that there is a giant leap between Donald Harrington's task of segregating that portion of the performance bond claim submitted by Hensel Phelps to XL which was "related to low voltage" and a finding of entitlement on the part of XL to an offset against plaintiff Paige International's payment bond claim. First, at no point does Harrington even address the issue of fault. The fact that a drywall repair appeared to Harrington has being "related to" low voltage does not establish the reason for the damage. For example, the mere fact that particular drywall may have been damaged near the location of a low-voltage cable does not constitute evidence that a low voltage subcontractor caused that damage. Since the tickets at issue did not contain such information, it requires sheer speculation to assign responsibility to "low voltage." Further, some of the drywall damage occurred in the course of testing or repairing cables, where it was necessary to cut open drywall to gain access to the cable. In such cases, it is readily apparent that it was Truland's default termination and the introduction into the Project of a substitute electrical subcontractor that created the need for such testing, not

13

any fault of the cable installer. The standard Harrington used – "related to" low voltage – is simply not sufficient to establish causation.

Moreover, since Paige International was only one of several low-voltage cable installers, proof that a drywall repair was related to "low voltage" does not establish liability on the part of Paige International as opposed to one or more of the other low voltage subs. *See* BD-36 (low-voltage system for internet service - Morcom), and BD-37 (low-voltage system for wireless communications - Clearsky). The analytical gap between drywall damage "related to" low voltage and the purported liability of Paige is too great upon which to base a reliable expert opinion.

## II.   THE HARRINGTON REPORT AS TO DRYALL AND REPAINTING COSTS SHOULD BE EXCLUDED AS BASED ON AN INSUFFICENT EVIDENTIARY FOUNDATION

As is explained in Section II of plaintiff's *Daubert* motion concerning Hensel Phelps' cleanup costs, a construction "backcharge" constitutes nothing more than an allegation. In order to determine the validity of a backcharge, two things are required that are totally absent in Harrington's analysis: evidence supporting the backcharge, and an evaluation of any defenses which may be available to the contractor against whom the backcharge is assessed.

Donald Harrington's Report is based solely on his relating the substance of Hensel Phelps' claim document, without any expertise applied to an evaluation of the validity of any of the various claims asserted by Hensel Phelps. Further, the methodology underlying the allocation by Hensel Phelps of a substantial portion of claims against Truland (and hence XL) for drywall repairs during construction – the number of punch list entries – is itself wholly random and arbitrary. Given that the Hensel Phelps asserted that much of the drywall damage was caused by workers' toolbelts, if Hensel Phelps had used the same methodology it used for cleanup costs –

percentage of payroll – there would at least be a scintilla of logic:  more manpower = more

toolbelts = more drywall damage. There is no possible correlation, however, between the number

of punch list entries and drywall damage. Further, if the same methodology were applied to

determine Paige's share of Truland's share, Paige had less than 1% of Truland's punch list entries

(7,082 ÷ 70), not 50%. See Exhibit B, Paige Declaration, at ¶¶ 8-10.

As to drywall repairs and repainting, the allocation to "low voltage" by Donald

Harrington of 50% of the costs that were allocated by Hensel Phelps to Truland constitutes an

arbitrary opinion based on an arbitrary foundation, and should therefore be excluded.

### III.  THE HARRINGTON REPORT AS TO DRYALL AND REPAINTING COSTS SHOULD BE EXLCUDED AS BASED ON AN UNRELIABLE METHODOLOGY

The methodology used by Donald Harrington to segregate Hensel Phelps' "low voltage"

related drywall and painting costs to other damage borders is entirely unreliable.

In support of its performance bond claim against XL, Hensel Phelps attached each of

those subcontractors' extra work invoices, supported by daily T & M tickets. There were six

drywall and painting subcontractors. A reasoned approach to segregating low voltage from non-

low voltage would have involved what would have admittedly been a slow and laborious process:

going through the extra work tickets of each of the six drywall and painting subcontractors, one

by one, identifying those tickets that were for repairs which involved cutting open drywall to

perform work on a low-voltage cable, and then calculating the cost incurred by Hensel Phelps for

that specific ticket (manhours by trade, multiplied by the hourly rate for each trade). Rather than

doing so, Harrington took two shortcuts, both of which resulted in wholly random and arbitrary

results.

First, rather than performing a separate analysis of the extra work tickets of all six subcontractors, Harrington chose one of them, Cleveland Construction – the one whose tickets were largely illegible – as the prototype, and then on the basis of his estimate of the percentage of low-voltage related work for Cleveland (50%), Harrington took the Cleveland percentage for the "specifically identified" tickets, and then applied that percentage not only to the Cleveland "global allocation" tickets, but also to the entire costs of the other five subcontractors, without any detailed analysis of the other subs' tickets. The result was grossly arbitrary and capricious.

Secondly, and even more bizarrely, rather than basing his calculation of the low-voltage percentage of Cleveland's work on the *contents* of the Cleveland extra work tickets (i.e., the number of hours reflected in each ticket, which was listed on a chart prepared by Hensel Phelps), Harrington based his percentage for Cleveland on the *number of tickets,* thus giving tickets with a large number of hours the same weight as one with just a few hours, or "split" tickets (more than more allegedly responsible subcontractor).

Third, the apparent reason for his use of his "number of tickets" approach was the fact that roughly half of the Cleveland tickets were illegible. *See* PSX-1. Thus if there was anything discernable written on the ticket that might have indicate that *in someone else's judgment* (not Harrington's) that the ticket for "related to" low voltage," Harrington counted it as such.

Lastly, for those tickets which contained no information as to what work was involved, Harrington *speculates* that it is "reasonable" to assume that 33% of those tickets related to low voltage, and on that basis jacks up his percentage to 50%, and then applies that 50% to Truland's share of the global drywall and painting allocations to Cleveland *and* to the Hensel Phelps' entire claims for extra work performed by P & D, Commercial Interiors, NLP, PWT and Teel – all that despite the fact that the documentation for those five other subcontractor's work is far more detailed than Cleveland (and legible to boot).

16

## IV.   THE HARRINGTON REPORT FAILS TO ACCOUNT FOR THE DIFFERENCE IN SEQUENCING OF CABLE INSTALLATION AND DRYWALL INSTALLATION

Although Donald Harrington claims expertise in construction, and asserts in his Report a familiarity with the Project schedule, his "allocation" of drywall and painting costs to a cable installer shows a shocking lack of understanding of construction sequencing, which further calls into question the reliability of his Report.

