UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAIGE INTERNATIONAL, INC.          *

    *Plaintiff,*          *

v.          *          Case No. 14-cv-01244 (JEB)

XL SPECIALTY INSURANCE CO., et al.  *

    *Defendants.*          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MOTION TO STRIKE DEFENDANTS' EXPERT REPORT OF
## DONALD HARRINGTON ON MANAGEMENT COSTS

Plaintiff Paige International, Inc. ("Paige"), through counsel, pursuant to Federal Rules of Evidence 702 and 703, and the legal principles enunciated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny, moves the Court to strike the expert report of Donald Harrington. The Report at issue was submitted by defendants XL insurance companies to support offsets asserted by XL against the amounts claimed to be due to Paige in this case under the XL payment bond. The specific offset addressed in this motion is one of five asserted by Harrington, and involves a portion of the monies that XL paid in settlement of the prime contractor's performance bond claim for management costs.

A copy of the Harrington Report is set forth at BD-1.[1] For ease of reference, that part of the Report dealing with management costs which is specifically addressed in this motion is attached hereto as Exhibit A.

---

[1] The plaintiff has assembled in a single submission the expert report at issue, the relevant contracts and bonds, and other key documents, entitled "Basic Documents Applicable to All Motions," hereafter BD- __. The documents specifically related to the management cost issues are attached hereto.

## Introduction

This matter involves a suit by an unpaid sub-subcontractor to enforce a payment bond issued by the surety defendants on behalf of an insolvent electrical subcontractor which was terminated for default and which was liquidated in bankruptcy. This *Daubert* motion is the third of four, each of which addresses the admissibility of the Report submitted by Donald Harrington concerning specific claims asserted as offsets by the surety against the amount due to the plaintiff for monies paid out to the prime contractor under the performance bond.

In its first motion concerning XL's claim of offset for monies paid to the prime contractor in reimbursement of the prime's cleanup costs, sections I-IV set forth alternative grounds for excluding the entire Harrington Report, which plaintiff incorporates into this Motion by reference. In the event the entire Report is not excluded, this Motion is directed at the deficiencies in the Report concerning XL's attempt to pass on to the plaintiff sub-subcontractor a part of the prime contractor's costs for purported increases in management costs which the prime contractor asserted, in its performance bond claim, was the joint responsibility of the electrical subcontractor and XL as its surety.

## Background and Setting

This matter arises out of the construction of the Marriott Marquis Hotel, which is adjacent to the District of Columbia Convention Center. The prime contractor was Hensel Phelps Construction Company. The (now defunct) electrical subcontractor was Truland Systems Corporation. The plaintiff, Paige International, Inc., was one of four low-voltage second-tier subcontractors to Truland. The defendants, the XL insurance companies, issued payment and performance bonds on behalf of Truland.[2]

---

[2] A detailed history of the Project is set forth in plaintiff's first *Daubert* motion.

During the course of the Project Truland became insolvent and failed, among other things, to make payments to its subcontractors and suppliers, including Paige. Under its payment bond, XL had pledged to make payment to persons supplying labor and materials to the Project if not paid by Truland. Paige filed a timely claim under the XL payment bond, but XL refused to honor its bond. This case involves a suit by Paige to enforce Truland's payment bond.

Truland's failure to make payment to its subcontractors and suppliers constituted a breach of its subcontract with Hensel Phelps. As a result, Hensel Phelps terminated Truland for default, thereby invoking XL's obligation under its performance bond to complete Truland's work. Upon XL's refusal to honor its bond, Hensel Phelps contracted with a substitute electrical subcontractor. After substantial completion of the substitute electrical subcontractor's work, Hensel Phelps filed a claim against XL for the extra costs it incurred, as well as costs for which Hensel Phelps had issued backcharges to Truland during the Project ("the HP Claim"). XL denied the HP Claim and asserted various defenses.

The XL performance bond incorporated the dispute resolution process in the Hensel Phelps-Truland subcontract, which provided for arbitration. After Hensel Phelps submitted a demand for arbitration and XL filed a counterclaim, before an arbitrator was appointed a settlement was reached under which XL paid a portion of the HP Claim and permitted HP to keep monies it had withheld from Truland.

The HP Claim asserted a breach by XL of its contractual obligations under its performance bond. Hensel Phelps' damages were based on the costs incurred by HP in completing Truland's work. The HP Claim made no effort to identify specific costs that may have been the fault of any of Truland's subcontractors. After making payment to Hensel Phelps, XL engaged the services of a construction claims consultant, Donald Harrington, whose assigned task was to review the HP Claim and to "segregate that portion of costs related to low voltage

work performed by Paige and its subcontractors" as the basis for an offset against Paige's payment bond claim. HP-1 at 14. The methodology followed by Harrington in undertaking that task was to review each individual part of the HP Claim, identify any work that was in Harrington's judgment "related to low voltage," and then to add up the costs incurred by Hensel Phelps for such work. All such costs were then asserted in Harrington's Report to be the responsibility of the low voltage subcontractors, and thus constituted in his opinion offsets against the amount due from XL to Paige under the XL payment bond.

