UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAIGE INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> XL SPECIALTY INSURANCE CO., *et al.*, <br><br> Defendants. | Civil Action No. 14-1244 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Paige International and Defendants XL Specialty Insurance Company and its related entities are locked in a heated dispute concerning costs associated with the construction of the Marriott Marquis hotel in Washington, D.C. Paige was a subcontractor on the project, working under Truland Systems Corporation, itself a subcontractor to the prime contractor. When Truland subsequently became insolvent, it ceased work and also stopped paying Paige. Prior to Truland's insolvency, it took out a bond with Defendants to insure against its failure to pay its subcontractors (including Paige). This suit against the insurers seeks payment under that bond.

XL's primary argument in defense of full payment is that it has already paid out substantial sums to the prime contractor under a separate <u>performance</u> bond, including reimbursement to cover costs for incomplete and shoddy work by Truland, Paige, and other subcontractors. Defendants thus argue that these costs should be subtracted from what Paige is owed under the <u>payment</u> bond. Determining who owes what to whom is no easy feat, as the overarching construction contract was worth well north of $370 million. To this end, XL has

1

identified an expert, Donald Harrington, to testify at trial concerning completion-related construction costs in the hopes of reducing Paige's recovery.

Evidently not content to wait until trial, Paige has now fired off four separate Motions to Strike Harrington's Report on account of dozens of alleged flaws in his methodology. While these combined Motions are quite lengthy, they can be reduced to the core contention that the contents of the Report fall short of the standard for expert testimony under Federal Rule of Evidence 702. While Plaintiff may certainly challenge Harrington's testimony at trial, the Court does not believe that his Report should be stricken at this stage of the litigation. It will thus deny the Motions.

## I.     Background

Plaintiff Paige International, Inc. is a Washington, D.C.-based corporation that was one of many subcontractors involved in the construction of the Marriot Marquis hotel, built next to the District of Columbia Convention Center. See Compl., ¶ 2; Mot. to Strike I (ECF No. 18) at 2. As with most large construction projects, the prime contractor, Hensel Phelps Construction Company, subcontracted portions of its work, including electrical, fire alarm, security, audio visual, and telecommunications, to a subcontractor, Truland Systems Corporation. See Compl., ¶¶ 7-8; Def. Opp. (ECF No. 27) at 4. Truland, in turn, subcontracted a portion of its work – involving security, audio-visual, and telecommunications – to Paige. See Compl., ¶ 9; Opp. at 4.

Truland purchased a payment bond from XL and its co-Defendants, pursuant to which Defendants, as sureties, pledged to make payments to those persons under contract with Truland who supplied labor, material, and equipment to the project in the event it ever failed to pay. See Comp., ¶ 10. Truland also obtained a performance bond, which similarly provided Hensel Phelps with a guarantee as to compensation in the event Truland failed to perform. See Mot. to

Strike I at 2. When Truland later became insolvent and stopped performing on its contract, it also ceased making payments to its lower-tier subcontractors such as Paige. See Mot. to Strike I at 3. As a result of its failure to meet its contractual obligations, Truland was terminated by Hensel for default and subsequently filed for liquidation in bankruptcy. Id.

Paige's Complaint here alleges that it "provided labor, materials and equipment to Truland in partial satisfaction of Truland's subcontract obligations to Hensel Phelps, and is hence a proper claimant under the [payment] Bond." Compl., ¶ 11. Paige thus seeks payment for contract work completed on behalf of Truland in the amount of $1,854,830, id., ¶¶ 18-20; for extra work performed by Paige in accordance with proposed change orders in the amount of $462,147, id., ¶¶ 22-23; and for additional costs incurred by Paige resulting from Truland's breach of its implied duty of cooperation and non-interference, to the tune of $762,768. Id., ¶¶ 26-28.

