UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAIGE INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>XL SPECIALTY INSURANCE CO., *et al.*,<br><br>Defendants. | Civil Action No. 14-1244 (JEB) |

## **MEMORANDUM OPINION**

The law of construction suretyships is a subject that aspiring lawyers might happen across in studying for the bar exam but then quickly forget. This case against three surety companies has been more enduring. It involves Plaintiff Paige International, Inc.'s suit against Defendants XL Specialty Insurance Company and its related entities for unpaid sums incurred in completing construction work at Washington's Marriott Marquis Hotel. After longstanding litigation and a multi-day bench trial, the Court held that Defendants were liable pursuant to a Payment Bond and awarded Plaintiff $463,092.50 in proven damages.

Not satisfied with this recovery, Paige now seeks to revisit the damages calculation, tack on pre-judgment interest, and add an award of attorney fees. It finds success on only the middle request.

1

I.  **Background**

Before addressing the substance of Paige's Motions, the Court offers an overview of its suit against the three surety companies. In doing so, the Court primarily relies on its own oral findings of fact, supplemented where necessary with the parties' post-trial briefing and trial exhibits. See April 27, 2017, Hearing Transcript; ECF Nos. 57 (Plaintiff's Post-Trial Memorandum), 58 (Defendants' Post-Trial Memorandum). This section first synopsizes the overarching contracting scheme before discussing the outcome of the recent bench trial.

The present lawsuit involves a Russian-nesting-doll setup of construction contractors. Occupying the outermost layer is HQ Hotel, LLC, which owns the Marriott Marquis Hotel connected to the D.C. Convention Center. See Pl. Mem. at 1; Def. Mem. at 3. In October 2010, HQ Hotel and Hensel Phelps Construction Company entered into a Prime Contract worth around $400 million to build that hotel. See Tr. at 3:4-8; Pl. Exh. 1.1 (Hensel Phelps Prime Contract). Hensel Phelps then divvied up individual components of that task among various entities and, as relevant here, entered into a Subcontract with Truland Systems Corporation to set up different electrical systems. See Tr. at 3:12-14; Pl. Exh. 1.2 (Truland Subcontract). Truland, in turn, further split up its portion of the project by executing additional contracts, including a Sub-subcontract with Plaintiff for telecommunications and security-systems work. See Tr. at 3:19-4:10; Pl. Mem. at 1; Def. Mem. at 5; Pl. Exh. 1.7 (Paige Sub-subcontract).

Now this setup involved some risk for Hensel Phelps. Its Prime Contract with HQ Hotel provided that the Marriott was to open on May 1, 2014, and that it would incur substantial monetary penalties for delay. See Tr. at 4:11-13; Pl. Mem. at 3. More specifically, if any of Hensel Phelps's various subordinate companies faltered and if construction halted, then it would be on the hook for upward of $100,000 per day and $13 million in total liquidated delay

2

damages.  See Pl. Mem. at 3; Prime Contract, arts. 6.15(i), 6.16(c), 6.17(c).  Mishap might come in many forms, but relevant here was the possibility that subcontractors might fail to pay their own laborers and suppliers, thus throwing a wrench into the project.  To insulate itself from this risk, Hensel Phelps required that Truland guarantee its downstream payment obligations by furnishing a payment bond, executed by a surety company.  See Truland Subcontract, § D, art. 34(a).  As Hensel Phelps was the protected party, the Subcontract specified that that the Bond "shall be drawn in favor of the [Prime] Contractor" "for the full amount of this Subcontract," roughly $40 million.  Id., § C.

Truland indeed obtained such a Payment Bond from Defendants XL and two related surety companies (Greenwich Insurance Company and XL Reinsurance America, Inc.).  See Pl. Exh. 1.4 (Payment Bond).  The Court will need to delve into the details of this Bond later.  For now, it suffices to say that the instrument came into effect if Truland did not "promptly make payment" to its sub-subcontractors (*e.g.*, Paige), in which case those lower-tier companies could file claims with XL to be paid "amounts due for labor, material or equipment used or reasonably required for use in the performance of the [Truland] Subcontract."  Id., pmbl. & ¶ 5.  As a result, Hensel Phelps could rest assured that the project would continue apace and that it would not itself need make further payments to Truland's sub-subcontractors.