As is documented in the Project schedule and explained in the attached declaration Exhibit B) of the President of Paige International, Charles Paige, the sequencing of the Marriott Marquis was no different than any large construction project: the infrastructure trades go first, and the finish trades follow. The majority of Paige's cables ran from a jack where each room would be located to an Intermediate Distribution Frame ("IDF") in an electrical closet on the same floor. To put it as simply as possible, when Paige pulled its cables, there were no rooms, no hallways, and no ceilings, and therefore no drywall to be damaged.

Hensel Phelps recognized that not all subcontractors had equal responsibility for drywall damage by excluding from its allocation the excavation subcontractor, the outdoor lighting subcontractor, and the landscaping subcontractor, and by making a downward adjustment of its allocation for other subcontractors that were deemed "low impact" subs. See attachment 1 to Exhibit B. Harrington, however, does not even consider the fact that Paige was an infrastructure trade that preceded drywall.

Further, Hensel Phelps' performance bond claim asserts costs for drywall repairs by each of the six HP subcontractors which, with the exception of a handful of tickets in 2013 and early 2014, were nearly all for work performed in March 2014 and later.  As explained by Charles Paige (Exhibit B), in March 2014 the only thing left to do under his company's scope of cable contract was to terminate cables to IDFs that were supposed to be located in closets that were six

17

months late in being built. Truland, as perhaps the largest finish contractor with thousands of electrical fixtures to install, was a prime target for complaints of drywall damage. The very notion that a contractor with a $1.8 million cable supply and installation sub-subcontract whose work preceded drywall installation and preceded the period of time in which the damage is alleged to have occurred could be liable for $700,556 in drywall and painting repairs is truly absurd.

V.      **CONCLUSION**

To the extent the entire Harrington Report is not excluded as unreliable, that portion of the Report asserting an offset against the plaintiff's payment bond claim for monies paid by XL to the prime contractor in settlement of its performance bond claim for drywall and painting costs should be stricken as unreliable. The Report is based on an inadequate evidentiary foundation, and constitutes nothing more than speculation and conjecture.

Respectfully submitted,

PAIGE INTERNATIONAL, INC.

Philip C. Jones, DC Bar # 196097
JONES & COHEN, LLC
1125 West Street, Suite 200
Annapolis, Maryland 21401
(301) 921-3360
pjones@jonescohenlaw.com

18

## CERTIFICATE OF SERVICE

I hereby certify that on this _3_ day of _March_____, 2016, in addition to service

through the Court's ECF System, a copy of the foregoing document was served, by mail, on counsel

for defendants, addressed as follows:

> Patrick J. Madigan, Esq.
> Pike & Gilliss, LLC
> 9475 Deereco Road, Suite 300
> Timonium, Maryland 21093

Philip C. Jones

# Exhibit A

**(Excerpt from Harrington Report
Concerning Alleged Paige Liability
For 50% of Hensel Phelps'
Drywall / Repainting Costs)**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Action No.  14-cv-1244 (JEB)

**Plaintiff:** PAIGE INTERNATIONAL, INC.                    )
                                                            )
                                                            )
v.                                                          )
                                                            )
**Defendants:** XL SPECIALTY INSURANCE COMPANY, INC., et al )
                                                            )
                                                            )

Case No. 15-cv-00130 (JEB)

**Plaintiff:** SIGNAL PERFECTION, LTD. d/b/a SPL INTEGRATED )
SOLUTIONS                                                   )
                                                            )
                                                            )
v.                                                          )
                                                            )
**Defendants:** XL SPECIALTY INSURANCE COMPANY, INC., et al )
                                                            )

EXPERT REPORT OF DONALD HARRINGTON

December 10, 2015

including drywall and painting, cleanup costs, and associated Hensel Phelps management costs. Because the additional costs were not always separately identified segregating Paige's low voltage work from the other Truland work, it was necessary in some cases to calculate the portion of the costs relative to the low voltage work based on the documentation available. Based on the analysis, as much as $4,446,463 of the additional costs was determined to relate to Paige's low voltage work summarized as follows:

| Description | Amount |
|---|---|
| 1) Drywall, Painting, and Repairs Resulting From Damage, Rework, Late and Incomplete Work, Etc. | $ 700,556 |
| 2) Direct Costs of Rework | $ 20,483 |
| 3) Rosendin Low Voltage Work | $2,539,148 |
| 4) Cleanup Costs | $ 460,861 |
| 5) Hensel Phelps Management Costs | $ 725,415 |
| **Total** | **$4,446,463** |

Each of these five categories is discussed as follows:

1) **Drywall, Painting, and Repairs Resulting From Damages, Rework, Late and Incomplete Work, Etc.**   The additional costs incurred by Hensel Phelps include drywall, painting, and tile replacement to repair damage caused during the completion and correction of the electrical and low voltage work. Per Hensel Phelps "Explanation of Change" included in Sections 1.1 through 1.6 of its July 10, 2015 updated claim for additional costs, Hensel Phelps noted that "Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling." Hensel Phelps further noted that this "resulted in significant damages to finished spaces in the building." Hensel Phelps also noted that an "excessive quantity of openings had to be cut into the finished walls and ceilings to complete forgotten work". For example, Hensel Phelps noted that the acoustic ceiling tile damage and replacement was "primarily caused due to late low voltage

15

subcontractor working in the ceilings after they were signed off and closed in". Hensel Phelps also identified painting costs attributable to data cables and noted that "rework due to required data cable fixes in guestrooms". Paige's failure to timely complete its work resulted in additional costs incurred by Hensel Phelps.

As indicated above, the additional costs for drywall, painting, and damage repairs relate to Truland's contract work. The additional costs were not segregated separately between Paige's low voltage portion of the work and Truland's contract effort. In determining an amount of the additional drywall, painting, etc. costs attributable to Paige, 50 percent of the total costs were allocated to the low voltage work. Applying a 50 percent factor to the applicable categories results in $700,557 and is a conservative and equitable allocation of the additional costs incurred as a result of Paige for drywall, painting, etc., work.

To determine the 50 percent allocation factor documentation was reviewed related to the work. Hensel Phelps made numerous references to low voltage work in its claim. Other available documentation including contractor/vendor invoices and work orders citing multiple low voltage work efforts were reviewed.

For example, a total of 198 work orders for Cleveland Construction were reviewed to determine the amount of drywall work and repairs resulting from damages caused by low voltage subcontractors including Paige and SPL. Of the 188 legible work orders, 99 specifically identified Truland as wholly or partially responsible. Of the 99 work orders, 33 or 33 percent specifically referenced low voltage subcontractors as responsible for the drywall repairs. For the 66 work orders that did not further identify the type or category of work performed on behalf of Truland, it is reasonable to apply the 33 percent factor which yields 22 work orders related to low voltage work. Thus a total of 55 of the 99 work orders or 55 percent relate to low

16

voltage work which validates the use of a 50 percent factor for the drywall and paint costs included in the Hensel Phelps claim.