This *Daubert* motion is the third of four, each of which addresses the admissibility of the expert report of Donald Harrington concerning specific claims asserted by XL as offsets to Paige's payment bond claim. In its first motion, concerning XL's claim of offset for monies paid to the prime contractor in reimbursement of the prime's cleanup costs, sections I-IV set forth alternative grounds for excluding the entire Harrington Report, which plaintiff incorporates into this Motion by reference. In the event the entire Report is not excluded, this Motion is directed at the deficiencies in the Report concerning XL's $725,415 claim for the additional management costs incurred by Hensel Phelps as the result of the default termination of Truland.

### The Hensel Phelps Claim Against XL For Management Costs

Since the offset which XL asserts against Paige is derivative of the liability Hensel Phelps asserted against XL in its status as Truland's performance bond surety, the first step in the process of determining whether any such Paige liability exists is an analysis of the Hensel Phelps' claim ("the HP Claim"). That claim, in its entirety with respect to management costs, in the same electronic format as provided by XL, is appended hereto as Attachment 1. HP's management costs claim consists of a chart ("the Claim Chart") that sets forth the basis for the claim as "HP Staff Costs." The Claim Chart further provides the Description as "Hensel Phelps Staff Costs thru 05/31/2015", the Cost as  "$1,594,101," and under Notes states "See attached spreadsheet

summary." Below the text portion of the Claim Chart, under the heading "Explanation of Change," is the following:

> These costs have been updated thru May 2015 include the actual Hensel Phelps management costs incurred to date on behalf of Truland. Reference section 9 of the Hensel Phelps response letter to Manier & Herod for additional information.

The reference under "Explanation of Change" to section Section "9" of Hensel Phelps' response to the Manier & Herod letter is erroneous. The HP letter to Manier & Herod is set forth at   BD-10. Section 9 addresses the costs of the substitute electrical subcontractor, Rosendin Electric. The correct reference for management costs is to Section *11*, under "Hensel Phelps Staff Costs." A copy of that page, for ease of reference, is attached hereto as Exhibit B. The portion of that letter that is relevant to this motion states as follows:

> Note that the quantity of staff time included in this claim represents the amount of effort, issue resolution, and management that was required by Hensel Phelps to mitigate the overall costs impact to the project. Note that this project should have been completed by May 1, 2014. Not all staff time is allocated to Truland, but only the percentage of time proportionate to Truland's outstanding work completion items as outlined in the above sections.

There is no narrative explanation provided by Hensel Phelps in the HP Claim itself. The explanatory letter to counsel for XL asserts that such costs were "required by Hensel Phelps to mitigate the overall costs impact to the project" and that "the project should have been completed by May 1, 2014." The attached "spreadsheet summary" simply sets out Hensel Phelps' alleged damages, assuming the existence of liability.

The spreadsheet in question (hereafter, "the Damages Chart") lists each Hensel Phelps' manager assigned to the Project, including the Project Executive, three General Superintendents, four Project Managers, a Design Manager, seven Project Superintendents, sixteen Area Superintendents, ten Quality Control Managers, two Safety Managers, twelve Project Engineers, fifteen Office Engineers, and twenty-one Field Engineers.

The Damages Chart shows which individuals were assigned to the Project by month, with a start date of September 2010 and an end date of May 2015. At the top left hand corner of the Chart three key dates are set out:

Substantial completion 4/1/14

Hotel Opening 5/1/14

Final Completion 6/30/14

A bold line runs down the Damages Chart separating April and May 2014, with the notation "May 1st, 2014 – Hotel Opens."

The Damages Chart is color-coded. Hensel Phelps designates those persons for whom management costs are assessed against Truland by yellow-colored boxes for the months in question.

The Damages Chart assesses management costs prior to the May 1 opening of the hotel for two managers: one-half of the time for General Superintendent Joe McDonald, at a monthly rate of $28,477, for February, March and April of 2014, and for all of the time for Area Superintendent Matt Scott, at a monthly rate of $17,712, for January, February, March and April, 2014.