What complicates Paige's pursuit of reimbursement under the payment bond is that Hensel – as the prime contractor – has already sought to be made whole on the performance bond. After Truland was terminated for default, Hensel demanded that XL and co-Defendants, as sureties, honor their obligation under the performance bond to cover the costs of hiring a replacement subcontractor to complete the electrical portion of the project. See Mot. to Strike I at 3-4. XL claims it ultimately paid Hensel $3,550,000 under the performance bond to cover those additional costs. See Opp. at 4. As a result, XL's defense is that payments it made under its performance bond associated with completing (and cleaning up after) Paige's electrical work should be deducted from any payments XL makes to Paige under its payment bond.

In preparing this likely defense, XL relies in part on the contents of an expert report completed by Donald Harrington pursuant to Fed. R. Civ. P. 26(a)(2), which governs expert

witness reports disclosures.  See Opp. at 2.  Harrington is a senior consultant for Sage Consulting Group, which provides consulting and expert-witness services within the construction industry.  See Aff. of Donald Harrington (ECF No. 27), Attach. 2, ¶ 1.  Harrington's Report assesses and allocates responsibility for specific costs associated with finishing the work Truland – and Paige – started but failed to complete.

Seeking to exclude Harrington's Report, Paige has filed four separate Motions to Strike, each relating to a particular aspect of the dispute:

    1. Cleanup/Trash Removal Claim, see Mot. to Strike I (ECF No. 18);

    2. Dry[w]all and Painting Claim, see Mot. to Strike II (ECF No. 19);

    3. Management Costs, see Mot. to Strike III (ECF No. 20); and

    4. Electrical Work Completion Costs.  See Mot. to Strike IV (ECF No. 21).

The four Motions collectively exceed 100 pages and include dozens of exhibits.  Defendants do not exaggerate in lamenting that "Paige is effectively attempting to litigate this entire case through the Motions."  Opp. at 1.  Despite the length of these Motions, Harrington himself examined them and, consequently, revised some of the findings of his original Report.  He then generated a Supplemental Report, which supersedes the original and will be the document at all times considered here.  See Opp. (ECF No. 27), Exh. A (Supplemental Harrington Report of April 15, 2016).  Because Paige has filed its Motions to Strike pursuant to Federal Rule of Evidence 702 and the legal principles enunciated by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court will focus on the admissibility of the Report's conclusions, rather than on the factual disputes Paige raises.

**II.     Legal Standard**

Although Plaintiff has filed its four Motions each as a "Motion to Strike," a "Rule 26(a)(2) expert disclosure is neither testimony nor a pleading, and therefore could not properly be stricken under Rule 12(f)." U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., 474 F. Supp. 2d 75, 80 (D.D.C. 2007). Harrington's Report, technically speaking, is "in no position to be stricken at all, since it was only placed on the docket by [Plaintiff] when it moved to strike" it. Id. at 80. Plaintiff's Motions are better characterized as motions *in limine* to exclude Harrington's testimony. While the Federal Rules of Evidence do not expressly authorize such motions, "the practice has developed pursuant to the district court's inherent authority to manage the course of trials." Luce v. United States, 469 U.S. 38, 41 n.4 (1984). In the broadest sense, the term *in limine* "refer[s] to any motion . . . to exclude anticipated prejudicial evidence before the evidence is actually offered." Id. at 40 n.2. These motions "are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" Graves v. Dist. of Columbia, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (quoting Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1070 (3d Cir. 1990)). They are not to be "used to resolve factual disputes or weigh evidence," however, which is "the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards." C & E Services, Inc. v. Ashland Inc., 539 F. Supp. 2d 316, 323 (D.D.C. 2008).

Properly characterized as motions *in limine*, Plaintiffs' Motions seek to exclude the Harrington Report pursuant to Federal Rule of Evidence 702 and Daubert. See Mot. to Strike I at 1. As a general matter, a district court has "'broad discretion in determining whether to admit or exclude expert testimony.'" United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 608

F.3d 871, 895 (D.C. Cir. 2010) (quoting United States v. Gatling, 96 F.3d 1511, 1523 (D.C. Cir. 1996)). Rule 702, which governs the admissibility of such testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, trial courts are required to act as gatekeepers who may only admit expert testimony if it is both relevant and reliable. See Daubert, 509 U.S. at 589; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (applying Daubert's holding to non-scientific expert testimony).