As any pessimist would anticipate, all did not proceed as planned.  To begin, in June 2013, Tropical Storm Andrea hit Washington, requiring Paige to rack up expenditures associated with remediating water damage from the squall.  See Tr. at 4:14-20.  If that were not enough, the hotel project also suffered other delays, and so Plaintiff bore costs from accelerating its work to fit a tighter timetable.  Id. at 4:21-24.  To top it off, Truland went bankrupt, leaving Paige (and

3

others) in the lurch, as several of Paige's proposed change orders for additional work to the defunct Subcontractor were left pending, unsigned and unpaid. Id. at 5:1-4, 7:20-21.

With Truland out of the picture, Paige filed a claim under the Payment Bond and then immediately brought the present lawsuit against XL to recover those amounts left due and owing. XL, conversely, believed that Paige's claims were insufficiently documented and not necessarily in excess of the already-paid contract price. The case thus proceeded to a bench trial, after which the Court ruled that Defendants were indeed liable for sums related to Plaintiff's storm remediation, acceleration of work, and pending change orders. Id. at 8:12-15. Paige claimed around $1.3 million in damages, but because it could not adequately show that all those dollars went to performing duties over and above the base Sub-subcontract and because its recordkeeping was so shoddy, the Court discounted the award by 50% and also deducted other amounts that XL had already paid Paige or its own subcontractors. Id. at 15:3-14. In total, the Court determined that Defendants owed Plaintiff $463,092.50 in damages. Id.

Plaintiff now raises three separate issues with the award. It first seeks to amend two aspects of the damages calculation, and it also demands pre-judgment interest as well as attorney fees. See ECF Nos. 59 (Motion for Attorney Fees & Motion for Pre-judgment Interest), 60 (Motion to Amend Damages). The Court analyzes each question in turn.

**II.   Analysis**

A. Calculation of Damages

In its initial effort to increase its recovery, Paige takes issue with two features of the Court's $463,092.50 award. First, it assails the Court's 50% reduction of certain claimed charges. While "Paige accepts [the 50%] discount as reasonable as to its breach of duty claim," it contends that such discount "was erroneously applied . . . to the pending PCOs and Storm

4

Andrea damage claim." Damages Mot. at 3. Second, Plaintiff believes that the Court improperly credited XL with money saved from the insurance company's direct settlement with SPL, a Paige subcontractor. Id. at 9-12.

The Court held a six-day bench trial, heard from multiple witnesses, and considered hundreds of exhibits. It also reviewed lengthy post-trial submissions from each side on both factual and legal questions in dispute. As explained in its ultimate oral verdict, determining the appropriate measure of damages was no easy feat. Paige's lack of records was the principal culprit in the Court's struggle to fashion a just award. In settling on the 50% discount figure, the Court, as the finder of fact, selected what it considered the fairest figure. In seeking to limit that percentage reduction, Paige raises no new issues not already contemplated by the Court and incorporated in the verdict. For example, Plaintiff has not demonstrated that more than 50% of its additional PCO and storm-remediation work was performed over and above what would have been required under the base contract. Similarly, the Court sees no basis to revisit its determination on the SPL credit and believes that its prior damages finding on that issue remains valid.

Other factfinders could well have come to different conclusions on these and myriad other disagreements between the parties, but this Court's determination on the final sum represents its best effort under the facts and law presented.

B. Pre-judgment Interest

The Court turns next to the issue of pre-judgment interest, to which Plaintiff claims it is entitled. As a general matter, there are two forms of interest to compensate a plaintiff for losses from a breach of contract: pre-judgment and post-judgment. The former runs "from the time the claim accrues until judgment is entered," West Virginia v. United States, 479 U.S. 305, 310-11

5

n.2 (1987), while the latter "runs from the date of the entry of judgment" until payment by the defendant. Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 835-36 (1990). Only pre-judgment interest is at issue here. While Paige believes that it is owed such interest on the Court's full damages award, XL retorts that pre-judgment interest is unwarranted because Plaintiff's poor recordkeeping made it impossible for XL to ever know the appropriate damages amount owed. The Court concludes that Paige has the better of the argument here.