Rosendin Electric performed significant work to complete and correct Truland's work including the low voltage work of Paige and Paige subcontractors. A total of $2,539,148 or 79 percent of the $3,197,465 total of Rosendin's work for Truland was low voltage work. Based on the amount of low voltage rework performed by Rosendin, $700,557 is a conservative and reasonable estimate of the additional corrective costs incurred related to the low voltage work performed by Paige and its subcontractors and further validation that a 50 percent allocation of the drywall, paint and tile corrective costs to low voltage work is a reasonable and conservative allocation.

Invoices from Rosendin vendors identified the work performed. The total amount of many of those was wholly attributable to low voltage work. The total of Rosendin vendors was $1,401,524. The total associated with low voltage work was $1,148,506 or 82 percent. This is additional validation that a 50 percent allocation is reasonable. Paige is responsible for any costs incurred to correct its work.

2) **Direct Costs of Rework.** The additional cost of $20,483 includes the removal and replacement of finishes including millwork and stone to accommodate rework along with the removal and re-installation of furniture for data testing. These costs were listed in Hensel Phelps "Explanation of Change" for Sections 2.4, 4.2, 4.4, 11.2, and 11.7 of its July 10, 2015 updated claim for additional costs. For example, Hensel Phelps noted in its "Explanation of Change" for Section 11.7 that "Low Voltage certification testing was not performed after cable installation". This necessitated a contractor "to come into the rooms, remove the furniture from the clips on the wall, and return to reinstall after the testing was complete." Paige is responsible for any costs incurred as a result of Paige's inability to timely complete its work.

# Exhibit B

**(Declaration of Charles Paige, President, Paige International, Inc. With Attachments 1-2)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAIGE INTERNATIONAL, INC.      \*

     *Plaintiff*,       \*

v.       \*    Case No. 14-cv-01244 (JEB)

XL SPECIALTY INSURANCE CO., et al.  \*

     *Defendants*.      \*

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## DECLARATION OF CHARLES PAIGE CONCERNING
## DEFENDANTS' CLAIM OF OFFSET FOR DRYWALL DAMAGE

    Charles Paige, in his capacity as President of the plaintiff in this action, Paige

International, Inc., after being duly sworn on oath, states as follows:

    1.    Paige International, Inc. ("Paige") was a second-tier subcontractor to Truland

Systems Corporation ("Truland"), which was a first tier subcontractor to the prime contractor,

Hensel Phelps Construction Company ("Hensel Phelps") for the construction of the Marriott

Marquis Convention Center Hotel ("the Project"). Truland was bonded by the XL insurance

companies ("XL"), which issued both a payment bond and a performance bond for which

Truland was the Principal.

    2.    The objective of this declaration is to address that portion of the expert report

of Donald Harrington that contends that the "low voltage" subcontractors to Truland for the

Marriott, of which Paige was one of four, were responsible for 50% of the portion of drywall

costs incurred by Hensel Phelps which Hensel Phelps allocated to Truland.

    3.    The very notion that Paige, a communications and security cable installer, could

have been responsible for more than a miniscule amount of drywall repairs is so utterly absurd as

to call into question whether Donald Harrington has even the most basic understanding of how

construction projects are sequenced. There is not a single document in the entire Project record complaining that anyone from Paige damaged so much as a single piece of drywall, nor would one expect to find such a document, since Paige's cable installation *preceded* drywall installation.

4.      The majority of Paige's work involved running cables from where rooms *in the future* would be built to termination points in electrical closets. At that time, the floors on which Paige was working consisted of bare concrete. In the process of pulling cable, Paige's forces could not have damaged the drywall in the rooms because the rooms had not yet been built. Paige's forces could not have damaged the drywall in the hallways because there were no hallways. The same goes for ceilings. Just common sense suggests that accusing Paige of responsibility for *any* drywall damage, what's more 50% of that allocated to Truland, is either moronic or fraudulent.

5.      The Project was built entirely by subcontractors. It was Hensel Phelps's responsibility to schedule the work of the various subcontractors in a logical sequence. As a result of the impact on the schedule of the damage caused by Tropical Storm Andrea in June 2013, the work of the trades had to be accelerated. It was common knowledge among all Project participants that the owner, Marriott, had contracted to host a convention immediately following the scheduled date for substantial completion, and thus no time extensions could be granted.  In the last few months leading to the opening of the hotel on May 1, 2014, there were multiple trades all crowded together, under severe pressure to finish their respective parts of the job. Although its change orders to its drywall subs reveal that Hensel Phelps had included in its Project budget a "patching allowance" for damage to drywall, it is not surprising that the level of damage to the walls exceeded that anticipated by Hensel Phelps in that allowance.

6.      No records were kept concerning which trade or trades were responsible for drywall damage. In order to recover its costs, Hensel Phelps created a formula, based on each subcontractor's percentage share of punch list entries, as a means of "allocating" responsibility.

7.     Appended to this declaration as Attachment 1 is a chart showing the methodology used by Hensel Phelps in its allocation process. First, Hensel Phelps divided its subcontractors into two categories: those that were "potentially responsible" for drywall damage (each of which was designated as "100%"), and those which were not ("0%"). Those designated "0%" were the outdoor trades: the excavation contractor, the outdoor lighting contractor, and the landscaping contractor. Secondly, Hensel Phelps divided those that remained on its list into two categories: those that were judged to be engaged in "high impact" activities and "low impact" activities. It is difficult for me to tell just what criteria Hensel Phelps used to distinguish between the two. For "low impact" trades, 50% rather than 100% of their punch list entries were counted.

8.     Appended to this declaration as Attachment 2 are charts which show the results of Hensel Phelps's allocation process for its drywall and repainting costs. The smallest allocations (other than the 0.64% which Hensel Phelps allocated to itself) were to VQC (1.00%) and Lorton Stone (1.22%). VQC, after adjustment for its "low impact" status, is listed as having 287 punch list entries. Lorton Stone, also a "low impact" sub, had 294 entries.

9.     There were no subcontractors which had less than 287 punch list items to whom Hensel Phelps assessed costs for drywall damage. For example, Majestic Mirror had 118, Mortensen Woodwork had 106, Old Dominion Insulation had 109, and Fire STOPPERZ had 74 – none of which were assessed any drywall repairs by Hensel Phelps (Attachment 1, page 1)

10.    I have reviewed the Truland punch list, on which there are 7,082 entries, of which 70 are designated as being for Paige. At that level of punch list entries, if Paige had been a direct sub to Hensel Phelps rather than a sub to Truland, Paige would not have been allocated any of Hensel Phelps' drywall costs.