As noted above, final completion of the hotel was scheduled for June 30, 2014.  In its Damages Chart Hensel Phelps assessed management costs before final completion for the months of May and June, 2014, for six managers, as follows:

| Manager | Function | Monthly Rate |
|---|---|---|
| Joe McDonald | Project Executive | $28,477 |
| Matt Scott | Area Superintendent | 17,712 |
| Paul Mancuso | Area Superintendent | 17,712 |
| Hank Grimes | Quality Control Manager | 19,476 |
| John Kriner | Field Engineer | 11,609 |
| Katherine Joseph | Field Engineer | 11,609 |

The Damages Chart shows that after August 2014, twenty Hensel Phelps managers stayed on the Project for one or more months. One-half of the cost of two of those managers, and all of the costs of fourteen of them were allocated by Hensel Phelps as being the responsibility of Truland.

### Donald Harrington's Allocation of XL's Liability to "Low Voltage"

XL's expert, Donald Harrington, devotes a grand total of one paragraph in his Report in support of his assertion that XL is entitled to an offset in the amount of $725,415 against the payment bond claim of the plaintiff in this action, Paige International, for a portion of Hensel Phelps' management costs. That paragraph (see Exhibit A) states in full as follows:

> *Hensel Phelps includes a total of $1,594,101 for additional management costs which was incurred on behalf of Truland. This amount includes superintendents, managers, supervisors, engineers, schedulers, and secretaries. To determine the amount applicable to low voltage work, the total low voltage including cleanup ($3,721,050) was compared to the total costs claimed by Hensel Phelps ($8,177,009) for the same categories to arrive at a ratio of 45.5 percent. This 45.5 percent ratio was then applied to the $1,594,101 of management costs, resulting in an amount of $725,415 allocated to the low voltage work.*

### Summary of the Applicable Law

Pursuant to Rule 702 of the Federal Rules of Evidence and the guidance of the United States Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993) and related cases, trial courts are required to act as "gatekeepers" who may admit expert testimony only if it is both relevant and reliable.

Under Rule 702, expert testimony is reliable if (1) it is "based upon sufficient facts or data;" (2) it is "the product of reliable principles and methods," and (3) the witness has applied the principles and methods reliably to the facts of the case. *Harris v. Koenig*, 815 F.Supp2d 6, 8 (D.D.C. 2011). The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. *Kumbo Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

7

In all cases, "[t]he trial judge … must find that [the proffered testimony] is properly grounded, well-reasoned and not speculative before it can be admitted. Fed. R. Evid. 702 advisory committee's note (2000 amends).

Expert testimony that rests solely on "subjective belief or supported speculation" is not reliable. *Daubert, supra.* Analytical gaps can make an expert's opinions unreliable and inadmissible. A court may refuse to admit expert testimony if it concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Groobert v. President and Dirs. of Georgetown Coll.,* 219 F.Supp2d 1, 6 (D.D.C. 2002) (quoting *Gen. Elec. Elec. Co. v. Joiner,* 522 U.S. 136 (1997).

In order to allow a court to assess the reliability of the methodology of a proposed expert witness, it is necessary for the expert to demonstrate that he does in fact have a methodology. Simply reviewing a few documents and reaching a series of conclusions do not constitute a methodology. *Chesapeake Climate Action Network v. Export-Import Bank of the United States,* 78 F.Supp3d 208, 219 (D.D.C. 2015).

It is true that pursuant to Fed. R. Evid. 203 that the facts or data upon which an expert bases his or her opinion do not have to be admissible in evidence. There are, however, limits to the data that can properly be used by an expert. In order to be admitted, the facts or data relied upon by an expert must be of a type reasonably relied on by experts in the particular field in forming opinions or inference upon the subject. *See, e.g., Fiorentino v. Rio Mar Assocs.,* 381 F.Supp2d 43 (D. Puerto Rico 2005). With respect to the data which may be properly relied upon by an expert witness, it is fundamental that expert testimony be predicated on facts legally sufficient to provide a basis for the expert's opinion, thus, an expert should not be permitted to give an opinion that is based on conjecture or speculation, from an insufficient evidentiary foundation. *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1474 (1st Cir. 1996). Expert testimony should

8

be excluded where an expert fails to apply his experience and a reliable methodology. For

example, where a witness simply proposes to transmit hearsay to the jury, rather than applying

his experience and a reliable methodology, the testimony should be excluded. *U.S. v. Mejia,* 545

F.3d 179, 197 (2nd Cir. 2008). In evaluating the admissibility of expert testimony, the proper focus

of the court should be on the methodology or reasoning employed. *Rothe Development, Inc. v.*

*Department of Defense,* 107 F.Supp3d 183, 197 (D.D.C. 2015), citing *Ambrosini v. LaBarraque,*

101 F.3d, 133 (D.C. Cir. 1996).

## ARGUMENT

### I.   INTRODUCTION

The entire Harrington Report suffers from the same deficiencies addressed in plaintiff's

first *Daubert* motion, at sections I-IV, which set forth grounds for exclusion of the entire Report.