Expert testimony is relevant if it will assist the trier of fact to understand the evidence presented. See Fed. R. Evid. 401, 702; see also Daubert, 509 U.S. at 592-93 (citing Fed. R. Evid. 104(a)); Kumho, 526 U.S. at 141. While the way in which "reliability is evaluated may vary from case to case," United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (*en banc*), in all cases, "[t]he trial judge . . . must find that [the proffered testimony] is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note. The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho, 526 U.S. at 152; see also Groobert v. Pres. and Dirs. of Georgetown Coll., 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (describing standard set forth in Rule 702 as "a liberal and flexible one") (internal citation omitted).

"In considering Rule 702 motions, the court assumes only a 'limited gate-keep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief' or 'unsupported speculation.'" Harris v. Koenig, 815 F. Supp. 2d 6, 8 (D.D.C. 2011) (quoting Ambrosini v. Labarraque, 101 F.3d 129, 135-36 (D.C. Cir. 1996)).  Courts are not permitted to "pass on the merits of the expert's scientific conclusions . . . [and] must refrain from 'evaluat[ing] the credibility of opposing experts and the persuasiveness of competing [ ] studies.'" Lakie v. SmithKline Beecham, 965 F. Supp. 49, 54–55 (D.D.C. 1997) (quoting Ambrosini, 101 F.3d at 140).  Further, courts have recognized that "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996).  "Rejection of an expert's testimony is the exception rather than the rule." Geico Cas. Co. v. Beauford, No. 05-697, 2007 WL 2412974, at *3 (M.D. Fla. Aug. 21, 2007).  While the Court's role is admittedly limited, it cannot "toss the [*sic*] 'the decision to receive expert testimony . . . off to the jury under a let it all in philosophy.'" Boyar v. Korean Air Lines Co., Ltd., 954 F. Supp. 4, 7 (D.D.C. 1996) (quoting Joy v. Bell Helicopter Textron Inc., 999 F.2d 549, 569 (D.C. Cir. 1993)); see also Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 143 (4th Cir. 1994) (recognizing that "court may not abdicate its responsibility to ensure that only properly admitted evidence is considered by the jury").

"The issue for the Court to determine is whether this is a case where [the expert's] assumptions amount to 'rampant speculation' and should be excluded, or whether his assumptions merely represent a weak factual basis for his testimony that is appropriately challenged on cross examination." Boyar, 954 F. Supp. at 7; see also Daubert, 509 U.S. at 596

7

("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). "A court may refuse to admit expert testimony if it concludes that 'there is simply too great an analytical gap between the data and the opinion proffered.'" Groobert, 219 F. Supp. 2d at 6 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). It is not proper, however, for the Court to exclude expert testimony "merely because the factual bases for an expert's opinion are weak." Joy, 999 F.2d at 567; see also United States v. Philip Morris USA Inc., No. 99-2496, 2004 WL 5643764, at *1 (D.D.C. July 29, 2004) ("[E]ven though the testimony of an expert witness may carry little weight and little persuasiveness because of the weakness of its factual underpinnings, that fact in and of itself does not render the testimony inadmissible.") (citation omitted), and Polk v. Ford Motor Co., 529 F.2d 259, 271 (8th Cir. 1976)).

Daubert's gatekeeping obligations apply to "all expert testimony, including testimony based on technical or other specialized knowledge." Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir. 2000) (citing Kumho, 526 U.S. at 141) (emphasis in original). "In [some] cases, the relevant reliability concerns may focus upon personal knowledge or experience . . . [as] there are many different kinds of experts, and many different kinds of expertise." Kumho, 526 U.S. at 150. The trial court's role, then, "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," but "the law grants the trial judge broad latitude to determine" what reasonable measures of reliability are in any given case. Id. at 152–53. This inquiry is not to be aimed at "the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." Daubert, 509 U.S. at 597. That said, "the unremarkable observation that an expert may be qualified by experience

does not mean that experience, standing alone, is a sufficient foundation . . . . [U]nder Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility." Frazier, 387 F.3d at 1261 (emphasis in original).