Both sides agree that D.C. Code § 15-109 governs whether pre-judgment interest is owed in this case. That provision states, as relevant here:

> In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only. This section does not preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff.

This statute thus "expresses the general rule that damages for an unliquidated claim run only from the date of judgment, [but] it also contains an exception where an award of interest is necessary to fully compensate the plaintiff." House of Wines, Inc. v. Sumter, 510 A.2d 492, 499 (D.C. 1986) (quotation omitted).

Over time, D.C. courts have interpreted § 15-109 as granting a court "broad discretion in awarding pre-judgement interest." Id.; Winder v. District of Columbia, 555 F. Supp. 2d 103, 111 (D.D.C. 2008), aff'd sub nom. Winder v. Erste, 566 F.3d 209 (D.C. Cir. 2009); see Fed. Mktg. Co. v. Virginia Impression Prod. Co., 823 A.2d 513, 532 (D.C. 2003) ("[T]he court has ample discretion to include prejudgment interest."). Courts now balance the "equities in [each] case" to determine whether pre-judgment interest is appropriate. Law Office of G.A. Lambert & Assocs. v. Davidoff, 72 F. Supp. 3d 110, 119 (D.D.C. 2014). Relevant considerations in this calculus include (1) "whether the plaintiff has been deprived of the use of the money withheld," (2)

6

"whether he timely commenced suit," and (3) "the certainty of the amount due." Winder, 555 F. Supp. 2d at 111.

Here, the parties do not disagree that the first two factors strongly favor the award of pre-judgment interest. Because Plaintiff successfully sought "reimbursement for expenses already incurred, it has [plainly] been deprived of the money withheld by [Defendant]." Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea, 962 F. Supp. 2d 152, 164 (D.D.C. 2013). Likewise, Paige commenced this suit before the construction project had even finished

XL contends, however, that the final prong weighs in its favor because it could not have repaid Paige before the judgment in this case given Plaintiff's own shoddy record-keeping. The Court agrees that this equitable factor weighs against Paige's recovery of interest. Weighing all the equities together, the Court nevertheless believes that Plaintiff has done enough to show it ought to be made whole for its work on the hotel. See Fed. Mktg., 823 A.2d at 531-32 (describing certainty of amount owed as "less important consideration" than first two). XL, moreover, knew from the start that Paige was owed at least some money for its additional expenditures on the project, and the Payment Bond setting out its liability unequivocally provides that it would pay the claims of laborers and suppliers. See Payment Bond, ¶ 5. There can thus be no question that Paige has since been denied access to these sums for many years, diminishing its opportunity to enjoy the fruits of its labor or to invest in other projects. See Cobell ex rel. Cobell v. Jewell, No. 96-1285, 2017 WL 1319710 (D.D.C. Apr. 10, 2017) (awarding interest where first two factors cut for plaintiff, despite fact that amount owed was "anything but 'easily ascertainable'").

The Court, accordingly, will award prejudgment interest to Paige at the 6% statutory rate provided by D.C. Code § 28-3302. While that provision is silent as to whether this interest

should be calculated on a simple or compounded basis, "[a]bsent a contractual provision providing for compounded interest, 'neither prejudgment nor judgment interest is compounded' in contract actions." Id. at *7 (quoting Giant Food, Inc. v. Jack I. Bender & Sons, 399 A.2d 1293, 1304 (D.C. 1979)). The Court will thus apply simple interest at a 6% annual rate.

The sums flow as follows. Following the recent bench trial, the Court awarded $463,092.50 to Paige. The amount of time between the date that Paige filed suit (July 22, 2014) and today (July 28, 2017) is 3.016438 years. The total interest calculated on a simple 6% annual basis on the above sum for that time period is $83,813.40. Adding that to the initial award means that Paige is entitled to a total award of $546,905.90.