11.    Further, of the 70 "Paige" punch list entries, 63 of them were for the installation of the face plates over the data jacks in the rooms, work that has nothing to do with drywall.

12.     Further, Donald Harrington totally ignores *when* the drywall damage in question occurred, with respect to Paige's cable work. Nearly all of the drywall repairs for which Hensel Phelps sought reimbursement from its subcontractors occurred on or after February 2014. By that time Paige had already pulled its cable, and the only work left was to terminate our cables in IDF closets that were still under construction.

13.     I categorically deny any responsibility whatsoever on the part of Paige International, Inc. for reimbursement to XL of monies paid to Hensel Phelps for its costs of drywall repair and repainting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 2, 2016.


                                                    _____
                                                    Charles Paige, President
                                                    Paige International, Inc.

# Attachment 1

**(Hensel Phelps' Methodology for
Allocating Drywall Costs Among Subcontractors,
Based on Percentage of Punch List Entries)**

**Marriott Marquis Hotel**
**Custom Report**

02/05/15 13:12:07 EST

| | Total Number of Punchlist Items Opened from 1/1/14 - 6/30/14 | Percentage of Items Potentially Responsible for Damage | High or Low Damage Impact Activities | Adjusted Total Punchlist Items for Damage Costs Allocation | Percentage Damage Cost Allocation | Notes |
|---|---|---|---|---|---|---|
| **All Subcontractors Except Drywall, Paint & Final Cleaning** | | | | | | |
| Allstate Floors of DC, LLC 215 Items | 215 | 100% | High | 215 | 1.0% | |
| Anchor Construction Corporation 9 Items | 9 | 0% | n/a | - | 0.0% | Exterior Activity |
| Architectural Concepts 700 Items | 700 | 100% | Low | 350 | 1.6% | |
| Ashland Equipment, Inc. 159 Items | 159 | 100% | Low | 159 | 0.7% | |
| Baker DC, LLC 7 Items | 7 | 100% | High | 7 | 0.0% | |
| Beauboin 1397 Items | 1397 | 50% | Low | 349 | 1.6% | 50% of punchlist items are for Damage Repair |
| Bluword 6 Items | 6 | 100% | High | 6 | 0.0% | |
| CA Lindman 14 Items | 14 | 100% | High | 14 | 0.1% | |
| Chiaramonte Construction 12 Items | 12 | 100% | Low | 6 | 0.0% | |
| CSI/AT&T 125 Items | 125 | 100% | Low | 63 | 0.3% | |
| DC Slurry Partners 4 Items | 4 | 100% | High | 4 | 0.0% | |
| Elis Page Co. 615 Items | 615 | 100% | Low | 308 | 1.4% | |
| Floors, Etc. 1472 Items | 1472 | 50% | Low | 368 | 1.7% | 50% of punchlist items are for Damage Repair |
| Gelberg Signs 420 Items | 420 | 100% | Low | 210 | 1.0% | |
| Goldin & Stafford 4 Items | 4 | 100% | High | 4 | 0.0% | |
| Gordon Contractors, Inc. 16 Items | 16 | 100% | High | 16 | 0.1% | |
| Greenscreen 1 Item | 1 | 100% | High | 1 | 0.0% | |
| Hensel Phelps 3179 Items | 3179 | 50% | Low | 795 | 3.7% | 50% of punchlist items are for Damage Repair |
| Imperial Stone Paving 10 Items | 10 | 100% | High | 10 | 0.0% | |
| J&S Pavers 62 Items | 62 | 100% | High | 62 | 0.3% | |
| John J. Kirlin, LLC 3754 Items | 3754 | 100% | High | 3,754 | 17.5% | |
| USM (United Sheet Metal) 730 Items | 730 | 100% | High | 730 | 3.4% | Total JJK & Subcontractor Damage Percentage = 22.9% |
| DECA 206 Items | 206 | 100% | High | 206 | 1.0% | |
| Honeywell 53 Items | 53 | 100% | High | 53 | 0.2% | |
| Old Dominion Insulation 218 Items | 218 | 100% | Low | 109 | 0.5% | |
| JP Phillips 827 Items | 827 | 100% | Low | 414 | 1.9% | |
| Kalkreuth 5 Items | 5 | 100% | High | 5 | 0.0% | |
| Kane 4339 Items | 4339 | 80% | High | 3,471 | 16.2% | Kane Damage Percentage = 16.2% |
| Lorton Stone, LLC 587 Items | 587 | 100% | Low | 294 | 1.4% | |
| Los Primos 3 Items | 3 | 100% | Low | 2 | 0.0% | |
| Majestic Mirror 54 Items | 54 | 100% | Low | 27 | 0.1% | |
| Material Distributors, Inc. 236 Items | 236 | 100% | Low | 118 | 0.5% | |
| MC Dean 2 Items | 2 | 0% | n/a | - | 0.0% | Exterior Activity |
| Metropolitan Rolling Door, Inc. 4 Items | 4 | 100% | High | 4 | 0.0% | |
| Miller & Long Concrete Construction 13 Items | 13 | 100% | High | 13 | 0.1% | |
| Miscellaneous Steel Industries, Inc 79 Items | 79 | 100% | Low | 79 | 0.4% | |
| Modern Door 33 Items | 33 | 100% | High | 33 | 0.2% | |
| Mortensen Woodwork 212 Items | 212 | 100% | Low | 106 | 0.5% | |
| National Fire Protection 574 Items | 574 | 100% | Low | 287 | 1.3% | |
| New Era 858 Items | 858 | 100% | High | 429 | 2.0% | |
| Novum 14 Items | 14 | 100% | High | 14 | 0.1% | |
| Otis Elevator 212 Items | 212 | 100% | High | 212 | 1.0% | |
| Parkinson Construction 20 Items | 20 | 100% | High | 20 | 0.1% | |
| Paxile 28 Items | 28 | 100% | Low | 14 | 0.1% | |
| Precision Doors Hardware, Inc 1 Item | 1 | 100% | Low | 1 | 0.0% | |
| Quito Electrical Contracting Company, Inc. 2 Items | 2 | 100% | High | 2 | 0.0% | |
| Regional Contracting 51 Items | 51 | 100% | High | 51 | 0.2% | |
| Ruppert Landscaping 44 Items | 44 | 0% | n/a | - | 0.0% | Exterior Activity |
| Saflok 38 Items | 38 | 100% | Low | 19 | 0.1% | |
| Schnabel Foundation Company 5 Items | 5 | 0% | n/a | - | 0.0% | Exterior Activity |
| Southern Insulation, Inc. 57 Items | 57 | 100% | Low | 29 | 0.1% | |
| Spectra 343 Items | 343 | 100% | Low | 172 | 0.8% | |
| Staging Concepts 36 Items | 36 | 100% | High | 36 | 0.2% | |
| Tate Ornamental 39 Items | 39 | 100% | High | 39 | 0.2% | |
| Total Shading Solutions 20 Items | 20 | 100% | Low | 10 | 0.0% | |
| Truland Systems Corporation 7082 Items | 7082 | 100% | High | 7,082 | 33.0% | Truland Damage Percentage = 33% |
| TSI/Exterior Wall Systems, Inc. 584 Items | 584 | 100% | Low | 292 | 1.4% | |
| VQC 573 Items | 573 | 100% | Low | 287 | 1.3% | |
| Won-Door Corporation 6 Items | 6 | 100% | High | 6 | 0.0% | |
| Worcester Eisenbrandt, Inc 61 Items | 61 | 100% | Low | 31 | 0.1% | |
| **Drywall, Paint & Final Clean Subcontractors** | | | | | | |
| Calistoga Construction, LLC 127 Items | | | | | | |
| Cleveland Construction 2473 Items | | | | | | |
| Commercial Interiors 73 Items | | | | | | |
| National Service Contractors 1451 Items | | | | | | |
| NLP 2671 Items | | | | | | |
| P&D Drywall 2076 Items | | | | | | |
| Progressive Wallcovering Technicians, Inc. 6626 Items | | | | | | |
| Teel 46 Items | | | | | | |
| **Total:** | 30,577 | | | 21,467 | | |