First, Harrington's entire analysis is based on a backcharge asserted by Hensel Phelps against XL

in its capacity as the Truland's performance bond surety. A backcharge consists of nothing more

than an allegation. A claim document has no more evidentiary value than a Complaint in a

lawsuit. A report based on an assumption that the allegations made in a claim are true – with no

evidence to back it up – constitutes mere speculation. A claim of offset on the basis of vouching

for a mere backcharge is too speculative to meet the *Daubert* reliability requirement.

Second, simply adopting the allegations made by Hensel Phelps does not even constitute a

"methodology," not to mention a reliable one. It takes no expertise, no judgment, to read a claim

document and write up a summary of its contents.

Third, nowhere in the single paragraph which constitutes Harrington's "Report"

concerning the Hensel Phelps management cost claim does Harrington make so much as a single

reference to Paige International. His Report relates what portion of the HP Claim is "applicable to

low voltage work," despite the fact that Paige was one of four low-voltage subcontractors.

The entire Harrington Report lacks a proper evidentiary foundation and consists of rank speculation. The entire Report should be excluded.

## II.   HARRINGTON'S REPORT IS BASED ON AN INADEQUATE EVIDENTIARY FOUNDATION

Donald Harrington's Report is based entirely on the HP Claim. The HP Claim for management costs constitutes a grossly inadequate foundation upon which to base liability on the part of Truland. Nowhere in the HP Claim is there any explanation as *why* Truland (and hence XL as its surety) is supposedly liable to Hensel Phelps for management costs. The issue of causation is simply assumed and therefore not addressed.

Particularly troubling is HP's assertion that it is entitled to reimbursement from XL to cover its senior management costs in the amount of $113,563[3] during the final two months leading up to the May 1, 2014 hotel opening. Such a contention is truly and utterly absurd. Could anyone seriously believe that at a time when Hensel Phelps was requiring all of its finish-trade subcontractors to work extended hours and over weekends, in a frantic push to get the hotel ready for occupancy, that the reason why its senior management were on the Project was somehow related to Truland's impending default?

Equally ridiculous is Hensel Phelps' claim that the cost of six of its managers should be charged to Truland and XL for their work in the two months between the May 1 substantial completion and the June 30, 2014 final completion, for which HP asserts entitlement in the amount of $213,190.[4]

---

[3] $28,477 ÷ 2 x 3 months = $42,715 for General Superintendent Joe McDonald, and $17,712 x 3 months for = $53,136 for
[4] The total monthly rate for all of the six managers was $106,595, times 2 months = $213,190.

Without applying even a modicum of common sense to his task, Donald Harrington's Report asserts that XL is entitled to an offset against Paige International's payment bond claim in the amount of $148,590[5] for Paige's 45.5% share of Hensel Phelps' management costs which were incurred at a time when it is inconceivable that the company's managers would *not* be fully engaged in completing the Project.

Equally troubling is the fact that Hensel Phelps offers no evidentiary support for its management claim. Each week, Hensel Phelps' managers maintained Project Logs which documented what the subcontractors they supervised had accomplished for the week. The logs documented the number of workers the subcontractors had on the job, and exactly what they did. When a subcontractor worked both day and night shifts, a separate Project Log was kept by the Hensel Phelps night supervisor. See e.g., the Hensel Phelps' night supervisor's report on the work performed by the substitute electrical subcontractor, Rosendin Electric, for the week of April 28, 2015 (Exhibit C). There is nothing in the HP Claim supporting its contention, for example, that a particular manager spent an entire month supervising only low voltage work.

The sparse and unsupported claim submitted to XL by Hensel Phelps for management costs provides a wholly inadequate foundation upon which to base Harrington's analysis of the "low voltage" share of such costs. A reliable expert opinion cannot be based on inadequate, speculative and unreliable data.

### III.   THE HARRINGTON EXPERT REPORT IS NOT BASED ON A RELIABLE METHODOLOGY

It is quite likely, given his purported expertise in construction matters, that Donald Harrington could have developed a methodology for determining how much Hensel Phelps'

---

[5] $113,563 + $213,190 = $326,753 x 445 = $145,590.

supervision was involved – not for "low voltage" – but rather specifically for installation of communications and security cables which were within Paige's scope of work. The obvious starting point would have been Hensel Phelps' Project Logs, through which he could have discovered which HP Field Engineers supervised any re-work involving Paige's scope of work, and there was any such re-work, the number of hours they had spent doing so.  A close analysis of the daily work tickets of the subcontractors which performed such work would have added additional meaningful data. If Harrington had wanted to go all out, the preferred method of communication on the Project was by email. There were a total of 17 Hensel Phelps managers whose costs, for an average of five months, HP allocated to Truland. The emails of those managers would have revealed exactly what each of them was doing on a daily basis, from which the time they spent supervising re-work of Paige's scope, if any, could have been confirmed. Yes, it would have been a time consuming and laborious task, but the data was there for Harrington to analyze had he been willing to take the time to look at it. Given that XL is relying on Harrington's Report for an offset against Paige's payment bond claim for management costs in the amount of $725,415 – by no means an inconsequential sum – the amount at stake would have justified such an effort.