## III. Analysis

Given Rule 702's four-part test, the Court proceeds separately through each of the criteria. As a reminder, these are (a) that the expert possesses specialized knowledge; (b) that his testimony is based on sufficient facts or data; (c) that it is the product of reliable principles and methods; and (d) that the expert has reliably applied those principles and methods to the facts at hand.

### A. Expert's Knowledge

The first factor is whether the expert's specific knowledge will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Resolving this consideration is straightforward, for Plaintiff nowhere assails Harrington's specialized knowledge or qualifications. Defendants, on the other hand, establish at length Harrington's credentials, which include a Bachelor of Science degree in Civil Engineering, professional affiliations with a number of construction trade associations, a 40+-year career in the construction and construction contract-dispute field, and experience serving as an expert witness in dozens of construction-contract-related lawsuits. See Opp. (ECF No. 27), Exh. A at 46-56 (Resume of Donald Harrington). Plaintiff has given no reason to doubt Harrington's credentials and expertise, and the Court finds that his specific knowledge in "construction industry customary practices . . . would assist the trier of fact," Finer Space (San Jose), LLLP v. Diamond H Const., LLC, No. 06-1723, 2008 WL 190425, at *3 (S.D. Tex. Jan. 22, 2008), under Fed. R. Evid. 702(a).

B. <u>Sufficient Facts or Data</u>

In contrast to its failure to impugn Harrington's specialized knowledge, Paige repeatedly asserts throughout its four Motions to Strike that he lacks knowledge relevant to this case. For example, in its Motion related to cleanup and trash removal, Plaintiff claims that "the entire Harrington report is based on an insufficient evidentiary foundation, and is hence unreliable," in part because his "entire analysis is improperly based on his acceptance of Hensel Phelps' allegations as true and factual, with no knowledge concerning what defenses Truland would offer, nor without [*sic*] taking into account claims that Truland would have filed against Hensel Phelps." Mot. to Strike I at 23. Paige makes similar contentions as to "dryall [*sic*] and painting" costs, asserting that Harrington "lacked substantive evidentiary foundation upon which to base a reliable expert opinion." Mot. to Strike II at 10. Going even further as to electrical-work completion costs, Plaintiff states that "[t]here was not a scintilla of evidence . . . that Paige International was responsible . . . for [a] single piece of trash removal . . . [or that] Paige was at fault for any specific drywall damage." Mot. to Strike IV at 24.

It is not as if the Report fails to consider relevant evidence; as Plaintiff itself acknowledges, it is "based on Donald Harrington's analysis of the roughly 3,500-page claim document and supplement submitted by Hensel Phelps in support of its performance bond claim." Mot. to Strike II at 4. Harrington's Report also includes a four-page attachment that specifies the dozens of additional documents related to the project that he reviewed in the course of drawing up his Report. <u>See</u> Opp. (ECF No. 27), Exh. B at 24-27. As to Paige's complaint about lack of proof that it was responsible for drywall repair or trash removal, Harrington explains (as is discussed in more detail in Section III.C, *infra*), "It would not be cost effective to try to determine on a drywall patch by patch basis who was liable for each patch. This would

10

virtually require a manager or supervisor to be on-site with each crew as the work was performed[,] which is not realistic." Harrington Report at 7. Instead, Harrington explains, it is "typical practice in the construction industry . . . to backcharge contractors most likely to have caused drywall damage on a percentage basis," as Harrington did in assessing Paige's percentage share of responsibility. Id. at 8. In essence, Paige contests Harrington's approach to assessing liability, arguing that hard evidence is required before Paige can be found liable for any trash removal or drywall damage, while Harrington explains that demanding such evidence is unrealistic given the complexities of large-scale construction projects.