C. Attorney Fees

The final item on Plaintiff's invoice involves not the merits of the case, but the perennial question of what comes after — namely, attorney fees. "The so-called 'American Rule' governing the award of attorneys' fees in litigation in the federal courts is that attorneys' fees 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'" F. D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 126 (1974) (quoting Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717 (1967)). When fees are requested, the "applicant bears the burden of establishing entitlement to an award." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). While the parties had previously batted around the possibility of contractual fees in a pre-trial evidentiary motion, see ECF Nos. 43, 46, 51, it was not until after the bench trial concluded that the Court directed Paige to make a formal request.

The homework was as follows. The Court first instructed that, in this suit between Paige and XL, "the [P]ayment [B]ond rather than the [Paige] [Sub-sub]contract likely governs," but

noted that the former instrument was not pellucid. See Tr. at 15:22-24. In other words, "given the [B]ond's ambiguity," there could be "a reasonable reading of the [P]ayment [B]ond provision[s] that would permit attorney fees." Id. at 15:24-16:1, 16:5. The Court, in sum, directed Paige to brief "its affirmative case as to why the structure [and] text of the [B]ond awards fees." Id. at 16:7-8 (emphases added).

Paige has turned in a different assignment altogether. It merely cites a single definitional clause of the Payment Bond to elucidate its structure and text. See Fees Mot. at 1-9. Plaintiff instead posits a general theory that XL's liability must necessarily be "coextensive" to what Truland's would have been under the Paige Sub-subcontract, which appears to award prevailing-party attorney fees in a scenario where Truland or Paige sues the other. Id.; see Paige Sub-subcontract, ¶ 15 ("Should either party to this agreement have to employ counsel to enforce any provision of this agreement or breach thereof, the prevailing party shall be entitled to reimbursement of reasonable attorney's fees."). Paige draws out this liability principle by relying primarily on cases involving statutorily mandated payment bonds. Id. at 7.

This argument fails to achieve passing marks. To see why, however, involves walking through a three-part rubric. The Court begins by explaining what type of payment bond it is dealing with, proceeds to discussing the applicable rules of construction, and finishes by analyzing the present Bond.

### 1. *Type of Payment Bond*

Payment bonds come in many shapes and sizes, some being required by statute and others being private contracts. A "threshold consideration" is the precise nature of this Payment Bond, as both "the scope of a surety's liability" and the applicable interpretive rules vary depending on the typology. See Kevin L. Lybeck, *et al.*, The Law of Payment Bonds 5 (2d ed.

9

2011).  For example, while "[c]ourts construe bonds pursuant to . . . statutes in favor of laborers and material suppliers and strictly against the surety" by referencing "the terms of the statute applicable to the bond," they "construe a surety's obligations under a common law bond in light of the specific bond language" "subject to the applicable law of contracts."  Id. at 17, 19.

Paige here wants to have it both ways.  On the one hand, the company concedes that the Payment Bond is "a private, common law bond."  Fees Reply at 3 (quoting Fees Opp. at 3).  On the other, Plaintiff asserts that decades-old "case decisions involving Miller Act bonds" — *i.e.*, bonds pursuant to a federal statute governing public works — that sometimes recognize attorney fees "apply equally to non-statutory payment bonds."  Fees Mot. at 7-8.

This patchwork is poorly quilted.  Those statutory-bond decisions are not binding on this common-law Payment Bond, as the Miller Act provides a special route to attorney fees that is not present here.  A brief primer on that statute demonstrates this.  Since 1935, the Act has required that private contractors hired by the federal government to construct, alter, or repair a public work must furnish a payment bond "for the protection of all persons supplying labor and material in carrying out the work."  40 U.S.C. § 3131(b)(2); see Act of Aug. 24, 1935, ch. 642, § 1, 49 Stat. 793, 793; United States ex rel. Sherman v. Carter, 353 U.S. 210, 216 (1957) (giving Act "liberal construction to effectuate its protective purposes").  For many decades, until 2002, the statute gave persons working for contractors on those projects "the right to sue on such payment bond for the amount" of "labor or material" left "unpaid" and also, as a final clause, the right to "prosecute the action to final execution and judgment for the sum or sums justly due him."  40 U.S.C. § 270b(a) (2000).