XL 03169

# Attachment 2

**(Hensel Phelps' Percentage Allocations of Drywall Costs Among Subcontractors, Based on Percentage of Punch List Entries, and Allocation to Truland by Subcontractor)**

## Tower - Above Grade (Lvl 1 - 16)

| | |
|---|---|
| Other | 3.15% |
| P&D Drywall | 1.74% |
| Hensel Phelps | 0.64% |
| Gelberg Signs | 1.40% |
| VQC | 1.00% |
| Lorton Stone, LLC | 1.22% |
| TSI | 1.17% |
| Architectural Concepts | 2.31% |
| JP Phillips | 4.25% |
| NFP | 1.66% |
| Beaubois | 4.53% |
| Floors, Etc. | 4.89% |
| Kane | 16.24% |
| JJK / USM / DECA | 22.73% |
| Truland Systems Corporation | 33.07% |
| | |
| Totals | 100.00% |

| Podium - Below Grade (Lvl A - P2) | |
|---|---|
| Other | 3.79% |
| Hensel Phelps | 0.77% |
| Cleveland | 0.53% |
| Gelberg Signs | 1.69% |
| Lorton Stone, LLC | 1.47% |
| Architectural Concepts | 3.78% |
| JP Phillips | 2.04% |
| NFP | 1.41% |
| Beaubois | 5.44% |
| Floors, Etc. | 5.89% |
| JJK / USM / DECA | 30.37% |
| Truland Systems Corporation | 42.82% |
| | |
| Totals | 100.00% |

## Share of Undetermined Damage for Tower (Based on Punchlist)



- Hensel Phelps, 0.64%
- P&D Drywall, 1.74%
- Gelberg Signs, 1.40%
- VQC, 1.00%
- Lorton Stone, LLC, 1.22%
- TSI, 1.17%
- Architectural Concepts, 2.31%
- JP Phillips, 4.25%
- NFP, 1.66%
- Beaubois, 4.53%
- Floors, Etc., 4.89%
- Kane, 16.24%
- Other, 3.15%
- JIK / USM / DECA, 22.73%
- Truland Systems Corporation, 33.07%

**Share of Undetermined Damage for Podium (Based on Punchlist)**



**Exhibit 1.1**
**Response to XL Bond Claim Questions**
**Date: 2/12/15**

The following table summarizes the total amount of drywall, paint & final cleaning costs that were included in the original bond claim submission based on a percentage allocation to Truland.

| Section # | Description | Date Range of Costs from T&M Tickets | Costs Included |
|---|---|---|---|
| Section 1.1 | Cleveland Drywall Costs | Feb - May 2014 | $ 223,126 |
| Section 1.2 | P&D Drywall Costs | Feb 2014 | $ 4,234 |
| Section 1.3 | Commercial Interiors Costs | March - June 2014 | $ 78,797 |
| Section 1.4 | NLP Paint Costs | Feb - May 2014 | $ 26,507 |
| Section 1.5 | PWT Paint Costs | Jan - May 2014 | $ 42,662 |
| Section 1.6 | Teel Paint Costs | April - July 2014 | $ 31,847 |
| Section 2.3 | Allstate Tile Costs | April - May 2014 | $ 16,157 |
| Section 6.2 | NSC Final Clean Costs | April - May 2014 | $ 259,839 |
| | | | |
| | | Total: | $ 683,169 |

Note that the above costs were incurred between January 2014 and June 2014.

Attached is a summary print-out from ComplianceWise which is the software used on the project to track work completion and punchlist items by subcontractor. The 33% allocation of Truland damage cost responsibility is based on the percentage of work completion and punchlist items identified during this time period for Truland vs. the number of items identified for the balance of the subcontractors on the project.

**XL 03168**

# Exhibit C

**(Hensel Phelps Claim for Drywall Repair
and Repainting, by Subcontractor)**

Marriott Marquis, Washington DC
Truland Systems Corporation

**Section 1.1 - Cleveland Costs (Drywall)**

| Company | Description | Cost | Notes |
|---|---|---|---|
| Cleveland | Acoustic Ceiling Tile Damage & Replacement | $ 49,107 | See Attached Summary Sheet & Detailed Description. This is primarily caused due to late low voltage subcontractor working in the ceilings after they were signed off and closed in. |
| Cleveland | Cleveland T&Ms Specifically for Truland | $ 154,146 | Cleveland T&M Log - Truland Sole Contributor. See attached T&M tickets for further description. |
| Cleveland | Cleveland T&Ms - Undetermined Damage in Podium - Truland's Share | $ 16,734 | $38,917 worth of general drywall repairs were performed by Cleveland in the Podium (Below grade portion of the Project). Truland is responsible for 43% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). $38,917 * 43% = $16,734 |
| Cleveland | Cleveland T&Ms - T&M Crew Damage in Podium - Truland's Share | $ 185,126 | $432,852 worth of general drywall repairs were performed in the Podium by Cleveland's T&M Crew tasked with repairing damage from other trade's punchlist work. Truland is responsible for 43% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). $432,852 * 43% = $186,126 |
| Cleveland | Cleveland T&Ms - Damage in Tower - Truland's Share | $ 20,266 | $61,412 worth of general drywall repairs/ rework were performed in the Towers by Cleveland's T&M Crew tasked with repairing damage from other trade's punchlist work. Truland is responsible for 33% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). $61,412 * 33% = $20,266 |
| | | $ 426,379 | |

**Explanation of Change:**

Truland's incomplete & late general construction activities resulted in significant damages to finished spaces in the building. This excessive damage was largely caused by Truland's incomplete/late installation of work. Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling. The damage is comprised of both accidental damage from work carts and tool belts etc as well as by the excessive quantity of holes that had to be cut back into the finished walls and ceilings to complete forgotten work. An outline of the costs incurred is listed above and detailed in the attached ticket logs. Percentage allocations are based on a punchlist analysis of items that could lead to damage.