Another source of data that Harrington could have analyzed was Hensel Phelps' own explanation for its claim. A review of Hensel Phelps's narrative support for its performance bond claim, which is set forth in a letter from HP to counsel for XL (BD-10), reflects in summary form the issues which Donald Harrington could have analyzed in greater detail had he engaged in an in-depth review of the Project record. That letter makes it abundantly clear that Hensel Phelps considered its costs to have been incurred due to the fault of Truland itself, not Truland subcontractors. For example:

BD-10, at page 1:

*Truland was in default of its obligations under its subcontract when Hensel Phelps issued the Declaration of Default. Given that Truland closed its doors and declared bankruptcy a few weeks later only supports Hensel Phelps' decision to declare Truland in default.*

BD-10, at page 2:

*There were significant impacts to the project as a result of Truland's incomplete rough-in that resulted in drywall rework, patching and repainting. The drywall close-in activities were coordinated and scheduled with all subcontractors, including Truland, and the above-referenced impacts were a result of Truland's negligence in coordinating and confirming all rough-in was completed.*

BD-10 at page 4:

*Truland was responsible for providing the chandelier support steel .... The other MEP work was already partially installed before Truland realized that they needed to significantly increase the chandelier support steel. \*\*\* The coordination of this area extended over 12 weeks (approximately 20 meetings) in order to coordinate this congested area.*

BD-10 at page 6:

*Fire Alarm System Completion – The Hotel was opened with a Temporary Certificate of Occupancy due to the incomplete fire alarm system which was Truland's responsibility, causing multiple rounds of Fire Alarm Testing from May 1, 2014 to November 8, 2014, when the final Certificate of Occupancy was achieved. Note that code required a 24 hour fire watch until the final CO was achieved.*

BD-10 at page 6:

*Completion of Electrical and Low Voltage System As-Built Documentation*
*\*\*\* Truland did not install the contract required electrical panel schedules in each of the electrical panels in the electrical rooms. In order to verify the circuits installed, Rosendin had to field verify every electrical circuit to ensure that the Hotel Operator could rely on accurate information.*

BD-10 at page 7:

*General Lighting Issues – There was a significant quantity of issues between the installed lights, ballast, electrical voltage, and dimming circuits that caused constant system failure for more than six months after opening*

BD-10 at page 7:

*An electrical fire occurred in the occupied hotel due to improper installation. During the investigation it was discovered that the NF3 Light Fixtures ... were installed with ballasts that were not UL rated. Approximately 1400 of the fixtures had to be removed, interior components replaced and reinstalled.*

BD-7-8 at page 7-8:

*After Truland filed bankruptcy in July 2014, Honeywell informed Hensel Phelps that they had spent over $1,000,000 in costs above their contract value in order to achieve Temporary Certificate of Occupancy. Honeywell indicated that they would not return to complete the Fire Alarm System on the project until Hensel Phelps made them whole for the $1,000,000 costs spent.*

Each of the foregoing issues – none of which were the fault of Paige International – required staff time on the part of Hensel Phelps. Further investigation into each of these issues by Donald Harrington would have assisted Harrington in determining what portion of Hensel Phelps' management costs, if any, were the responsibility of Paige. Harrington failed to even try to perform any analysis of the Project record.

Two other sources of data which Harrington could have analyzed were the Truland Punch List and the Electrical Completion List. The Truland Punch List, which was updated periodically, would have shown what electrical work items were still open when Truland was terminated for default and Rosendin Electric took over. Of particular importance would have been whether any of the 70 items listed on the Truland Punch List for Paige International's scope of work were still open (none were). Further, after Truland was terminated, Hensel Phelps performed a comprehensive review of all electrical work in the hotel to determine what work within Truland's

14

scope remained to be done. While there is not an exact correlation between open punch list items or incomplete work and the likely amount of Hensel Phelps staff time involved in supervising the performance of that work, it would be a least information which could have provided a "reality check" on Harrington's estimation of what portion of Hensel Phelps' management costs should have been allocated to Paige.