Regardless of whose arguments have more merit, it is abundantly clear that they are inappropriately resolved on Motions to Strike. Resolving "factual disputes or weigh[ing] evidence" is "the function of a motion for summary judgment," C&E Services, Inc., 539 F. Supp. 2d at 323, or, in the alternative, the task of the factfinder at trial. Paige may reasonably believe that Harrington's analysis fails to consider important or contrary evidence, or inappropriately jumps to conclusions, but the solution is to provide competing evidence of its own or to cross-examine Harrington at trial, rather than seek to strike Defendant's Report. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). In asking the Court to resolve such fact-heavy inquiries now, Plaintiff is in effect "improperly seeking a dispositive ruling on [these issues] through a motion *in limine*." Hana Fin., Inc. v. Hana Bank, 735 F.3d 1158, 1162 n.4 (9th Cir. 2013), aff'd, 135 S. Ct. 907 (2015). At the motion-*in-limine* stage, it is not appropriate to "litigate this entire case," as Defendants justly accuse Plaintiff. See Opp. at 1. Indeed, at this juncture, the "reviewing [C]ourt is handicapped in any effort to rule on subtle evidentiary questions outside a factual

context." Luce, 469 U.S. at 41. This is abundantly true here, given the numerous disputes involved in calculating the various sums and the absence of a complete record before the Court. In fulfilling its "limited gate-keep[ing] role," Koenig, 815 F. Supp. 2d at 8, the Court believes the Harrington Report relies on facts sufficient to justify raising that gate for the time being.

    C.  Reliable Principles and Methods

In similar fashion, Plaintiff also contends in various places across the four Motions that the Harrington Report is not the product of reliable principles and methods because "[a]t no point in his entire Report does Donald Harrington express any judgment based on his experience and in reliance on a methodology." Mot. to Strike I at 24. Plaintiff also contends that Harrington's approach of "simply adopting the allegations made by Hensel Phelps does not even constitute a 'methodology' . . . . It takes no expertise, no judgment, to read a claim document and write up a summary of its contents." Mot. to Strike III at 9. Paige characterizes the Report as simply communicating and repeating Hensel Phelps's allegations and "assuming" they are true "without any inquiry concerning why the costs were incurred," something it argues "constitutes inadmissible speculation and conjecture, not a viable methodology." Mot. to Strike I at 24. Yet, as mentioned above, Harrington also evaluated dozens of other documents in the course of preparing his Report.

In any event, clarifying and contesting the methodology of a proffered expert witness is generally better achieved through "vigorous cross-examination and the presentation of contrary evidence," Shadow Lake Mgmt. Co., Inc. v. Landmark Am. Ins. Co., No. 06-4357, 2008 WL 2510119, at *3 (E.D. La. June 17, 2008), or the introduction of a competing expert report, see Apple Glen Investors, L.P. v. Express Scripts, Inc., No. 14-1527, 2015 WL 3721100, at *2-3 (M.D. Fla. June 15, 2015), the latter of which Plaintiff declined to do. See Opp. at 2. Contrary

to Paige's contention, furthermore, Harrington in several places in both his affidavit and Report <u>does</u> articulate his methodology and approach. In his affidavit attached to Defendant's Opposition, he states:

> It is reasonable and customary when analyzing construction projects and the assessment of the parties responsible for bearing expenses relating to completion or repair work to employ allocation formulas based on contract amounts, scopes of work, percentages of work, identifiable problems, and related factors. This is especially true in connection with large complex commercial projects such as the Project at issue in this case.

Harrington Aff., ¶ 7. Harrington further adds that "it is not customary to limit such analysis based solely on project documentation" but instead common "in the industry for general contractors to assess backcharges against their subcontractors for problems and associated costs caused by subcontractors," and for those subcontractors to do the same with their subs. <u>Id.</u>, ¶¶ 11-12.

Harrington also references common industry practices in his Report. For example, in assessing the drywall and repairs work, he notes that the "typical practice in the construction industry [is] to backcharge contractors most likely to have caused drywall damage on a percentage basis," as Harrington did in assessing Paige's percentage share of responsibility. <u>See</u> Harrington Report at 8. As to management costs, Harrington states that the costs assigned "are all typical supervision categories incurred on a construction project," <u>id.</u> at 18, and that "[s]upervision is a cost directly related to the labor incurred on a project and the duration of the project . . . [, and such costs] are typically treated in much the same way as general conditions costs as a percentage of the direct cost[,] since there is a direct correlation." <u>Id.</u> at 20. Such statements identify the "principles and methods" used in the construction industry. <u>See</u> <u>U.S. ex rel. M.L. Young Const. Corp. v. Austin Co.</u>, No. 04-0078, 2005 WL 6000505, at *3 (W.D. Okla.