Courts interpreted the latter "sums justly due" language to cover all amounts — including attorney fees — that would otherwise be due laborers and suppliers under their respective

10

contracts. See United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co., 86 F.3d 332, 336 (4th Cir. 1996) ("[A]ttorney's fees are recoverable if they are part of the contract between the subcontractor and supplier."); United States ex rel. Pertun Constr. Co. v. Harvesters Grp., Inc., 918 F.2d 915, 916 n.1 (11th Cir. 1990) (holding that fees could "constitute 'sums justly due' under the Miller Act"); United States ex rel. Carter Equip. Co. v. H.R. Morgan, Inc., 554 F.2d 164, 166 (5th Cir. 1977) (allowing attorney fees "to the supplier of a subcontractor"). Put another way, even absent language in the contractor–surety payment bond (*e.g.*, the Truland–XL Payment Bond), the Miller Act gave lower-tier laborers and suppliers (*e.g.*, Paige) an actionable right to recover on their individual agreements (*e.g.*, the Paige Sub-subcontract). See Sherman, 353 U.S. at 215-16 ("The surety's liability on a Miller Act bond must be at least coextensive with the obligations imposed by the Act if the bond is to have its intended effect."); see also GE Supply v. C & G Enters., Inc., 212 F.3d 14, 19 (1st Cir. 2000) (relying on "invoices contain[ing] a fee-shifting provision").

Although Congress has since updated the terminal statutory clause to endow a right to "prosecute the action to final execution and judgment for the amount due," Revision of Title 40, United States Code, "Public Building, Property, and Works," Pub. L. No. 107-217, 116 Stat. 1062 (2002) (codifying amendments at 40 U.S.C. § 3133(b)(1)), that amendment was "not meant to substantively change the statute." United States ex rel. Tenn. Valley Marble Holding Co. v. Grunley Constr., 433 F. Supp. 2d 104, 116 n.3 (D.D.C. 2006) (noting that change was to "achieve uniformity" or "conform to common contemporary usage"); accord United States ex rel. SCCB, Inc. v. P. Browne & Assocs., Inc., 751 F. Supp. 2d 813, 819 (M.D.N.C. 2010); H.R. Rep. No. 107-749, at 2 (2002). Were the Marriott a public building and the Miller Act thus to apply, it would mean that Paige could sue XL for fees that would have been due on its Sub-subcontract.

11

The problem with giving statutory-bond cases binding effect is that the common-law Bond in this case incorporates neither a "sums justly due" or an "amount due" catchall in addition to the payment right to "labor or material," 40 U.S.C. § 270b(a) (2000); id. § 3133(b)(2), nor an explicit "protective purpose[]" toward laborers and suppliers. Sherman, 353 U.S. at 216; see 40 U.S.C. § 3131(b)(1); Technica LLC ex rel. United States v. Carolina Cas. Ins. Co., 749 F.3d 1149, 1153 (9th Cir. 2014) (distinguishing "rights established by the Miller Act" from "application of the substantive law of contracts"). By contrast, it grants only the more modest purely contractual right to recover "amounts due for labor, material or equipment used or reasonably required for use." Payment Bond, ¶ 5 (emphasis added). In other words, the entitlement to "amounts due," here, is explicitly limited. Whatever persuasive force that Miller Act cases might have generally, they do not dictate the outcome of the fees inquiry here. The Court thus proceeds to analyze the Bond as a common-law instrument. In doing so, it begins with the rules of construction.