XL00751

Marriott Marquis, Washington DC
Truland Systems Corporation

**Damage to Acoustical Ceiling Tile Systems**

| Company | Description | Cost | | Notes |
|---|---|---|---|---|
| Cleveland Construction | Replacement Specialty Ceiling Tile (ACT 2) | $ | 35,850 | $39,833 worth of replacement tile was ordered. Truland damaged 90% of this tile type. $39,833 * 90% = $35,850 (Truland's Responsibility) |
| Cleveland Construction | Replacement Non-Specialty Ceiling Tiles | $ | 13,257 | $17,676 worth of replacement tile was ordered. Truland damaged 75% of the non-specialty ACT types. $17,676 * 75% = $13,257 |
| | | | | |
| | | | | |
| | | | | |
| | | $ | 49,107 | Subtotal Above |
| | Grand Total Backcharge $ | | 49,107 | |

**Explanation of Change:**

Truland's above ceiling construction activities resulted in significant damage to the ACT ceilings on the Project. Incomplete overhead rough in and the constant need to get back above the ceilings resulted in the replacement of numerous ceiling tiles and grid systems. The grid material and labor portion of this cost impact were tracked via T&M ticket, ACT quantities were tracked separately and are outlined above. The attached costs breakdowns show the additional quantities of ACT that had to be ordered to replace the damaged tile.

XL00752

Marriott Marquis, Washington DC
Truland Systems Corporation

### Section 1.2 - P&D Costs (Drywall)

| Company | Description | Cost | Notes |
|---|---|---|---|
| P&D | Drywall T&M Tickets - T&M Damage Crew - Truland's Share | $ 134,596 | $134,596 worth of backcharges specifically listed on P&D's tickets. Please reference attached tickets for further information/backup. |
| P&D | P&D T&M Log - Truland's Share of Undetermined Damages (TOWERS) | $ 4,234 | $4,234 worth of general drywall repairs/ rework were performed in the Towers by P&D's T&M Crew tasked with repairing damage from other trade's punchlist work. Truland is responsible for 33% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). $12,830 * 33% = $4,234 |
| P&D | P&D T&M Log - Truland Sole Contributor | $ 49,695 | $49,695 worth of backcharges specifically listed on P&D's tickets. Please reference attached tickets for further information/backup. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | $ 188,525 | |

**Explanation of Change:**

Truland's incomplete & late general construction activities resulted in significant damages to finished spaces in the building. This excessive damage was largely caused by Truland's incomplete/late installation of work. Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling. The damage is comprised of both accidental damage from work carts and tool belts etc as well as by the excessive quantity of holes that had to be cut back into the finished walls and ceilings to complete forgotten work. An outline of the costs incurred is listed above and detailed in the attached ticket logs. Percentage allocations are based on a punchlist analysis of items that could lead to damage.

XL00753

Marriott Marquis, Washington DC
Truland Systems Corporation

Section 1.3 - Commercial Interiors Costs

| Company | Description | | Cost | Notes |
|---|---|---|---|---|
| Commercial Interiors | Costs Incurred | $ | 609,594 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | $ | 609,594 | |

**Explanation of Change:**

Truland's incomplete & late general construction activities resulted in significant damages to finished spaces in the building.  This excessive damage was largely caused by Truland's incomplete/late installation of work.  Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling.  The damage is comprised of both accidental damage from work carts and tool belts etc as well as by the excessive quantity of holes that had to be cut back into the finished walls and ceilings to complete forgotten work.   An outline of the costs incurred is listed above and detailed in the attached ticket logs.  Percentage allocations are based on a punchlist analysis of items that could lead to damage.

The attached spreadsheet itemizes the additional work performed by Commercial Interiors that are a direct / shared result of Truland's incomplete/late installation of work.  The work primarily performed by Commercial Interiors includes punchlist due to late work damage, patches, and firestopping.

XL00755

Marriott Marquis, Washington DC
Truland Systems Corporation

### Section 1.4 - NLP Costs (Painting & VWC)

| Company | Description | Cost | Notes |
|---|---|---|---|
| NLP | Painting & VWC T&M Backcharges for Truland | $ 13,076 | NLP T&M backcharges where Truland was sole contributor.  See attached summary spreadsheet and backup. |
| NLP | Painting & VWC T&Ms for Podium - Truland's Share | $ 12,848 | $29,880 worth of general paint and wall covering repairs were performed by NLP in the common areas of the Podium (Below grade portion of the Project).  Truland is responsible for 43% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). $29,680 * 43% = $12,848 |
| NLP | Painting & VWC T&Ms for Tower - Truland's Share | $ 13,659 | $41,392 worth of general paint and wall covering repairs were performed by NLP in the common areas of the Tower.  Truland is responsible for 33% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility).  $41,392 * 33% = $13,659 |
| NLP | Painting & VWC T&Ms for Truland due to Data Cable Repair | $ 8,803 | This rework was caused due to required data cable fixes in the guestrooms. |
| NLP | Painting & VWC T&Ms due to Ongoing Data Cable Work | $ 30,000 | This rework was caused due to required data cable fixes in the guestrooms. |
| | | | |
| | | | |
| | | | |
| | | $ 78,386 | |

**Explanation of Change:**

Truland's incomplete & late general construction activities resulted in significant damages to finished spaces in the building.  This excessive damage was largely caused by Truland's incomplete/late installation of work.  Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling.  The damage is comprised of both accidental damage from work carts and tool belts etc as well as by the excessive quantity of holes that had to be cut back into the finished walls and ceilings to complete forgotten work.  An outline of the costs incurred is listed above and detailed in the attached ticket logs.  Percentage allocations are based on a punchlist analysis of items that could lead to damage.