Instead of applying his supposed expertise to an analysis of the actual relevant data, Harrington's entire analysis was contained in a single sentence:

> *To determine the amount applicable to low voltage work, the total low voltage including cleanup ($3,721,050) was compared to the total costs claimed by Hensel Phelps ($8,177,009) for the same categories to arrive at a ratio of 45.5 per cent.*

That's it??? That's all the explanation given by Harrington for a $725,415 offset???

Not only is Harrington's so-called "analysis" woefully inadequate, the numbers he uses for his 45.5% allocation of Paige's responsibility for Hensel Phelps' extended management costs are not appropriate numbers upon which to make such an estimate.

The number Harrington uses as the "total low voltage" amount ($3,721,050) is *a Harrington-derived number,* not a number based on the Project record. The percentage which Harrington asserts as the offset to which XL is entitled for management costs is based on in his opinion of the total amount of offsets he asserts for the other four claims: the drywall and repainting claim ($700,556), the cleanup cost claim ($460,861) and the two re-work claims (total of $2,559,631). There is no correlation, however, between drywall and painting costs, the majority of which was incurred from February to May, 2014, and management costs, which were incurred, with the exception of two managers, from May to October 2014. Similarly, there is no correlation between cleanup costs – again incurred *prior* to Project completion, and extended management costs, which were incurred, with the exception noted, *after* Project completion. Moreover, in order to sustain the management cost offset in the manner in which Harrington

15

calculates it, it would be necessary first to sustain all four of the other claims. If any of those claims are rejected, there would be nothing in the record on which to recalculate Harrington's "45.5%" opinion.

It is readily apparent from the foregoing that rather than going to the trouble of performing a true analysis to determine whether, if at all, Paige International was responsible for any of Hensel Phelps' management costs, Donald Harrington made a speculative estimate that was based on other speculative and unsupported data. Harrington's opinion that Paige was responsible for 45.5% of management costs allocated by Hensel Phelps to Truland and XL thus constitutes speculation based on speculation. Such an opinion does not meet the *Daubert* standards for admissibility of an expert's testimony.

## IV.   CONCLUSION

For the multiple reasons stated, the Donald Harrington expert report should be excluded from evidence as based on an inadequate foundation and an unreliable methodology.

Respectfully submitted,

PAIGE INTERNATIONAL, INC.

Philip C. Jones, DC Bar # 196097
JONES & COHEN, LLC
1125 West Street, Suite 200
Annapolis, Maryland 21401
(301) 921-3360
pjones@jonescohenlaw.com

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on this _5th_ day of _March_, 2016, a copy of the foregoing document was served, by the Court's ECF system and by mail on counsel for defendants, addressed as follows:

> Patrick J. Madigan, Esq.
> Pike & Gilliss, LLC
> 9475 Deereco Road, Suite 300
> Timonium, Maryland 21093
>
>
> Philip C. Jones

17

# Exhibit A

**(Excerpt from Harrington Report
Concerning Alleged Paige Liability
For 45.5% of Hensel Phelps'
Extended Management Costs)**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Action No.  14-cv-1244 (JEB)

**Plaintiff:**  PAIGE INTERNATIONAL, INC.                                   )
                                                                            )
                                                                            )
v.                                                                          )
                                                                            )
**Defendants:**  XL SPECIALTY INSURANCE COMPANY, INC., et al                )
                                                                            )
                                                                            )

Case No. 15-cv-00130 (JEB)

**Plaintiff:**  SIGNAL PERFECTION, LTD. d/b/a SPL INTEGRATED               )
SOLUTIONS                                                                    )
                                                                            )
                                                                            )
v.                                                                          )
                                                                            )
**Defendants:**  XL SPECIALTY INSURANCE COMPANY, INC., et al                )
                                                                            )

EXPERT REPORT OF DONALD HARRINGTON

December 10, 2015

total of $460,861 ($41,479 + $419,382) for cleanup costs is applicable to the low voltage work.

5) **Hensel Phelps Management Costs.**  Hensel Phelps includes a total of $1,594,101 for additional management costs which was incurred on behalf of Truland.  This amount includes superintendents, managers, supervisors, engineers, schedulers, and secretaries.  To determine the amount applicable to low voltage work, the total of the low voltage work including cleanup ($3,721,050) was compared to the total costs claimed by Hensel Phelps ($8,177,009) for the same categories to arrive at a ratio of 45.5 percent. This 45.5 percent ratio was then applied to the $1,594,101 of management costs, resulting in an amount of $725,415 allocated to the low voltage work.

As summarized above, a total of $4,446,463 of the additional costs claimed and summarized by Hensel Phelps is applicable to low voltage work that was the contractual responsibility of Paige and/or its subcontractors including SPL.  The detail and analysis supporting this $4,446,463 amount is shown in Exhibit 4.