13

Sept. 29, 2005). Whether such methods are appropriately applied to each and every particular issue in dispute should not be resolved here. Given its coherent account of its methods used, the Harrington Report more than clears the bar at this stage of the litigation.

### D. Reliably Applied to This Case

In addition to claiming that the Harrington Report lacks reliable principles and methods, Plaintiff also identifies dozens of grievances with the specific application of those methods. Given the panoply of issues Paige raises, the Court will not recite all of them, but will instead provide a sample from Paige's tasting menu of criticisms. Concerning Harrington's "dryall [*sic*] and painting" cost assessments, Plaintiff contends that he "took two shortcuts, both of which resulted in wholly random and arbitrary results." Mot. to Strike II at 15. "[T]he methodology Harrington used" concerning the allocation of repairs related to low-voltage installation, moreover, Paige claims "was arbitrary and capricious, and hence unreliable." Id. at 7. With respect to the cleanup and trash-removal estimates, it disputes Harrington's approach to allocating liability for Paige's share of cleanup costs, contending that there are "four major additional flaws" that make the Report unreliable. See Mot. to Strike I at 25. As to Harrington's estimates of electrical-completion costs, "[t]he upshot of Harrington's 'calculations' is an opinion that is not only not based on the actual data, but is directly contrary to such data, and constituted a deliberate attempt to deceive." Mot. to Strike IV at 9.

Since the Court has already stated that Paige's litany of complaints with Harrington's approach are not appropriately resolved at this stage in the litigation, it will not attempt to follow each and every argument volleyed back and forth between the parties like Wimbledon competitors. Yet, contrary to Plaintiff's contention, the Court does note that Harrington appears to apply his articulated methodology to the facts at hand at various points throughout the Report.

14

The Court will provide but a few examples. As to the direct costs of completing unfinished work, the Report states that assessments for reinstallation work were made on the basis of "the guest rooms where Paige . . . was responsible for the low-voltage telecom and audiovisual work within the rooms." Harrington Report at 9. Regarding the Rosendin low-voltage work that Harrington examined, the Report identifies "which vendor invoices were related to Paige low-voltage work" and assigns the share of costs accordingly, id. at 11, and explains that "[e]quipment costs . . . are typical[ly] general condition costs for a subcontractor . . . and thus applicable costs to allocate on a proportional basis" across subcontractors. Id. at 14. Harrington also states that "Hensel Phelps backcharged the appropriate subcontractors[,] which is common practice in the construction industry for cleanup and drywall repair type damage because it is next to impossible to isolate debris to specific contractors . . . [and] would not be cost effective to do so." Id. at 17-18. In short, "the basis for [his] conclusion[s are] discussed in detail in the body of his report. . . . [and his] analysis . . . sufficiently summarizes the evidence which [Harrington] utilizes to support his conclusion." Austin Co., 2005 WL 6000505, at *3.

Whether every single cost allocation Harrington made was correct implicates the precise facts in dispute between the parties that are central to this lawsuit. Resolving those questions here would simply be jumping the gun. Defendant's Report and attachments establish Harrington's expertise and knowledge, articulate his methodology and approach, identify numerous relevant facts and evidence, and apply that approach to many of the facts to derive the estimates in dispute. Although Plaintiff chose not to depose Harrington during discovery, it is welcome to cross-examine him at trial and to present evidence of its own to undermine the reliability and plausibility of Harrington's assessments or to call into question his specific

findings or conclusions. What Plaintiff is not welcome to do is litigate this dispute through these Motions to Strike, which the Court will deny.

## IV. Conclusion

For the reasons set forth above, Plaintiff's Motions to Strike will be denied. A separate contemporaneous Order will so state.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: May 25, 2016