2. *Rules of Construction*

In analyzing how a payment bond should be construed, the Court first lays out the language of suretyships while explaining basic interpretive rules, and it then deconstructs a further one that Paige offers.

a. Suretyship-Interpretation Basics

Understanding the rules of bond interpretation requires the Court to begin with some of the relevant lingo. Earlier on, the Court recapped the downstream contracting scheme whereby Hensel Phelps (the Prime Contractor) hired Truland (the Subcontractor), which retained Paige (the Sub-subcontractor). Suretyship law further complicates this setup, since the primary legal duty flows in the other direction. In other words, Truland is the Principal Obligor that owes an

12

upstream obligation to Hensel Phelps as the Obligee, and XL (the Surety) serves as the fallback Secondary Obligor in the event that the Principal falters. See Payment Bond, pmbl.; see also Restatement (Third) of Suretyship & Guaranty § 1 (1996) (defining relevant circumstances of suretyship and labeling Surety also as "Secondary Obligor"). The point of the Bond is to protect Hensel Phelps from mishap. See Payment Bond, ¶ 1 (noting "purpose is, in part, to indemnify Hensel Phelps"). This makes sense: If Truland defaulted as to its sub-subcontractors, Hensel Phelps would need to make sure that they were paid so that construction on the project as a whole could proceed without stoppage.

The relevant "obligation," here, is that Truland, via its Subcontract, expressly promised Hensel Phelps to pay lower-tier laborers and suppliers who worked on the hotel. See Truland Subcontract, art. 13. XL then guaranteed this obligation via the Bond. See Payment Bond, pmbl. Being one of those laborers or suppliers, Paige fits in as a third-party Claimant that may enforce the Bond's guarantee of the Subcontract if Truland does not fulfill that obligation. See Payment Bond, ¶ 4; District of Columbia v. Campbell, 580 A.2d 1295, 1302 (D.C. 1990); see also Restatement § 69 cmt. c ("If . . . the secondary obligor promises the obligee by a 'payment bond' that the contractor's duty to pay laborers and suppliers of materials will be fulfilled, the laborers and suppliers . . . may enforce it against the secondary obligor."). In other words, Paige could sue XL if Truland did not, as it had promised Hensel Phelps, make good on its payments.

The question of interpretation is how to construe a surety's responsibility to such third parties — *i.e.*, how to interpret what XL as Surety owes Paige as Claimant. To start, because that duty arises from the Bond, the scope of liability "must be measured by the conditions stated in the bond." Goldberg, Marchesano, Kohlman, Inc. v. Old Republic Sur. Co., 727 A.2d 858, 860 (D.C. 1999) (quoting Bevard v. New Amsterdam Casualty Co., 132 A.2d 157, 159 (D.C. 1957));

13

see 3 Philip L. Bruner & Patrick J. O'Connor, Jr., Construction Law § 8:152 (2016) (stating claimant is "entitle[d] recovery within the coverage of the bond").

In parsing those conditions, "[g]eneral rules of contract interpretation apply." Purcell v. Thomas, 28 A.3d 1138, 1144 (D.C. 2011). "This jurisdiction adheres to an 'objective' law of contracts, meaning 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties.'" Dyer v. Bilaal, 983 A.2d 349, 354-55 (D.C. 2009) (quoting DSP Venture Grp., Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003)).

Specific to suretyship law, there is also "a rule of construction which holds that when the language of the contract is ambiguous and the surety is a company, the surety bond should be construed liberally in favor of the beneficiary." Goldberg, 727 A.2d at 861 n.1. In this case, both Hensel Phelps and various Claimants are beneficiaries of the Payment Bond. See Payment Bond, ¶¶ 3, 5; see also Standard Acc. Ins. Co. v. Simpson, 64 F.2d 583, 590 (4th Cir. 1933) (applying liberal-construction maxim to bond claimants); Restatement § 69 (commenting that a third-party claimant is also an "intended beneficiary").

b.  Coextensive-Liability Interpretation Rule

In addition to these principles, Paige offers one more. There is purportedly a "general rule of construction" that "'the surety [is] bound to the same extent the principal is bound.'" Fees Mot. at 4-5 (quoting United States v. Maloney, 4 App. D.C. 505, 511 (1894)) (citing United States ex rel. District of Columbia v. Bayly, 39 App. D.C. 105, 113 (1912)). Plaintiff pushes this interpretive rule because Truland (the Principal) is bound by its Paige Sub-subcontract, which includes a fees provision. See Paige Sub-subcontract, ¶ 15. In other words, Paige asks the Court to construe the XL Bond in light of each particular Claimant's sub-subcontract.