XL00756

Marriott Marquis, Washington DC
Truland Systems Corporation

**Section 1.5 - PWT Above Grade Painting Services**

| Company | Description | Cost | Notes |
|---|---|---|---|
| PWT | Painting & VWC T&Ms for Tower - Truland's Share | $          51,890 | General paint and wall covering repairs were performed by PWT in the common areas of the Tower.  Truland is responsible for 33% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  | $          51,890 |  |

**Explanation of Change:**

Truland's incomplete & late general construction activities resulted in significant damages to finished spaces in the building.  This excessive damage was largely caused by Truland's incomplete/late installation of work.  Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling.  The damage is comprised of both accidental damage from work carts and tool belts etc as well as by the excessive quantity of holes that had to be cut back into the finished walls and ceilings to complete forgotten work.   An outline of the costs incurred is listed above and detailed in the attached ticket logs.  Percentage allocations are based on a punchlist analysis of items that could lead to damage.

XL00757

Marriott Marquis, Washington DC
Truland Systems Corporation

**Section 1.6 - Teel Above Grade Painting Services**

| Company | Description | Cost | Notes |
|---------|-------------|------|-------|
| Teel | Painting & VWC T&Ms for Tower - Truland's Share | $     38,518 | General paint and wall covering repairs were performed by Teel in the common areas of the Tower.  Truland is responsible for 33% of this damage based on the quantity of punchlist work in finished spaces (See attached breakdown of all Subcontractors punchlist responsibility). |
| | | | |
| | | | |
| | | $     38,518 | |

**Explanation of Change:**

Truland's incomplete & late general construction activities resulted in significant damages to finished spaces in the building.  This excessive damage was largely caused by Truland's incomplete/late installation of work.  Truland often had to go back into finished areas to install electrical and low voltage system devices and cabling.  The damage is comprised of both accidental damage from work carts and tool belts etc as well as by the excessive quantity of holes that had to be cut back into the finished walls and ceilings to complete forgotten work.  An outline of the costs incurred is listed above and detailed in the attached ticket logs.  Percentage allocations are based on a punchlist analysis of items that could lead to damage.

XL00758

# Exhibit D

**(Sample Cleveland T & M tickets
For Which Hensel Phelps
Allocated Responsibility to Truland)**

# CLEVELAND CONSTRUCTION

CLEVELAND • COLUMBUS • CINCINNATI • NAPLES • WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

**EXTRA WORK ORDER**

N⍛ 34851

CE 630

PI: _____ DC

Client: Hansel Phibos
Address: 901 Mass Ave
City: Darlington   State: DC   Zip: _____
Date: 10/25/13

## Instructions and Details of Extra Work Performed

Remove Ceiling Grid on the North Side to install colum & related damage by overhead trades

## LABOR

| TRADE | DESCRIPTION | HOURS | ST. HR RATE | O.T. HR RATE | HOURLY RATE | EXTENSION |
|-------|-------------|-------|-------------|--------------|-------------|-----------|
| 1 | Foreman | 2 hr | 6 | | | |
| 2 | Carpenters | 8 hr | 16 | | | |
| 1 | Labor | 4 hr | 4 | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | **TOTAL LABOR** | | | | **Total Labor** | |

## MATERIAL

| QUANTITY | DESCRIPTION | UNIT PRICE | EXTENSION |
|----------|-------------|------------|-----------|
| | | | |
| 8 | channels | 2.0% | |
| 1 | Boxes 4' Tees | 2.0% | |
| 1 | Boxes 2' Tees | 15.0% | |
| 5 | wall Angel | 35% | |
| 10 | Wires | | |
| | | Delivery | |
| | | Sales Tax | |
| | | Material Subtotal | |

## EQUIPMENT

| QUANTITY | EQUIPMENT/DESCRIPTION | UNITS | UNIT RATE | EXTENSION |
|----------|----------------------|-------|-----------|-----------|
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| | Total Labor |
| | Total Equip. |
| | Total Material |
| | Subcontractor |
| | **TOTAL** |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30 DAYS OF INVOICE DATE.

Repair and throughout m3 North. Mostly by DK trades (USM, insulate Also, late fire alarm work. verify who work has performed. AP 10/28/13

_____
Name of Company

_____
Authorized Signature

PREPARED BY: Bill Gorman

XL 12415

# CLEVELAND CONSTRUCTION

**EXTRA WORK ORDER**

Nº 35113

CLEVELAND ♦ COLUMBUS ♦ CINCINNATI ♦ NAPLES ♦ WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

CC#630

Client: Hensel Phelps
Address: 701 _____ AV
City: _____ State: DC Zip: _____

PI: MMDC
Date: 1/2/14

## Instructions and Details of Extra Work Performed

Patch Electric Frounts on M4, M3, M2 and M1
Drywall and Tape / Fire Caulk

### LABOR

| TRADE | DESCRIPTION | HOURS | ST. HR RATE | O.T. HR RATE | HOURLY RATE | EXTENSION |
|---|---|---|---|---|---|---|
| | Foreman | 4 hrs | 4 | | | |
| | Carpenter | 8 hr | | | | |
| | Finisher | 8 hr | 3 | | | |
| | Labor | 4 hr | 4 | | | |
| | | TOTAL LABOR | | | Total Labor | |

### MATERIAL

| QUANTITY | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|
| 5 | 4x10x5/8 XR Drywall | | |
| 10 | 2x4 Angel | | |
| 3 | Boxes USG mud | | |
| 4 | Rolls Tape | Delivery | |
| | | Sales Tax | |
| | | Material Subtotal | |

### EQUIPMENT

| QUANTITY | EQUIPMENT/DESCRIPTION | UNITS | UNIT RATE | EXTENSION |
|---|---|---|---|---|
| | | | Total Labor | |
| | | | Total Equip. | |
| | | | Total Material | |
| | | | Subcontractor | |
| | | | TOTAL | |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30 DAYS OF INVOICE DATE.

Name of Company

Authorized Signature

PREPARED BY: Will Gorman

XL 12425

# CLEVELAND CONSTRUCTION

EXTRA WORK ORDER

CLEVELAND ◦ COLUMBUS ◦ CINCINNATI ◦ NAPLES ◦ WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

CE # 630

Client: _____     PI: _____
Address: _____
City: _____ State: _____ Zip: _____   Date: _____

### Instructions and Details of Extra Work Performed

### LABOR

| TRADE | DESCRIPTION | HOURS | ST HR RATE | OT HR RATE | HOURLY RATE | EXTENSION |
|-------|-------------|-------|-----------|-----------|-------------|-----------|
|       |             |       |           |           |             |           |
|       |             |       |           |           |             |           |
|       |             |       |           |           |             |           |
|       |             |       |           |           |             |           |
|       |             |       |           |           |             |           |
|       |             |       |           |           | TOTAL LABOR | Total Labor |

### MATERIAL

| QUANTITY | DESCRIPTION | UNIT PRICE | EXTENSION |
|----------|-------------|-----------|-----------|
|          |             |           |           |
|          |             |           |           |
|          |             |           |           |
|          |             |           |           |
|          |             |           |           |
|          |             |           |           |
|          |             | Delivery  |           |
|          |             | Sales Tax |           |
|          |             | Material Subtotal |    |

### EQUIPMENT

| QUANTITY | EQUIPMENT DESCRIPTION | UNITS | UNIT RATE | EXTENSION |
|----------|----------------------|-------|-----------|-----------|
|          |                      |       |           |           |
|          |                      |       |           |           |
|          |                      |       |           |           |

| | |
|---|---|
| Total Labor | |
| Total Equip. | |
| Total Material | |
| Subcontractor | |
| TOTAL | |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30 DAYS OF INVOICE DATE.