By  _____

**Donald Harrington**

# Exhibit B

**(Excerpt from BD-10, Letter from Hensel Phelps to Counsel for XL, In Support of Performance Bond Claim)**

Mary Paty Lynn LeVan, Esq.
Manier & Herod
February 16, 2015
Page 8 of 10

achieve Temporary Certificate of Occupancy. Honeywell indicated that they would not
return to complete the Fire Alarm System on the project until Hensel Phelps made them
whole for the $1,000,000 of costs spent. Note that at this time the Hotel was under a
Temporary Certificate of Occupancy Permit that had to be renewed regularly. Since
Honeywell had a proprietary fire alarm system, there was no other firm that could complete
the Fire Alarm programming, testing and achieve the Final Certificate of Occupancy.
Hensel Phelps agreed to a payment of $600,000 of the $1,000,000 to complete the Fire
Alarm System and achieve the contract and code required Final Certificate of Occupancy
for the Hotel.

- Section 9.4 – Hensel Phelps spent $110,755 to procure the outstanding balance of NF3
  glass lenses directly from the supplier due to Truland's inability to pay for these previously
  ordered fixtures. Reference the letter (included in the original claim submission in section
  9.4) from Truland to Hensel Phelps on June 30, 2014 stating that Hensel Phelps should
  pay the amount directly and backcharge Truland for the costs.

[Manier & Herod – Section 10 Fire Alarm Impacts – Page 6/7]
- The costs in this section stem from late fire alarm completion. Hensel Phelps managed
  the referenced activities to mitigate the costs as much as possible keeping in mind these
  activities occurred in a fully occupied hotel.
    o Section 10.1 – The fire watch performed by Cavalier Management and Rosendin
      Electric was a condition of the Temporary Certificate of Occupancy and was
      required 24 hours a day until the Final Certificate of Occupancy.
    o Section 10.2 – The 3rd Party Fire Life Safety Inspector (Lourenco Consulting)
      experienced significant additional costs due to repeated testing of fire alarm
      system components due to failures in the installation and programming of the
      system by Truland.

[Manier & Herod – Section 11 Miscellaneous Impact Costs – Page 7]
- Hensel Phelps Staff Costs:
    o Hensel Helps used the agreed-upon staff rates for changes listed as an exhibit to
      the Prime Design/Build Agreement. Reference Exhibit 7.1 for a copy of the
      agreed-upon rates.
    o Hensel Phelps has updated the staff management costs expended on behalf of
      Truland thru 02/12/15 as well as the additional projected staff costs to complete
      the outstanding Truland work. The staff management costs have increased due to
      the items discussed in section 9 of this letter. Reference Exhibit 7.2 for a
      summary of these staff costs.
    o Note that the quantity of staff time included in this claim represents the amount of
      effort, issue resolution and management that was required by Hensel Phelps to
      mitigate the overall costs impacts to the project. Note that this project should have
      been completed by May 1, 2014. Not all staff time is allocated to Truland, but only
      the percentage of time proportionate to Truland's outstanding work completion
      items as outlined in the above sections.
- Truland received change order 7 for incorporating the "clearsky" design change early in
  the project. The Truland pricing for this change order included $283,000 to add an empty
  ENT conduit and pull string from the wall behind the desk to the ceiling above the closet in
  each of the 1176 guestrooms. It was discovered late in the project that Truland did not
  install the dedicated empty ENT conduit from behind the desk, but installed an ENT
  conduit from behind the dresser instead. In addition, the ENT was not empty, but was

*World-Class Innovators. Landmark Buildings. Inspiring Performance.*

# Exhibit C

## (Example of Hensel Phelps' Weekly Project Log)

**Hensel Phelps**

# Project Log

Performance

| Job Number | Date | Cal. Days Expended | Cal. Days Remaining | Cal. Days Off Sched. | Temperature: | | | General Weather Conditions |
|---|---|---|---|---|---|---|---|---|
| | | | | | 8 AM | NOON | 4 PM | |
| | 3/02/15-3/06/15 | | | 0 | | | | |

| In Charge (Initials) | This Log By: | |
|---|---|---|
| PDM | PDM | |
| | (Initials) | |

| Location of Concreting | C.Y. EST. | C.Y. ACT. | Mix | Admix | Tests | Placement Method | Time: Start | Finish | Curing or Winter Measures | Supplier |
|---|---|---|---|---|---|---|---|---|---|---|
| NA | | | | | | | - | | | |
| | | | | | | | - | | | |
| | | | | | | | - | | | |
| | | | | | | | - | | | |
| | | | | | | | - | | | |
| | | | | | | | - | | | |