14

Applying this interpretive rule to a surety's third-party liabilities goes too far. While the language of these hoary D.C. Court of Appeals cases is that sureties are liable to the "same extent" as their principals, see Bayly, 39 App. D.C. at 113; Maloney, 4 App. D.C. at 511, Plaintiff misunderstands the scope of this interpretive rule.

That language must instead be situated in the context of suretyship law. To repeat, at the epicenter of any such arrangement is the principal obligor's obligation to an obligee, which the surety guarantees. Here, that tripartite relationship is among Truland, Hensel Phelps, and XL, respectively, and the obligation is thus Truland's Subcontract with Hensel Phelps (not Paige's Sub-subcontract with Truland). See Payment Bond, pmbl.; Truland Subcontract, art. 13.

The structure then informs the rule. The essential undertaking is to have the surety stand squarely in the shoes of the principal (Truland) *vis-à-vis* the obligee (Hensel Phelps). Because of this basic structure, it is with respect to that obligation — again, the Truland Subcontract — that courts presume the surety to adopt the principal's liabilities to the "same extent." See 74 Am. Jur. 2d Suretyship § 21 (2017) (advising that "liability of the surety is ordinarily measured by the liability of the principal" on its "obligation"). Put differently, the surety's bond guarantee is generally "coextensive with the obligations of the contract" between the principal and obligee on which the "guaranty was made." Benjamin v. Hillard, 64 U.S. (23 How.) 149, 162 (1859); see Tri-State Emp't Servs., Inc. v. Mountbatten Sur. Co., 295 F.3d 256, 263 (2d Cir. 2003) ("[A] surety bond attaches to the principal contract and must be construed in conjunction with it.") (quoting Carrols Equities Corp. v. Villnave, 395 N.Y.S. 2d 800, 803 (App. Div. 1977)). Each of Plaintiff's common-law bond cases sits in this context. Maloney involved a suit by the United States, as obligee, against two sureties, and the Court of Appeals held that each surety was bound

15

to the obligee to the degree that the principal was. See 4 App. D.C. at 506, 511. The same goes for Bayly, where the District was the obligee. See 39 App. D.C. at 106-07, 109.

A surety's duties to third parties, on the other hand, are not essential to the suretyship structure. A surety arrangement need not include any third-party beneficiaries at all. That is, it is entirely optional that bonds allow for laborers and suppliers as claimants. See Restatement § 69 cmt. c ("In many construction contracts, while the contractor agrees to furnish labor and materials and may agree to complete the work free of liens, the contractor does not promise the owner to pay laborers and suppliers of materials. [There,] the laborers and suppliers of materials have no rights against the secondary obligor because the secondary obligor has not promised to fulfill the contractor's duty to them."). Because the existence of a surety's responsibilities to third parties rises and falls on bargained-for provisions of the given bond and not the fundamental nature of suretyships, the Court can only rely on the contract-interpretation principles outlined previously in analyzing this Payment Bond. See 3 Bruner & O'Connor, Construction Law § 8:15; see also Tri-State Ins. Co. v. United States, 340 F.2d 542, 544 (8th Cir. 1965) ("In general, a surety is liable to third persons only when his obligation to the principal obligor contains a promise which may be reasonably and clearly interpreted for the claimant's benefit.").

### 3. *Application to Payment Bond*

This brings the Court, finally, to the question that it asked the parties to brief: whether the structure or text of the Payment Bond allows attorney fees. Plaintiff does not carry its burden in demonstrating that it indeed deserves fees. See Hensley, 461 U.S. at 437.

A brief examination reveals that the Payment Bond clearly articulates which sums it covers. It first defines a Claimant as "one supplying labor, material and/or equipment, used or

16

reasonably required for use in the performance of the [Truland] Subcontract." Payment Bond, ¶ 4. An unpaid Claimant may then recover from XL "amounts due for labor, material or equipment used or reasonably required for use in the performance of the [Truland] Subcontract." Id., ¶ 5. To state the obvious, attorney fees are neither labor nor materials nor equipment. The Court cannot remunerate Paige if the recovery provision "says nothing about attorney fees." Purcell v. Thomas, 28 A.3d 1138, 1145 (D.C. 2011); see Dist. Contractors, Inc. v. N. Am. Specialty Ins. Co., 281 F. Supp. 2d 204, 206, 208-09 (D.D.C. 2003) (holding that provision "for labor or material, or both, used or reasonably required" does not allow attorney fees).