Name of Company

Authorized Signature

PREPARED BY: _____

XL 12445

# CLEVELAND CONSTRUCTION

CLEVELAND ◆ COLUMBUS ◆ CINCINNATI ◆ NAPLES ◆ WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

**EXTRA WORK ORDER**

PI: _____

Client: _____
Address: _____
City: _____ State: _____ Zip: _____

Date: _____

## Instructions and Details of Extra Work Performed

## LABOR

| TRADE | DESCRIPTION | HOURS | ST. HR RATE | O.T. HR RATE | HOURLY RATE | EXTENSION |
|-------|-------------|-------|-------------|--------------|-------------|-----------|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | **TOTAL LABOR** | | | **Total Labor** | |

## MATERIAL

| QUANTITY | DESCRIPTION | UNIT PRICE | EXTENSION |
|----------|-------------|------------|-----------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **Delivery** | |
| | | **Sales Tax** | |
| | | **Material Subtotal** | |

## EQUIPMENT

| QUANTITY | EQUIPMENT/DESCRIPTION | UNITS | UNIT RATE | EXTENSION |
|----------|----------------------|-------|-----------|-----------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| **Total Labor** | |
| **Total Equip.** | |
| **Total Material** | |
| **Subcontractor** | |
| **TOTAL** | |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT
AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND
THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE
CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW
LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30
DAYS OF INVOICE DATE.

_____
Name of Company

PREPARED BY: _____

XL 12417

## CLEVELAND CONSTRUCTION

CLEVELAND • COLUMBUS • CINCINNATI • NAPLES • WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

**EXTRA WORK ORDER**

630

Client: _____   PI: _____
Address: _____
City: _____ State: _____ Zip: _____   Date: _____

### Instructions and Details of Extra Work Performed

### LABOR

| TRADE | DESCRIPTION | HOURS | ST. HR RATE | O.T. HR RATE | HOURLY RATE | EXTENSION |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | **TOTAL LABOR** | | | | **Total Labor** | |

### MATERIAL

| QUANTITY | DESCRIPTION | | | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Delivery | |
| | | | | Sales Tax | |
| | | | | Material Subtotal | |

### EQUIPMENT

| QUANTITY | EQUIPMENT/DESCRIPTION | | UNITS | UNIT RATE | EXTENSION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Total Labor | |
| | | | | Total Equip. | |
| | | | | Total Material | |
| | | | | Subcontractor | |
| | | | | TOTAL | |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30 DAYS OF INVOICE DATE.

_____
Name of Company

PREPARED BY: _____

**XL 12418**



# CLEVELAND CONSTRUCTION

CLEVELAND • COLUMBUS • CINCINNATI • NAPLES • WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

**EXTRA WORK ORDER**

630

**Client:** _____ **PI:** _____
**Address:** _____
**City:** _____  **State:** _____  **Zip:** _____  **Date:** _____

| Instructions and Details of Extra Work Performed |
|---|
| |
| |
| |

## LABOR

| TRADE | DESCRIPTION | HOURS | ST. HR RATE | O.T. HR RATE | HOURLY RATE | EXTENSION |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | TOTAL LABOR | | | Total Labor | |

## MATERIAL

| QUANTITY | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Delivery | |
| | | Sales Tax | |
| | | Material Subtotal | |

## EQUIPMENT

| QUANTITY | EQUIPMENT/DESCRIPTION | UNITS | UNIT RATE | EXTENSION |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| Total Labor | |
| Total Equip. | |
| Total Material | |
| Subcontractor | |
| TOTAL | |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30 DAYS OF INVOICE DATE.

_____
Name of Company

_____
Authorized Signature

**PREPARED BY:** _____

**XL 12419**

## CLEVELAND CONSTRUCTION

CLEVELAND • COLUMBUS • CINCINNATI • NAPLES • WASHINGTON D.C.
8620 Tyler Boulevard
Mentor, Ohio 44060
440-255-8000

**EXTRA WORK ORDER**

№ 35337

CE#630

Client: _Hensel Phelps_
Address: _924 Mass. Av_
City: _Washington_   State: _DC_   Zip: _____

PI: _1st Wing DC_
Date: _____

### Instructions and Details of Extra Work Performed

_Patch Holes on 6th and 10th Floors_

_BACKCHARGE TO SSK & TRULAND_

### LABOR

| TRADE | DESCRIPTION | HOURS | ST. HR RATE | O.T. HR RATE | HOURLY RATE | EXTENSION |
|---|---|---|---|---|---|---|
| 1 | Foreman   2 br | 2 | | | | |
| 3 | Carpenter  8 br | 24 | | | | |
| 3 | Finisher  8 br | 24 | | | | |
| | | | | | | |
| | | | | | | |
| | | TOTAL LABOR | | | Total Labor | |

### MATERIAL

| QUANTITY | DESCRIPTION | | | | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|
| 8 | 4 x 10 x 5/8 Drywall | | | | | |
| 10 | 3 5/8 Steel | | | | | |
| 13 | Bags 5.2 Sand | | | | | |
| 6 | Buckets USG mud | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | Delivery | |
| | | | | | Sales Tax | |
| | | | | | Material Subtotal | |

### EQUIPMENT

| QUANTITY | EQUIPMENT/DESCRIPTION | | UNITS | UNIT RATE | EXTENSION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| | |
|---|---|
| Total Labor | |
| Total Equip. | |
| Total Material | |
| Subcontractor | |
| TOTAL | |

THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A CONTRACT AND THE WORK DETAILED ABOVE WAS ORDERED BY HIM AND THAT THE MATERIAL, LABOR AND OTHER ITEMS LISTED ARE CORRECT. THAT HIS SIGNATURE IS AUTHORIZED BY THE BELOW LISTED COMPANY AS VALID APPROVAL FOR PAYMENT WITHIN 30 DAYS OF INVOICE DATE.

_SSK/TRULAND_
_50/50_

_____
Name of Company

_____
Authorized Signature

PREPARED BY: _Will Gorman_

**XL 12471**