**Hires and Layoffs**

| Full Name | H L | Classification | Prev. Employ. | Rate | Comments |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Total HP Crew | TOTAL | Subs | No. | Subs | No. | Equipment | No. |
|---|---|---|---|---|---|---|---|
| Consisting of: | 1 | | 4 | | 4 | Owned or Rented | 1 |
| Supervisors | 1 | Mechanical-Total ** | | Dewatering | | Pickups (HP) | 1 |
| Engr / Surveyors | | Mechanical-Plumbers | | Pile Driving | | Flatbeds | |
| Timekeeper / Clerk | | Mechanical-Fitters (JJK) | 0 | Struct. Steel | | *Dumpbeds | |
| Flagman | | Mechanical - Tinners | | Rebar | | *Water Truck | |
| Watchman | | Mechanical-Insulators | | Steel Deck/Panels | | Hoist Truck | |
| Mechanic | | Mechanical-Controls (JJK) | 0 | Misc. Iron (TSI) | 0 | *Cranes | |
| Carpenters | | Electricians (Rosendin) | 4 | Precast | | *Dragline/Hoe/Shov. | |
| Carp. App. | | Roofing | | Roof Fill | | *Scrapers | |
| Millwrights | | Masonry-Brick | | Rig & Set Mach. | | *Loaders | |
| Pilebucks | | Masonry-Stone | | Partitions | | *Dozers/Push/Rip | |
| Laborers | | Lathers | | Flatwork | | Forklifts (TSI) | 0 |
| Operators | | Plasterers | | Paving | | Compressors | |
| Oilers | | Drywall (Commercial Interiors) | 0 | Utilities | | Welders (TSI) | 0 |
| Finishers | | G.C. Sht. Metal | | Excavation | | Compactors, H.O. | |
| Teamsters | | GL & Curtain Wall | | Landscaping | | *Rollers | |
| Ironworkers | | Terrazzo | | Low Voltage (G-Tech) | 2 | Conveyors | |
| Masons | | Ceramic & Marble | | Lowe Voltage (Rosendin) | 0 | Scissor Lifts (TSI) | 0 |
| Hod Carriers | | Acoustics | | Low Voltage (CEI) | 0 | Scissor Lifts (Rosendin) | 0 |
| Q.C. Engineers | | Res. Flooring | | AVI | 2 | | |
| Q.C. Technicians | | Painters | | Mid-Atlantic | 0 | | |
| Q.C. Testing | | Fire Protection | | Cooper Lighting | 0 | | |
| | | Elevators | | Fire Alarm Crew (Rosendin) | 0 | | |
| | | | | Fire Alarm Controls (Honeywell) | 0 | | |

** Breakdown Mech. Craft Only When Directed By P.M.          *Log Subcontractor Equib. Only In These Categories

**XL 14089**

| Inspector was On Job This date | | Name Of Other Inspectors, Repr. of Owner, Arch / Engr., or HP Visiting Project |
|---|---|---|

| Daily Report Of Construction Operations | Supervisor's notes and comments on operations, Progress, inspections, instructions or orders received, etc. Record Material deliveries and note condition upon receipt. Report all accidents, discovery of errors and action taken. Record operations commenced and concluded this date. Report any event or circumstance affecting the conduct or outcome of this project, which you believe should be a matter of record. |
|---|---|

HENSEL PHELPS:  Jobsite Supervision

ROSENDIN: Continued working on panel shedules circuit survey adn labeling. and level 2 carpet light and with Coooper. Also completed sculpture lights, qaren stick circuits,and completed 3 fixtures in antaem rest.  That were not able to be controlled through cooper system.

G-TECH: Assisted Rosendin in installing new sheilded RJ45 connectors for High Velocity TVs and tested cabling.  Also dressed in new TV shielded cabling in rack room 1-126 AV room.  Testing Fiber in M1-107 and M2-106 with AVI.

AVI/Mid-Atlantic:

Coooper- Ben Farmer with Cooper was onsite to complete punchlist items and fix photocell.  All items were completed except for  level 2 carpet lights.  He had to stop work on level 2 to complete a warranty fix on the exterior dimming panel.  A powr supply went bad unexpectedly, part was delivered overnight and the lat days was spent fixing panel. Photocell programming is still off and only can be edited onsite.  Ben has program rady to install once he is scheduled back onsite. A remote sessions was attempted but Cooper cannot connect to EG2 remotely through a temp access to Marriott servers.

I have examined this log for accuracy and completeness and have attached hereto a duplicate or copy of any field checks, work orders, purchase orders, delivery receipts and written notices issued or received on this project during the period covered, all according to standing orders, except as follows:

Signature _____

(Superintendent or Authorized Representative)

**XL 14090**