Plaintiff's only textual hook is that the somewhat general definition of Claimant — "one supplying labor, material, and/or equipment" —requires reference to each Claimant's sub-subcontract to spell out whether it indeed falls under that definition. See Fees Mot. at 3 (quoting Payment Bond, ¶ 4). Paige's Sub-subcontract then provides for prevailing-party attorney fees. See Paige Sub-subcontract, ¶ 15.

This is a perplexing point. While the Sub-subcontract would indeed underscore how Paige is a company that supplies "labor, material, or equipment," Plaintiff offers no reason why the Court would need to look at that agreement's attorney-fee provision to elucidate those three words. See Dist. Contractors, 281 F. Supp. 2d at 208-09. This backdoor insertion of the fee terms into the Bond is far too unnatural. "Nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended, by implication, beyond the terms of his contract." Estate of Dickson, 736 A.2d 1007, 1010 n.7 (D.C. 1999) (quoting Miller v. Stewart, 22 U.S. (9 Wheat.) 680, 702-03 (1842)).

Paige repeats, however, that the definitional provision is quite similar to that found in present-day Miller Act bonds. See Fees Mot., Exh. 2 (Miller Act Payment Bond) at 1 (applying

to "all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above"); see also Fees Mot. at 2-3, 7. This horseshoe also lands far from the stake. As the Court explained previously, that language is not what gives rise to attorney fees in Miller Act cases. Instead, it was the broad statutory right to payment for the "sums justly due" or "amount due" that opened the fees door. See 40 U.S.C. § 270b(a) (2000); id. § 3133(b)(1). Left with no other arguments, Plaintiff's fees request thus falls flat.

Notably, too, despite explicit invitation by this Court, Paige makes no effort to quote, cite, or even reference the conditions of the Bond that do mention costs and expenses. The Court thus considers those possible arguments forfeited. In any event, those clauses are not so obviously helpful to Plaintiff's case. If a Claimant sues Hensel Phelps, the instrument requires XL to indemnify the latter Prime Contractor for "all legal expenses." Payment Bond, ¶ 1. And if a Claimant sues XL, the Bond states that "Hensel Phelps shall not be liable for the payment of any costs or expenses that may be incurred by a Claimant." Id., ¶ 5 (emphasis added). Read together, these two provisions doubly protect Hensel Phelps from attorney-fees claims (whether in a direct suit or following a case against XL). This aligns with the underlying purpose of the Suretyship to protect the Obligee. See id., ¶ 1 (noting "purpose of this Bond is, in part, to indemnify Hensel Phelps"). The conditions of the Bond do not, however, say that Claimants hold any recovery right against XL for fees. See Dickson, 736 A.2d at 1010 n.7 (rejecting liability by implication).

As Paige has not provided any illumination, the Court declines to explore any other dark recesses of suretyship law. For instance, while the Bond explicitly incorporates the Truland Subcontract — although not the Paige Sub-subcontract — that agreement has gone unmentioned

despite the Court's indicating the various contracts' "complexity" at the last hearing.  <u>See</u> Tr. at 16:6-7; <u>see also</u> Payment Bond, pmbl.  Seeing as Paige has made no effort to identify any fees provisions in the Subcontract, let alone the Payment Bond — despite spending years on this case and surely accruing substantial sums — it fails to carry its burden of establishing any contractual entitlement.

### III.     Conclusion

For these reasons, the Court will deny Plaintiff's Motion to Amend Damages, grant its Motion for Prejudgment Interest, and deny its Motion for Attorney Fees.  A separate Order so stating will issue this day.

/s/ <i>James E. Boasberg</i>
JAMES E. BOASBERG
United States District Judge

Date:  <u>July 28, 2017</u>